Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br>       Recurridos<br><br>           v.<br><br>In re:<br>Autoridad de Energía Eléctrica<br>       Agencia Proponente-Recurrida<br><br>Junta de Calidad Ambiental<br>       Peticionaria<br>_____<br><br>In re:<br>Autoridad de Energía Eléctrica<br>       Peticionaria<br><br>           v.<br><br>Junta de Calidad Ambiental<br>       Recurrida<br><br>Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br>       Recurridos | Certiorari<br><br>2012 TSPR 50<br><br>184 DPR ____ |

Número del Caso: CC-2011-718
        Cons. CC-2011-722

Fecha: 21 de marzo de 2012

Tribunal de Apelaciones:

       Región Judicial de San Juan, Panel III

Abogados de la Parte Peticionaria:

       Aldarondo & López Bras

Abogados de la Parte Recurrida:

       Lcdo. Pedro Saadé Lloréns
       Lcdo. Luis J. Torres Asencio

Materia:  Derecho  Administrativo  –  Legitimación  activa  (standing)  en procedimientos administrativos tramitados bajo la  Ley 76 - 2000

Este  documento  constituye  un  documento  oficial  del  Tribunal Supremo  que  está  sujeto  a  los  cambios  y  correcciones  del  proceso de  compilación  y  publicación  oficial  de  las  decisiones  del Tribunal.  Su  distribución  electrónica  se  hace  como  un  servicio público  a  la  comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br><br>Recurridos<br><br>v.<br><br>In re:<br>Autoridad de Energía Eléctrica<br><br>Agencia Proponente-Recurrida<br><br><br>Junta de Calidad Ambiental<br><br>Peticionaria<br>_____<br><br>In re:<br>Autoridad de Energía Eléctrica<br><br>Peticionaria<br><br>v.<br><br><br>Junta de Calidad Ambiental<br><br>Recurrida<br><br>Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br><br>Recurridos | CC-2011-718<br>CC-2011-722 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 21 de marzo de 2012.

Debemos analizar si lo resuelto en Fund. Surfrider y

otros v. A.R.Pe., 178 D.P.R. 563 (2010) debe extenderse a los procesos administrativos tramitados al amparo de la Ley Núm. 76-2000, 3 L.P.R.A. sec. 1931 y ss. Sujeto a lo anterior, debemos auscultar si un grupo de personas tienen legitimación activa para presentar un recurso de revisión judicial ante el Tribunal de Apelaciones. Evaluadas cuidadosamente las controversias, respondemos la primera interrogante en la afirmativa y la segunda en la negativa. Por los fundamentos que exponemos a continuación, revocamos el dictamen del Tribunal de Apelaciones.

I

El 19 de julio de 2010 el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, aprobó el Boletín Administrativo Núm. OE-2010-031. En él, se estableció que Puerto Rico enfrenta una crisis energética debido a que nuestra infraestructura de generación de energía eléctrica depende en un 70% de combustibles derivados del petróleo. Se indicó, además, que la dependencia de combustibles derivados del petróleo expone a Puerto Rico a los efectos de cambios inesperados y súbitos en el precio y disponibilidad del combustible.

Asimismo, se expuso en el Boletín Administrativo Núm. OE-2010-031 que la dependencia del petróleo perjudica nuestro medioambiente. Ello ocurre porque se contamina el aire y se contribuye al efecto de invernadero con todas sus consecuencias, que incluyen problemas de salud para todos los puertorriqueños. Véase, Apéndice, págs. 1-3.

En atención a todo lo anterior, el Gobernador de Puerto Rico declaró un estado de emergencia en cuanto a la infraestructura de generación de energía eléctrica de Puerto Rico y ordenó que se activaran las disposiciones de la Ley Núm. 76-2000, 3 L.P.R.A. sec. 1931 y ss., que permiten utilizar un proceso expedito en situaciones de emergencias. De esta forma, se ordenó la utilización de un proceso sumario para el desarrollo de proyectos que fomenten una nueva infraestructura de generación energética en la que se usen fuentes alternas a los combustibles derivados del petróleo.

La Junta de Calidad Ambiental (JCA), amparada en el Boletín Administrativo Núm. OE-2010-031, emitió el 12 de agosto de 2010 una Resolución sobre "Procedimiento expedito para regir el proceso de presentación, evaluación y trámite de documentos ambientales para proyectos energéticos" (R-10-26-1). Mediante ese documento, se aprobó el procedimiento expedito para regir la evaluación de las Declaraciones de Impacto Ambiental y Evaluaciones Ambientales que se presentaran ante la JCA para acciones relacionadas al desarrollo de infraestructura de generación energética que utilice fuentes alternas a los combustibles derivados del petróleo.

Así pues, el 10 de septiembre de 2010 la agencia proponente, Autoridad de Energía Eléctrica (AEE), presentó ante la JCA un Borrador de la Declaración de Impacto Ambiental Preliminar (DIA-P) para la evaluación del proyecto conocido como Vía Verde. En específico, el

proyecto consiste en construir una línea de transferencia de gas natural, que de completarse, discurriría desde la central Eco Eléctrica en Peñuelas, hasta las centrales generatrices de Cambalache en Arecibo, Palo Seco en Toa Baja y San Juan *Steam Plant* en San Juan. De igual forma, la AEE solicitó a la JCA la celebración de vistas públicas sobre la DIA-P y que, además, concediera la extensión del término de cinco a treinta días para el recibo de comentarios. Mediante la Resolución R-10-30-1, la JCA declaró con lugar la solicitud de vistas públicas y la extensión del término para recibir comentarios.

El 16 de octubre de 2010 se celebraron una serie de vistas públicas investigativas ante la JCA en los pueblos de Barceloneta, Bayamón y Adjuntas. Comparecieron alrededor de 122 personas naturales y jurídicas representativas de diversos sectores de la sociedad. El 21 de octubre de 2010 el Panel Examinador que dirigió los procedimientos de las vistas públicas presentó su informe ante la JCA.

El 23 de octubre de 2010 la JCA aprobó el informe y lo remitió a la AEE con instrucciones de que atendiera los comentarios y recomendaciones de la JCA, de la comunidad y de entidades gubernamentales. Además, exigió a la AEE que indicara las modificaciones a la acción propuesta que se determinaren necesarias, si alguna, y finalmente, que presentara la DIA-P con las enmiendas necesarias.

Ante ese cuadro fáctico, el 15 de noviembre de 2010 la AEE presentó la DIA-P ante la JCA. El 24 de noviembre de 2010 la JCA, luego de evaluar ese documento en conjunto con

las recomendaciones del Sub-Comité Interagencial de Cumplimiento Ambiental por Vía Acelerada (Sub-Comité), emitió la Resolución R-10-44-1, en la que requirió a la AEE la preparación de una Declaración de Impacto Ambiental Final (DIA-F). La AEE presentó la DIA-F el 29 de noviembre de 2010. El Sub-Comité evaluó el documento y remitió sus recomendaciones ante la JCA.

Posteriormente, la JCA aprobó el informe del Sub-Comité y sus recomendaciones. Asimismo, determinó que la DIA-F que presentó la AEE cumplió con todos los requisitos de la Ley Núm. 416-2004, conocida como la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 8001 y ss., porque se consideró y analizó adecuadamente el impacto ambiental que conllevaba la acción propuesta.

En desacuerdo con el dictamen que emitió la JCA, se presentaron ante el Tribunal de Apelaciones tres recursos de revisión judicial: (1) KLRA20101238, que presentaron Justo Lozada y otros; (2) KLRA20101246, que presentaron Juan Cortés Lugo y otros y (3) KLRA20101248 que presentó la Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER). Ante ese escenario, la AEE y la JCA solicitaron la desestimación de los tres recursos. Fundamentaron su petitorio en que ninguno de los recurrentes poseía legitimación activa para solicitar la revisión judicial, conforme estableció este Tribunal en Fund. Surfrider y otros v. A.R.Pe., supra.

El foro apelativo intermedio consolidó los tres recursos por tratarse de la misma controversia. De igual

forma, luego de escuchar la posición de todas las partes, emitió una sentencia en la que desestimó los tres recursos de apelación por falta de jurisdicción. Cimentó su proceder en que ninguno de los recurrentes poseía legitimación activa para entablar una solicitud de revisión judicial ante ese foro.

En desacuerdo, Juan Cortés Lugo y otros y la UTIER solicitaron reconsideración al Tribunal de Apelaciones. La AEE y la JCA se opusieron. Sostuvieron que la desestimación de los recursos era el curso de acción correcto porque no se demostró que existiera legitimación activa. El 17 de junio de 2011 el Tribunal de Apelaciones ordenó a la AEE y a la JCA que mostraran su posición sobre los méritos de los recursos de revisión presentados.

Inconforme, el 21 de junio de 2011 la AEE presentó una solicitud de reconsideración en la que insistió que se denegaran las solicitudes de reconsideración presentadas por la UTIER y Juan Cortés Lugo y otros. Por su parte, la JCA presentó el 13 de julio de 2011 una "Moción en solicitud de remedio". Reclamó al Tribunal de Apelaciones que procedía resolver primero la solicitud de reconsideración que presentó la AEE, antes de ordenar cualquier otra providencia en el caso.

Luego de varios trámites, el 18 de agosto de 2011 el Tribunal de Apelaciones modificó su sentencia, para reconocerle legitimación activa a Juan Cortés Lugo y otros. En cuanto a la legitimación activa de la UTIER y Justo Lozada y otros, el foro apelativo intermedio sostuvo su

decisión original de desestimación por carecer de jurisdicción sobre ellos. De igual modo, el Tribunal de Apelaciones dejó sin efecto sus Resoluciones de 17 de junio de 2011 y 15 de agosto de 2011, y concedió a la AEE y a la JCA treinta días para que se expresaran sobre los méritos del recurso. La Juez, Hon. Laura Ortiz Flores, no reconsideraría su decisión, y en consecuencia, no le reconocería legitimación activa a Juan Cortés Lugo y otros.

Subsiguientemente, la AEE presentó una "Moción Informativa Urgente en torno a orden de 18 de agosto de 2011, en la que se reconoce legitimación en el caso de los recurrentes Juan Cortés Lugo et al., KLRA2010-01246". En ella, argumentó que aunque las alegaciones de Juan Cortés Lugo y otros no configuraban la existencia de legitimación activa, procedía desestimar el pleito por otro fundamento adicional. En particular, alegó que se configuraba la doctrina de cosa juzgada en su modalidad de impedimento colateral por sentencia. Asentó su contención en que el mismo Panel del Tribunal de Apelaciones (Hon. Morales Rodríguez, Hon. Ortiz Flores y Hon. Surén Fuentes), emitió una sentencia en otro caso (KLAN-20101851) en la que determinó que Juan Cortés Lugo y otros no tenían legitimación activa para instar una acción interdictal y de sentencia declaratoria en contra del Proyecto Vía Verde. Ante ese escenario, Juan Cortés Lugo y otros solicitaron una prórroga de veinte días para oponerse a la moción informativa urgente que presentó la AEE.

Sin embargo, en vista de que transcurría el término para acudir de la resolución de 18 de agosto de 2011, la JCA y la AEE presentaron por separado dos recursos de *certiorari* ante este Tribunal. En ellos, aducen en esencia que Juan Cortés Lugo y otros no cuentan con legitimación activa para solicitar la revisión judicial de la decisión de la JCA que aprobó la DIA-F para el proyecto Vía Verde.

Junto con los recursos, la AEE y la JCA presentaron por separado dos solicitudes de auxilio de jurisdicción con el propósito de que se paralizaran los procedimientos en el foro apelativo intermedio. Mediante Resolución de 9 de septiembre de 2011, declaramos con lugar esas mociones. Además, consolidamos los recursos presentados por tratarse de la misma materia. Por último, le concedimos un término de 15 días a Juan Cortés Lugo y otros para que replicaran a los recursos que presentaron la AEE y la JCA. Así lo hicieron.

Por otro lado, el 17 de noviembre de 2011 Juan Cortés Lugo y otros presentaron una moción en la que solicitaron la desestimación del recurso CC-2011-722, que presentó la AEE. Fundamentaron su petitorio en que la notificación de la presentación del recurso se hizo vía correo electrónico, método no contemplado a su entender en la Regla 39 de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A. Cónsono con lo anterior, adujeron que no se perfeccionó la notificación del recurso, por lo que este Tribunal no contaba con jurisdicción para atenderlo.

El 23 de noviembre de 2011 la AEE se opuso a la solicitud de desestimación. En esencia, adujo que se podía utilizar el correo electrónico como método adecuado de notificación. Cimentó su contención en que la actual Regla 67.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, contempla ese método y que no hay razón para que este no se acepte.

Posteriormente, Juan Cortés Lugo y otros, presentaron una moción de desestimación de los casos que nos ocupan. Sustentan su reclamo en que el pleito se tornó académico porque alegadamente el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, y el Presidente de la Junta de Directores de la Autoridad de Energía Eléctrica modificaron la política pública en torno al Proyecto Vía Verde que subyace este caso. En la alternativa, Juan Cortés y otros aducen que procede dejar "en suspenso la resolución del caso hasta que se produzcan las decisiones definitorias que los funcionarios del ejecutivo han anunciado". Moción de desestimación, pág. 2.

Como el recurso está perfeccionado, procedemos a resolver.

II

A

En primera instancia, nos corresponde resolver el planteamiento jurisdiccional que esbozaron Juan Cortés Lugo y otros en torno a la notificación de la presentación del certiorari por correo electrónico. Es principio reiterado que "[l]a jurisdicción es el poder o autoridad de un

tribunal para considerar y decidir casos y controversias". S.L.G. Solá-Moreno v. Bengoa Becerra, Op. de 11 de agosto de 2011, 2011 T.S.P.R. 119, 2011 J.T.S. 124, 182 D.P.R. __, (2011), citando a Asoc. Punta las Marías v. A.R.Pe., 170 D.P.R. 253, 263 n.3 (2007).

Ante una situación en la que un tribunal no tiene la autoridad para atender un recurso, solo tiene jurisdicción para así declararlo y proceder a desestimar el caso. Carattini v. Collazo Syst. Analysis, Inc., 158 D.P.R. 345, 355 (2003). Dicho de otro modo, la falta de jurisdicción

> trae consigo las consecuencias siguientes: (1) no es susceptible de ser subsanada; (2) las partes no pueden voluntariamente conferírsela a un tribunal como tampoco puede éste abrogársela; (3) conlleva la nulidad de los dictámenes emitidos; (4) impone a los tribunales el ineludible deber de auscultar su propia jurisdicción; (5) impone a los tribunales apelativos el deber de examinar la jurisdicción del foro de donde procede el recurso, y (6) puede presentarse en cualquier etapa del procedimiento, a instancia de las partes o por el tribunal motu proprio.
>
> González v. Mayagüez Resort & Casino, 176 D.P.R. 848, 855, (2009), citando a Pagán v. Alcalde Mun. de Cataño, 143 D.P.R. 314, 326 (1997).

La Regla 39 de nuestro Reglamento, supra, establece en lo pertinente:

> La notificación se efectuará por correo certificado con acuse de recibo o mediante un servicio similar de entrega personal con acuse de recibo. La notificación a las partes se hará dentro del término jurisdiccional o de cumplimiento estricto, según fuere el caso, para presentar el recurso. Cuando se efectúe por correo, se remitirá la notificación a los(as) abogado(as) de las partes o a las partes, cuando no estuvieren representadas por abogado(a), a la dirección postal que surja del último escrito que conste en el expediente del caso. Cuando del expediente no surja una dirección, de estar la

parte representada por abogado(a), la notificación se hará a la dirección que de éste(a) surja del registro que a esos efectos lleve el (la) Secretario(a) del Tribunal Supremo. La fecha del depósito en el correo se considerará como la fecha de la notificación a las partes. La entrega personal deberá hacerse en la oficina de los(as) abogados(as) que representen a las partes y las notificaciones deberán entregarse a éstos(as) o a cualquier persona a cargo de la oficina. De no estar la parte representada por abogado (a) la entrega se hará en el domicilio o dirección de la parte o partes según ésta surja de los autos, a cualquier persona mayor de edad responsable que se encuentre en la misma. En los casos de entrega personal se certificarán la forma y las circunstancias de tal diligenciamiento, lo que se hará dentro de las próximas setenta y dos (72) horas desde que se efectuó la entrega. El término aquí dispuesto será de cumplimiento estricto.

En circunstancias no previstas por esta Regla, el Tribunal, motu proprio o a solicitud de parte, dispondrá el método de notificación que mejor se ajuste a las circunstancias particulares del caso.

De igual manera, el Comentario que acompaña a la Regla 39, _supra_, indica en lo que nos ocupa:

Acogemos un método de notificación a las partes, similar al establecido en la Regla 67 de Procedimiento Civil. Lo mismo hemos hecho en el Reglamento del Tribunal de Circuito de Apelaciones, Véanse las Reglas 13, 23, 33 y 58 de ese Reglamento. Esta forma de notificación se refiere a los recursos de apelación, certiorari, certificación y recursos gubernativos en los casos pertinentes presentados. También se refiere a los recursos de mandamus dirigidos contra un juez, en relación con un caso que está pendiente ante su consideración.

Cónsono con lo anterior, la Regla 67.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, contempla la posibilidad de que se notifique vía correo electrónico. En específico, la Regla establece:

Siempre que una parte haya comparecido representada por abogado o abogada, la

notificación será efectuada al abogado o abogada, a menos que el tribunal ordene que la notificación se efectúe a la parte misma. **La notificación al abogado o abogada o a la parte se efectuará entregándole copia o remitiéndola por correo, fax o medio electrónico a la última dirección que se haya consignado en el expediente por la parte que se auto representa o a la dirección del abogado o abogada que surge del registro del Tribunal Supremo para recibir notificaciones, en cumplimiento con la Regla 9 de este apéndice.** Si la dirección se desconoce, se notificará de ello al tribunal con copia del escrito de que se trate.

Entregar una copia conforme a esta regla significa ponerla en manos del abogado o abogada o de la parte, o dejarla en su oficina en poder de su secretario(a) o de otra persona a cargo de ésta. De no haber alguien encargado de la oficina, puede dejarla en algún sitio conspicuo de la misma, o si la oficina está cerrada o la persona a ser notificada no tiene oficina, dejándola en su domicilio o residencia habitual en poder de alguna persona que no sea menor de 18 años que resida allí. **La notificación por correo quedará perfeccionada al ser depositada en el correo o al ser enviada vía fax o por correo electrónico.**

**(Énfasis nuestro.)**

Por su parte, la Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, indica que ese cuerpo de reglas "regirán todos los procedimientos de naturaleza civil **ante el Tribunal General de Justicia**". (Énfasis nuestro.) A su vez, la Regla 52.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, dispone en lo que nos ocupa:

Todo procedimiento de apelación, <u>certiorari</u>, certificación, y cualquier otro procedimiento para revisar sentencias y resoluciones **se tramitará de acuerdo con la ley aplicable, estas reglas y las reglas que adopte el Tribunal Supremo de Puerto Rico.**

(Énfasis suplido.)

Como se aprecia, nuestro Reglamento no establece expresamente la notificación de la presentación de los recursos por vía electrónica. En cambio, la Regla 67.2, supra, lo permite. Ante este escenario, nos parece que cobra vigencia el Art. 18 del Código Civil, 31 L.P.R.A. sec. 18, que indica que "[l]as leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro".

Así, un análisis integrado de las Reglas de Procedimiento Civil demuestra que se puede notificar la presentación de un recurso ante este Foro por correo electrónico. En primer lugar, la Regla 1 de Procedimiento Civil, supra, delimita el alcance de ese cuerpo de reglas al Tribunal General de Justicia, lo que implica que este Tribunal está incluido. Además, la Regla 52.1, supra, establece que los procesos de presentación de apelación, certiorari y otros se tramitan de acuerdo con: (a) la ley aplicable, (b) las reglas de procedimiento civil y (c) los reglamentos que establezca este Foro. Esto implica que las normas que contiene cada cuerpo de normas no son excluyentes, sino que se complementan y que la Regla 67.2, supra, que permite la notificación por correo electrónico, aplica a los procesos ante este Tribunal.

Por consiguiente, no es correcta la contención de Juan Cortés Lugo y otros. La notificación de la presentación de los recursos ante este Tribunal se puede hacer vía correo

certificado o método similar, mediante entrega personal, según es definida en la Regla 39, supra, y por correo electrónico.

B

Mencionamos recientemente en Asoc. Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920, 933 (2011), que "un caso se convierte en académico cuando con el paso del tiempo su condición de controversia viva y presente se ha perdido". Como es conocido, un pleito resulta académico si "se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe". San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640, 652 (2008). Véanse, además, Moreno v. Pres. U.P.R. II, 178 D.P.R. 969, 973 (2010); Lozado Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 908 (2010).

Y es que no puede ser de otra forma. Los tribunales solo debemos intervenir en "controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica". E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958).

En el caso que nos ocupa, Juan Cortés Lugo y otros nos invitan a que desestimemos los recursos de epígrafe a base de unos hechos futuros e inciertos. Dicho de otro modo, los recurridos pretenden que desestimemos el recurso porque se han publicado noticias en los rotativos de la Isla que denotan que la Rama Ejecutiva ausculta alternativas

alternas al gasoducto. Véase los anejos que acompañan la moción de desestimación.

Un análisis de los hechos de los recursos de epígrafe a la luz de la doctrina de academicidad, nos lleva a concluir que los casos no se han convertido en académicos. Es decir, no podemos declarar académico un caso por un hecho futuro e incierto del cual no podemos tomar conocimiento judicial. Véase, U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 276 (2010).

En cuanto al remedio alternativo que solicitan Juan Cortés Lugo y otros a los efectos de que dejemos la resolución de los casos en suspenso, basta indicar que no hay razón para ello. Los recursos no son académicos y consecuentemente, existe una controversia viva y latente que requiere nuestra atención.

Así las cosas, no tienen mérito las solicitudes de desestimación que presentaron Juan Cortés Lugo y otros. Luego de dilucidar el aspecto jurisdiccional, pasamos a resolver los méritos de los recursos consolidados.

III

A

En virtud de la Ley Núm. 76-2000, 3 L.P.R.A. Sec. 1931 y ss., la Asamblea Legislativa de Puerto Rico incorporó a nuestro ordenamiento jurídico una legislación que permite preterir el cauce administrativo ordinario en situaciones de emergencia. Al auscultar la Exposición de Motivos de esa ley, notamos que la intención del legislador fue dotar al poder ejecutivo de "mayor eficiencia y efectividad en la

solución de problemas y necesidades relacionadas [a una] emergencia". Exposición de Motivos, Ley Núm. 76, supra.

El Art. 1 de la Ley Núm. 76, 3 L.P.R.A. sec. 1931, expresa qué constituye una emergencia:

> (a) "Emergencia" – es cualquier grave anormalidad como huracán, maremoto, terremoto, erupción volcánica, sequía, incendio, explosión o cualquier otra clase de catástrofe o cualquier grave perturbación del orden público o un ataque por fuerzas enemigas a través de sabotaje o mediante el uso de bombas, artillería o explosivos de cualquier género o por medios atómicos, radiológicos, químicos o bacteriológicos o por cualesquiera otros medios que use el enemigo, en cualquier parte del territorio del Estado Libre Asociado de Puerto Rico, que amerite se movilicen y se utilicen recursos humanos y económicos extraordinarios para remediar, evitar, prevenir o disminuir la severidad o magnitud de los daños causados o que puedan causarse. De igual manera, el término emergencia comprende cualquier evento o graves problemas de deterioro en la infraestructura física de prestación de servicios esenciales al pueblo o, que ponga en riesgo la vida, la salud pública o seguridad de la población o de un ecosistema sensitivo.

Ahora bien, para que se configure una emergencia es necesario que el Gobernador de Puerto Rico así lo disponga mediante orden ejecutiva al efecto. Además, la emergencia tiene que estar vislumbrada dentro de la definición que el legislador estableció en el Art. 1 de la Ley Núm. 76, supra.

Por otro lado, el Art. 2 de la Ley Núm. 76, 3 L.P.R.A. sec. 1932, establece que durante el periodo de tiempo que dure la emergencia, se dispensará del cumplimiento con los términos y procedimientos ordinarios a las agencias

gubernamentales con injerencia en la tramitación de permisos, endosos, consultas o certificaciones.

Así, los Arts. 3 y 8 de la Ley Núm. 76, 3 L.P.R.A. secs. 1933 y 1938, instrumentalizan parte del trámite expedito al acortar el término de recibo de comentarios a 5 días y limitar la notificación a las partes interesadas en un solo aviso en dos diarios de circulación general. Contrástese con las Secs. 2.1 y 2.2 de la L.P.A.U., 3 L.P.R.A. secs. 2121-2122.

Sin embargo, aunque los procedimientos al amparo de la Ley Núm. 76, supra, son más flexibles, no están exentos de revisión judicial. De esta forma, el Art. 13 de esa ley, 3 L.P.R.A. sec. 1943, indica:

> La **parte adversamente afectada** por cualquier resolución u orden emitida por alguna agencia tendrá como único remedio presentar una solicitud de revisión ante el [Tribunal de Apelaciones]. Cualquier solicitud de revisión judicial de la agencia administrativa concernida deberá presentarse ante dicho Tribunal, dentro del término jurisdiccional de veinte (20) días naturales, contados a partir de la fecha en que se archive en autos copia de la notificación de la resolución u orden final de la agencia. La parte recurrente notificará la presentación de la solicitud de revisión a la agencia recurrida y a todas las partes interesadas dentro del término establecido; disponiéndose, que el cumplimiento con dicha notificación será de carácter jurisdiccional.
>
> (Énfasis suplido.)

Este inciso deja meridianamente claro que los procedimientos tramitados al palio de la Ley Núm. 76, supra, son revisables por el foro apelativo intermedio. No obstante, el término para recurrir a ese tribunal para

cuestionar una decisión administrativa es de 20 días, a diferencia de los 30 días que concede la Sec. 4.2 de la Ley Núm. 170 de 12 de agosto de 1988, conocida como Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. sec. 2172. Es preciso hacer constar que aparte de la diferencia en el término, el contenido de ambas disposiciones de ley son muy similares. Ambas hacen referencia a la parte adversamente afectada por la decisión administrativa. Por esa razón, nuestra normativa jurisprudencial en torno a la legitimación activa necesaria para acudir en revisión judicial de una decisión administrativa es aplicable a los procesos seguidos al amparo de la Ley Núm. 76, supra. Resolver de otra forma sería burlar el principio de justiciabilidad que ha permeado por décadas nuestro ordenamiento jurídico. Asoc. Fotoperiodistas v. Rivera Schatz 180 D.P.R. 920 (2011); Moreno v. Pres. U.P.R. II, 178 D.P.R. 969 (2010); Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893 (2010); E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Dicho de otro modo, sería abrir la puerta para que el Tribunal de Apelaciones emita opiniones consultivas sin que exista una controversia viva y latente.

Consecuentemente, procede auscultar si Juan Cortés Lugo y otros tenían legitimación activa para presentar el recurso de revisión judicial ante el Tribunal de Apelaciones.

B

Frecuentemente hemos expresado el principio axiomático de nuestro ordenamiento legal que predica que los tribunales solo podemos resolver aquellos casos que sean justiciables. Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 931. "Una controversia abstracta, ausente un perjuicio o amenaza real y vigente a los derechos de la parte que los reclama, no presenta el caso y controversia que la Constitución exige para que los tribunales puedan intervenir". Moreno v. Pres. U.P.R. II, supra, pág. 973. Véanse, además, Lewis v. Continental Bank Corp., 494 U.S. 472 (1990); Lozada Tirado et al. v. Testigos Jehová, supra.

De esta forma, "los propios tribunales deben preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional". Smyth, Puig v. Oriental Bank, 170 D.P.R. 73, 76 (2007). Véase, además, E.L.A. v. Aguayo, supra.

Ahora bien, este principio de justiciabilidad responde al rol asignado a la Rama Judicial en una distribución tripartita de poderes, esquematizada para asegurar que no actuará en áreas sometidas al criterio de las otras ramas del gobierno. Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 720 (1980).

Por su pertinencia, citamos de nuestra Opinión reciente en Fund. Surfrider y otros v. A.R.Pe., supra, pág. 572 en la que discutimos abundantemente el tema que nos ocupa:

> Una de las doctrinas de autolimitación derivadas del principio de "caso o controversia" es la legitimación de la parte que acude ante el foro judicial. En el ámbito del derecho administrativo, cuando un litigante solicita la revisión judicial sobre la constitucionalidad de una acción o decisión administrativa a través de un pleito civil, éste tiene que demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejercita y el daño alegado; y (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley.

(Citas omitidas.)

Se deduce de lo anterior que toda persona que interese presentar un recurso de revisión judicial ante el Tribunal de Apelaciones, tiene que cumplir con el requisito de legitimación antes esbozado. Fund. Surfrider y otros v. A.R.Pe., íd., págs. 574-575. Véase, además, D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogota, Ed. Forum, 2001, pág. 500.

Hemos expresado que una asociación "tiene legitimación para solicitar la intervención judicial por los daños sufridos por la agrupación y para vindicar los derechos de la entidad". Fund. Surfrider y otros v. A.R.Pe., supra, pág. 572. Por otro lado, cuando una asociación acude al foro judicial a vindicar los derechos de al menos uno de sus miembros es necesario probar que: "(1) el miembro tiene legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual

[de cada miembro]". Íd., pág. 573. Véase, además, Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989).

De esta forma, al interpretar la Sec. 4.2 de la L.P.A.U., supra, señalamos en Fund. Surfrider y otros v. A.R.Pe., supra, págs. 575-576, que para que un "litigante pueda presentar el recurso de revisión judicial tiene que satisfacer dos requisitos: (1) ser parte y (2) estar 'adversamente afectado' por la decisión administrativa. Además, deberá agotar los remedios administrativos y recurrir dentro del término provisto".

En el caso que nos ocupa, ni la AEE ni la JCA cuestionan si Juan Cortés Lugo y otros son partes para fines del proceso administrativo. Por el contrario, su argumentación va dirigida a establecer que los recurridos no fueron adversamente afectados por la aprobación de la DIA-F. Por tal razón, nos concentramos en ese aspecto.

En Fund. Surfrider y otros v. A.R.Pe., íd., pág. 579, concluimos luego de un análisis minucioso que "la frase 'adversamente afectada' significa que la parte recurrente [en el Tribunal de Apelaciones] tiene un interés sustancial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administrativa que se impugna mediante recurso de revisión judicial".

Añadimos que el daño que tiene que sufrir la persona que interese acudir en revisión judicial tiene que "ser claro, específico y no puede ser abstracto, hipotético o especulativo". Íd. De esta forma, aunque "reconocimos que

la lesión se puede basar en consideraciones ambientales, recreativas, espirituales o estéticas", señalamos que "la puerta no está abierta de par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de política pública". Íd., pág. 573, citando a Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723-724 (1974).

En Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 924 (1998) indicamos que

> el proceso de preparar y aprobar una declaración de impacto ambiental es, en esencia, sólo un instrumento para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el medio ambiente. En situaciones como la de autos, dicha declaración es sólo un instrumento de planificación, la primera etapa de un largo camino de autorizaciones oficiales en el desarrollo de un proyecto.

Dicho de otro modo, la aprobación de la DIA-F por parte de la JCA no es un permiso ni una licencia, sino que es un instrumento de planificación. En él, la JCA tiene que asegurarse de que el proponente analizó el impacto ambiental del proyecto propuesto. Art. 4 de la Ley Núm. 416, 12 L.P.R.A. sec. 8001. Es decir, la JCA no aprueba ni desaprueba el proyecto en cuestión; solo ausculta si el proponente tomó en consideración la conservación del ambiente.

Mencionamos también que "cualquier ciudadano o grupo de ciudadanos **afectados** por la falta de implantación de la

Ley 9 [actual Ley Núm. 416] puede presentar las acciones judiciales que procedan para asegurarse que se logren los fines de protección ambiental...". Misión Ind. P.R. v. J.C.A., supra, pág. 927. (Énfasis suplido.) Esto es cónsono con la doctrina de legitimación activa.

Ahora bien, resulta ineludible diferenciar la aprobación por parte de la JCA de una DIA-F, de la aprobación de construcción del proyecto en sí. Es decir, "superada la etapa de la aprobación de la declaración de impacto ambiental, la construcción y el inicio de operaciones del proyecto propuesto no pueden llevarse a cabo sin que se aprueben una *serie de permisos* que también están dirigidos a asegurar la protección ambiental". Íd., págs. 925-926. (Énfasis en el original.)

Así pues, la aprobación de la DIA-F es un paso inicial dentro del proceso de tramitación de permisos que no puede confundirse con la autorización gubernamental que permite el comienzo de las obras de construcción.

La legitimación se evaluará con referencia a "la acción administrativa que se impugna mediante recurso de revisión judicial". Fund. Surfrider y otros v. A.R.Pe., supra, pág. 579. Por ello, la parte que solicita la revisión judicial de la decisión final de la JCA en el proceso de aprobación de una declaración final de impacto ambiental (DIA-F) tiene que demostrar que esa actuación le causó o le causará "una lesión o daño particular". Íd.

Claro está, ese daño tiene ser causado por la decisión administrativa de la cual se recurre. Nótese que en este

caso no se está cuestionando "la concesión de los permisos para la construcción y el inicio de operaciones del proyecto propuesto...". Misión Ind. P.R. v. J.C.A., supra, pág. 926. La acción administrativa que se cuestiona es la aprobación de una DIA-F, en la que la AEE tuvo la obligación de considerar y detallar por escrito las consecuencias ambientales significativas vinculadas a su propuesta. Este es un asunto diferente a los permisos para la construcción y operación del proyecto Vía Verde. Evaluaremos la legitimación activa de los reclamantes con esa distinción en mente.

IV

El Tribunal de Apelaciones concluyó en reconsideración que Juan Cortés Lugo y otros tenían legitimación para presentar el recurso de revisión judicial porque demostraron "con datos suficientes, el grado de afección necesario para solicitar la revisión judicial". Apéndice del recurso, pág. 2. No obstante, luego de analizar las alegaciones de los recurridos, es necesario concluir que estos no demostraron legitimación activa para presentar el recurso de revisión judicial que nos ocupa.

Los recurridos Juan Cortés Lugo, Sofía Colón Matos, Luis Guzmán Meléndez, Ana Oquendo Andújar, y Gustavo Casalduc Torres, adujeron que son dueños de fincas por donde podría pasar el Proyecto Vía Verde. Además, señalan que discurren por sus terrenos cuerpos de agua que se podrían ver perjudicados, aunque no especifican de qué manera. Sin embargo, concretamente no enumeraron qué daño

les causó la aprobación de la DIA-F. Por el contrario, utilizaron contenciones especulativas para concluir que la aprobación de la DIA-F les afecta. Con rigor analítico es menester concluir que los recurridos Cortés Lugo, Colón Matos, Guzmán Meléndez, Oquendo Andújar y Casalduc Torres no demostraron poseer legitimación activa en este caso.

De igual forma, otro grupo de los recurridos[1] alegan en síntesis que el proyecto Vía Verde pasaría muy cerca de sus residencias, ubicadas en diferentes municipios de la Isla. No obstante, estos recurridos no detallan de forma específica y clara en qué consisten los daños en particular. Más allá de invocar un "temor por su seguridad", no presentan hechos concretos que demuestren

---

[1] En específico, el Sr. Iván Vélez González, la Sra. Francisca Montero Colón, la Sra. Sol María de los Ángeles Rodríguez Torres, el Sr. Iván Carlos Vélez Montero, el Sr. Arístides Rodríguez Rivera, la Sra. Ada Rodríguez Rodríguez, el Sr. Alex Noel Natal Santiago, la Sra. Miriam Negrón Pérez, el Sr. Francisco Ruiz Nieves, la Sra. Silvia Jordán Molero, la Sra. Ana Serrano Maldonado, el Sr. Félix Rivera González, el Sr. William Morales Martínez, la Sra. Trinita Alfonso Vda. De Folch, el Sr. Alejandro Saldaña Rivera, la Sra. Dixie Vélez Vélez, la Sra. Dylia Santiago Callazo, el Sr. Ernesto Forestier Torres, la Sra. Miriam Morales González, la Sucesión de Ada Torres compuesta por Carmen Juarbe Pérez, Margarita Forestier Torres y Ernesto Forestier Torres, el Sr. Fernando Vélez Vélez, la Sra. Emma González Rodríguez, el Sr. Samuel Sánchez Santiago, la Sra. Raquel Ortiz González, la Sra. Maritza Rivera Cruz, el Sr. Virginio Heredia Serrano, la Sra. Lillian Serrano Maldonado, el Sr. Yamil Heredia Serrano en representación propia y de su hijo menor Jean Paul Heredia Marrero, el Sr. Pablo Montalvo Bello, la Sra. Ramona Ramos Días, el Sr. Virgilio Cruz Cruz, la Sra. Cándida Cruz Cruz, la Sra. Amparo Cruz Cruz, el Sr. Gilberto Padua Rullán, la Sra. Sabrina Padua Rullán, la Sra. Maribel Torres Carrión, el Sr. Hernán Padín Jiménez, la Sra. Rosa Serrano González, el Sr. Jesús García Oyola, la Sra. María Cruz Rivera, el Sr. Cristóbal Orama Barreiro, la Sra. Haydee Irizarry Medina, la Sra. Elizabeth Nazario Rodríguez, la Sra. Lydia Muñoz Mercado y la señora Samira Yassin Hernández.

daños por la aprobación de la DIA-F, por lo que estos tampoco demostraron legitimación activa. Apéndice del recurso, pág. 34.

Por otro lado, el Comité Bo. Portugués en Contra del Gasoducto (Cómite Bo. Portugués) y sus portavoces Sr. Carlos Cabán Cañedo, Sr. Luis Rodríguez Cruz, Sr. Jorge Rivera Rodríguez, señalaron que el despliegue de funcionarios en su comunidad y el sobrevuelo de helicópteros han causado temor, ansiedad y falta de descanso necesario entre los residentes. Apéndice, pág. 29. Además, indicaron que había varios cuerpos de agua importantes que discurrían por el barrio Portugués. No obstante, el Comité Bo. Portugués no pudo cumplir con la normativa jurisprudencial relativa a la legitimación activa para poder acudir al Tribunal Apelativo.

En primer lugar, el Comité Bo. Portugués no hace mención en su escrito de daños que se le causan como asociación, por la aprobación de la DIA-F. En ese aspecto, el Comité Bo. Portugués no tiene legitimación activa. En segundo lugar, el Comité Bo. Portugués tampoco indica quiénes son sus miembros. Solo nos informa que se dedica "a actividades educativas y de denuncia del proyecto Gasoducto", y acto seguido hace una lista de sus portavoces. Apéndice, págs. 28-29. Con ese trasfondo, el Comité Bo. Portugués no nos coloca en posición de ejercer nuestra función revisora y auscultar si alguno de sus miembros tiene legitimación activa, requisito elemental y necesario para que en esta situación el Comité la tenga. A

base de todo lo anterior, es ineludible concluir que el Comité Bo. Portugués y sus portavoces no demostraron tener legitimación activa en este caso.

De otro lado, el Comité Utuadeño en Contra del Gasoducto (Comité Utuadeño), se dedica, al igual que el Comité Bo. Portugués, "a actividades educativas y de denuncia del proyecto del Gasoducto". Apéndice, pág. 34. Aduce en su recurso que la construcción y operación del proyecto Vía Verde va a afectar los objetivos de sus miembros, aunque no hace mención específica de ningún tipo de daño. Tampoco relaciona su impugnación con la DIA-F, que es la acción administrativa que impugna aquí. Asimismo, el Comité Utuadeño no nos informa quiénes son sus miembros, lo que nos imposibilita la tarea de adjudicar los méritos de su reclamo. Ante ese escenario, es preciso concluir que el Comité Utuadeño no demostró tener legitimación activa en el caso que nos ocupa.

Finalmente, el último recurrido es el Sr. Miguel Báez Soto. Este aduce que tiene legitimación porque transita a diario por un tramo de la ruta propuesta para el proyecto Vía Verde. Es incorrecta su contención. El mero hecho de que el señor Báez Soto transite por un tramo (aunque no especificó cuál) cerca del proyecto Vía Verde no le confiere legitimación activa en este caso. Al igual que los casos anteriores, no demostró ningún daño concreto, específico, no hipotético, producto de la aprobación de la DIA-F. Su alegación es más escueta que la del vecino a quien no le reconocimos legitimación activa en Fund.

Surfrider y otros v. A.R.Pe., supra. Por consiguiente, el señor Báez Soto tampoco demostró ostentar legitimación activa.

Como se aprecia, en el caso que nos ocupa no se exponen alegaciones ni reclamos de daños reales, concretos y palpables. Ninguno de los daños aducidos por Juan Cortés Lugo y otros son producto de una controversia real o una situación específica. Por el contrario, los daños alegados se presentan en el abstracto, mediante controversias hipotéticas. No identifican qué daño les causa la aprobación de la DIA-F.

En conclusión, como Juan Cortés Lugo y los demás recurrentes no tienen legitimación activa, el foro apelativo intermedio no cuenta con jurisdicción para atender en los méritos la revisión judicial que se le presentó. Debió sostener su decisión inicial de desestimar el recurso.

V

A modo de epílogo, conviene contrastar las diferentes opiniones que se emiten en el día de hoy. En ellas, se aprecian, de forma palmaria, visiones encontradas sobre cuál debe ser el rol de la Rama Judicial al momento de adjudicar controversias dentro de nuestro sistema constitucional de gobierno. Al fin y al cabo, en el seno de este Tribunal subyace un dilema filosófico que por siglos ha cautivado a la humanidad: el rol del juez al momento de resolver controversias. Véase, K. Yoshino, On Empathy in Judgment, 57 Clev. St. L. Rev. 683 (2009).

Normalmente, cuando alguna persona no simpatiza con la decisión de un tribunal, la cataloga como un ejercicio de activismo o auto restricción judicial, según sea el caso. K. Kmiec, The Origin and Current Meanings of Judicial Activism, 92 Cal. L. Rev. 1441 (2004). Sin embargo, la tarea de categorizar una decisión judicial como activista o restrictiva no es siempre sencilla. C. Roberts, In Search of Judicial Activism: Dangers in Quantifying the Qualitative, 74 Tenn. L. Rev. 567 (2007). Véase, además, F. Cross and S. Lindquist, The Scientific Study of Judicial Activism, 91 Minn. L. Rev. 1752 (2006).

Eruditos del tema definen como activismo judicial la situación en que un tribunal adquiere jurisdicción impropiamente sobre un caso, en violación a los principios de separación de poderes, debido a que la Constitución le otorga esa autoridad a otra rama de gobierno. C. Roberts, op. cit., pág. 581. Incluso, algunos describen ese método como una falla de los tribunales en adherirse a los límites jurisdiccionales en su propio poder o como una relajación inapropiada de los requisitos de justiciabilidad. Íd., citando a W. Marshall, Conservatives and the Seven Sins of Judicial Activism, 73 U. Colo. L. Rev. 1217, 1220 (2002); S. Harwood, Judicial Activism: A Restrained Defense, págs. 19-20 (1992).

Por el contrario, los que favorecen la autorestricción judicial entienden que los tribunales siempre deben hacer un ejercicio analítico para definir los límites de su rol constitucional en la adjudicación de controversias. A.

Kavahagh, Judicial Restraint in the Pursuit of Justice, 60 Univ. of Toronto L. J. 23, 26 (2010). Dicho de otro modo, los que se enuncian a favor de la autorestricción judicial sostienen que el Poder Judicial le debe gran deferencia a las medidas del Poder Legislativo y del Poder Ejecutivo, a menos que sean inconstitucionales o quebranten alguna ley en específico. Z. Baron, The Many Faces of Judicial Restraint, 21 B.U. Pub. Int. L. J. 61, 62 (2010).

Mas allá del debate académico en torno a cuál visión es mas sabia, nuestra postura como integrantes de este Tribunal es guardar fidelidad completa a nuestro ordenamiento jurídico. **Ello implica que no intervendremos con las decisiones de las otras ramas de gobierno, a menos que la actuación de algunas de estas vaya en contra de la Constitución o alguna ley en específico. Adviértase, que a este Foro no le corresponde establecer la política pública que debe regir en las otras ramas de gobierno. El día que hagamos eso, quebrantaremos el principio de separación de poderes, firmemente arraigado en nuestro sistema de derecho.** Véase, Constitución de Puerto Rico, 1 L.P.R.A.

En tiempo reciente no hemos vacilado en indicar que a "los jueces no nos puede dominar el temor a decidir", Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 15-16 (2010), incluso "aunque lo que decidamos nunca antes se haya resuelto" Trans-Oceanic Life Insurance Company v. Oracle Corporation, Op. de 24 de febrero de 2012, 2012 T.S.P.R. 34, 2012 J.T.S. 47, 184 D.P.R.__ (2012). Ahora, tenemos que añadir que la imparcialidad debe ser la piedra

angular que guíe nuestros razonamientos, sin importar quiénes son las partes ni la empatía que sus planteamientos nos provoquen. Eso implica que si bien nuestras ideas y experiencias influyen en nuestro análisis al momento de adjudicar una controversia, debemos analizar los argumentos de las partes involucradas como lo haría la famosa Dama de la Justicia, con la mayor objetividad que nuestra condición humana nos permita. En esta coyuntura, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:

### S[É] IMPARCIAL

El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasiones, por temor o misericordia. La imparcialidad implica el coraje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil.

J.C. Mendonca, Los Mandamientos del Juez, 7:1 Revista Forum 34 (1991).

## VI

Por los fundamentos señalados se expide el auto de *certiorari* en estos recursos consolidados, se revoca el dictamen emitido por el Tribunal de Apelaciones y se desestima el caso en su totalidad por falta de jurisdicción.

Se dictará Sentencia de conformidad.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Justo Lozada Sánchez, Juan
Camacho Moreno, Wanda I.
González Vélez, Carmen I.
Alvarado Rivas, Enrique J.
Seguí Casalduc, Elba T.
Escribano de Jesús

     Recurridos

        v.

In re:
Autoridad de Energía Eléctrica

 Agencia Proponente-Recurrida

Junta de Calidad Ambiental

     Peticionaria
_____

In re:
Autoridad de Energía Eléctrica

    Peticionaria

       v.

Junta de Calidad Ambiental

     Recurrida

Justo Lozada Sánchez, Juan
Camacho Moreno, Wanda I.
González Vélez, Carmen I.
Alvarado Rivas, Enrique J.
Seguí Casalduc, Elba T.
Escribano de Jesús

    Recurridos

CC-2011-718
CC-2011-722

SENTENCIA

En San Juan, Puerto Rico, a 21 de marzo de 2012.

Por los fundamentos expuestos en la Opinión que
antecede, la cual se hace formar parte integrante de la

presente Sentencia, se expide el auto de *certiorari* en estos recursos consolidados, se revoca el dictamen emitido por el Tribunal de Apelaciones y se desestima el caso en su totalidad por falta de jurisdicción.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal. La Jueza Asociada señora Fiol Matta emite una opinión disidente a la cual se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez. Además, la Juez Asociada señora Rodríguez Rodríguez disiente con opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br>Recurridos<br><br>v.<br><br>In re:<br>Autoridad de Energía Eléctrica<br> Agencia Proponente-Recurrida<br><br><br>Junta de Calidad Ambiental<br>Peticionaria<br>_____<br>In re:<br>Autoridad de Energía Eléctrica<br>Peticionaria<br><br>v.<br><br>Junta de Calidad Ambiental<br>Recurrida<br><br><br>Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br>Recurridos | CC-2011-718<br>cons.<br>CC-2011-722 |

Opinión disidente emitida por la Jueza Asociada señora FIOL MATTA a la cual se unen el Juez Presidente señor HERNÁNDEZ DENTON y la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ


En San Juan, Puerto Rico, a 21 de marzo de 2012.

Vía Verde es el nombre de un gasoducto propuesto para proveer energía eléctrica a Puerto Rico durante los próximos 50 años. Ese gasoducto transportaría gas natural, un combustible fósil no renovable, en un trayecto de 92

millas, desde la Terminal de Gas Natural de Eco Eléctrica, en Peñuelas, hasta las centrales de la Autoridad de Energía Eléctrica (A.E.E.) de Cambalache, en Arecibo; de Palo Seco, en Toa Baja, y de San Juan, atravesando 1,191.3 acres de terreno en 13 municipios: Peñuelas, Adjuntas, Utuado, Arecibo, Barceloneta, Manatí, Vega Baja, Vega Alta, Dorado, Toa Baja, Cataño, Bayamón y Guaynabo.

La Declaración de Impacto Ambiental Final (DIA-F) de Vía Verde señala que, durante la planificación para el gasoducto, "se trató, en lo posible, de mantener distancias prudentes de las comunidades, evadir áreas de valor ecológico y de evitar impactos significativos a la agricultura", pero, por la magnitud del proyecto, hay impactos que no se pueden minimizar.[2] Asimismo, indica que "[d]e acuerdo al análisis de los aspectos que se discuten en esta DIA, concluimos que la construcción de Vía Verde tiene un impacto ambiental significativo, debido a la extensión territorial que abarca y la diversidad de áreas que atraviesa".[3] Los vecinos del proyecto arguyen que lo descrito, así como lo obviado, en la DIA-F de Vía Verde, como documento que da paso al gasoducto, representa una amenaza directa a su tranquilidad, su salud, su permanencia

---

[2] Autoridad de Energía Eléctrica (A.E.E.), Declaración de Impacto Ambiental Final para el Proyecto Vía Verde de Puerto Rico [DIA-F de Vía Verde], págs. I-7 – I-8, disponible en http://www.aeepr.com/viaverde_DIAP2.asp (última visita: 3 de enero de 2012). Ni la A.E.E. ni la Junta de Calidad Ambiental (J.C.A.) incluyeron la DIA-F en sus peticiones de certiorari, las cuales se atienden de manera consolidada en este caso.

[3] *Íd.* a la pág. I-8.

en sus residencias, el disfrute de sus propiedades y de la naturaleza que las rodea, la utilidad de sus terrenos, su sustento económico, las condiciones ambientales, la seguridad, la calidad de vida y la vida misma de las personas que residen en dichas áreas. Por ello, esos ciudadanos y ciudadanas impugnaron la aprobación de la DIA-F por la Junta de Calidad Ambiental (J.C.A.) en el Tribunal de Apelaciones.

Una mayoría de este Tribunal resuelve hoy que esos vecinos no tienen legitimación activa para presentar tal impugnación. Decide que lo establecido en *Fundación Surfrider y otros v. A.R.Pe.*[4] aplica a la revisión judicial de procedimientos administrativos acelerados como el utilizado en Vía Verde, que son tramitados al amparo de las disposiciones de la Ley 76 de 2000, la cual permite obviar los requisitos de permisos, endosos, consultas y certificaciones cuando se declare alguna "emergencia" mediante orden ejecutiva.[5] Además, hace un examen inconcebiblemente restrictivo de los daños alegados por los vecinos en su Escrito de Revisión Administrativa, que fueron apoyados con evidencia, para concluir que éstos son especulativos.

Entiendo que el análisis en el que se basa la Opinión mayoritaria, el mismo empleado en *Surfrider*, es erróneo. Más aun, aunque se utilice el escrutinio riguroso de

---

[4] Fundación Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010).

[5] Ley Núm. 76-2000, 3 L.P.R.A. secs. 1931-1945.

*Surrider*, los recurridos demostraron que tienen legitimación para impugnar judicialmente la acción gubernamental que claramente les perjudica. Por eso, disiento enérgicamente de la determinación mayoritaria, que parece indicar que cuando una persona alega algún daño ambiental tiene que esperar a que suceda una catástrofe para poder ser escuchada en nuestros tribunales.

I

Contrario a lo que enuncia la Opinión mayoritaria, los ciudadanos que impugnan la DIA-F del proyecto de gasoducto Vía Verde lograron establecer que están sufriendo o sufrirán un daño claro, palpable, concreto, real, no hipotético ni abstracto, no especulativo, específico, preciso y particular, y que el mismo es causado por la acción administrativa que objetan. Así, cumplieron con los requerimientos de gran especificidad que exige la nueva normativa de legitimación adoptada en *Surfrider* para acudir a los tribunales. Pero, a pesar de que se ajustaron a lo dispuesto en ese precedente, la mayoría les exige más.

El Tribunal de Apelaciones determinó correctamente que los recurridos justificaron tener legitimación activa, pues demostraron

> con datos suficientes, el grado de afección necesario para solicitar la revisión judicial ante este foro apelativo. En dicho recurso establecen, como daños palpables, claros y no especulativos que las áreas por donde pasará la ruta propuesta para el Gasoducto impacta directamente las inmediaciones de sus residencias y terrenos, lo que les ocasiona una situación emocional y de angustia colectiva. Es importante establecer que gran parte de las afectaciones que justifican la legitimación activa de los

recurrentes nacen del interés que estos tienen sobre sus propiedades y actividades de vida y comercio. A diferencia del caso de *Surfrider*, de las alegaciones del Sr. Juan Cortés Lugo y otros sí se puede establecer una considerable proximidad entre las residencias de los recurrentes y el proyecto del gasoducto.[6]

Sin embargo, la Opinión mayoritaria revoca esta determinación, indicando que todos los daños claros y los datos suficientes que examinó el Tribunal de Apelaciones son meras especulaciones. Las declaraciones sobre los daños y la extensa documentación que presentaron los recurridos en su recurso de revisión administrativa –que incluye argumentos jurídicos, estudios científicos, informes oficiales e información histórica– y sobre las que bien edifican sus reclamaciones se resumen escuetamente en la Opinión mayoritaria para luego concluir, sin mayor análisis, que esas alegaciones no detallan de forma específica en qué consisten los daños particulares.[7]

Los daños que sirven para conferir legitimación activa, como se ha descrito y repetido en innumerables ocasiones en las decisiones de este Tribunal y señala también la Opinión mayoritaria,[8] pueden basarse en consideraciones económicas, espirituales, ambientales,

---

[6] Justo Lozada y otros v. A.E.E. y J.C.A., KLRA 2010 1238 consolidado con KLRA 2010 1246 y KLRA 2010 1248, Resolución del Tribunal de Apelaciones de 18 de agosto de 2011, págs. 3 y 4; Apéndice del Certiorari CC-2011-718, págs. 2-3; Apéndice del Certiorari CC-2011-722, págs. 860-861. Esta es la Resolución que está en revisión ante el Tribunal Supremo y se refiere al caso KLRA 2010 1246.

[7] *Véase* Opinión mayoritaria, págs. 24-27.

[8] *Íd.* pág. 21.

recreativas o estéticas.[9] Asimismo, y acorde con la norma pautada en *Surfrider*, basta con que uno de los peticionarios posea legitimación activa para que proceda la revisión judicial.[10] Con ello en mente, veamos las alegaciones de los recurridos en su escrito de revisión y estudiemos las mismas de manera integrada con las disposiciones de nuestro ordenamiento jurídico, incluyendo la Opinión del caso de *Surfrider*.

A. Daños ambientales

Hemos establecido que incumplir con una declaración de impacto ambiental es de por sí considerado un daño irreparable, pues los daños al ambiente son de carácter permanente.[11] Preparar una declaración de impacto ambiental completa y cuidadosa, como exigen los ciudadanos en este caso, es esencial para evitar o mitigar esos daños

---

[9] *Véanse, por ejemplo*, Fundación Surfrider, *supra*, a la pág. 573; García Oyola v. J.C.A., 142 D.P.R. 532, 539 (1997); Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716, 723 (1974).

[10] *Véase* Voto de conformidad del juez Martínez Torres en Brito Díaz y otros v. Bioculture y otros, 2011 T.S.P.R. 185, págs. 11-14. En éste, se indica que la norma de que la presencia de un peticionario con legitimación activa es suficiente para que se pueda acoger el recurso, aunque los demás peticionarios no tengan legitimación, es consecuente con *Surfrider*, y se concluye que un vecino del proyecto propuesto que perdió compradores potenciales para las propiedades que estaba desarrollando estableció un daño suficientemente concreto para poder presentar una solicitud de paralización de una obra de construcción cuyos permisos se están impugnando. *Véase también* Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 52 esc. 2 (2006).

[11] Misión Industrial P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 682 (1997).

permanentes e irreparables, porque una DIA debidamente aprobada por la J.C.A. es el requisito indispensable para que comience la construcción y la operación posterior del proyecto.[12]

Las declaraciones de impacto ambiental sirven "para asegurar que la conservación y el uso racional de los recursos naturales [se tengan] en cuenta al momento de hacer planes y de *tomar las primeras decisiones gubernamentales sobre una propuesta* que pueda tener un impacto en el medio ambiente".[13] El resultado que se espera de una DIA es que demuestre que el camino contemplado es "el de menor impacto ambiental", luego de haberse estudiado las medidas que podrían mitigar los efectos nocivos del proyecto y las alternativas a la acción propuesta, incluyendo la de no llevar a cabo proyecto alguno.[14] Para ello, se requiere que la agencia proponente realice un esfuerzo serio y escrupuloso por discutir todas las consecuencias ambientales previsibles y que la J.C.A., como agencia creada para hacer cumplir la Ley sobre Política Pública Ambiental y el mandato constitucional de protección de los recursos naturales, estudie cabalmente las acciones que impactarían el medio ambiente, a través de un

---

[12] Colón y otros v. J.C.A., 148 D.P.R. 434, 452 (1999).

[13] (Énfasis en el original.) Municipio de San Juan v. J.C.A., 152 D.P.R. 673, 711 (2000).

[14] Misión Industrial P.R. v. J.C.A., 145 D.P.R. 908, 924-925 (1998).

procedimiento de consultas.[15] Las declaraciones de impacto ambiental así elaboradas cumplen con dos fines: que el proponente evalúe a fondo las consecuencias ambientales del proyecto que planifica y que se informe al público sobre éstas para que los ciudadanos puedan tomar las acciones que estimen pertinentes.[16]

En este punto, debemos advertir que los vecinos recurridos en este caso nunca pudieron presentar sus comentarios sobre la DIA-P ni mucho menos sobre la DIA-F, pues en las vistas públicas que se celebraron sólo se discutió un borrador de documento ambiental que no incluía todos los aspectos que se hallan en la DIA.[17] Dichas audiencias no cumplieron su propósito, ya que no dieron espacio para reflexionar sobre todos los puntos de la propuesta y emitir sugerencias. Tampoco el Panel Examinador encargado de comunicar a la Junta de Gobierno de la J.C.A. lo expresado en las vistas públicas investigativas consideró todos los planteamientos presentados por los ciudadanos en esas vistas, pues el Informe del Panel hace constar que no los discute debido a la gran cantidad de

---

[15] P.C.M.E. v. J.C.A., 166 D.P.R. 599, 611-613 (2005).

[16] Misión Industrial P.R. v. J.C.A., supra, a las págs. 923-924.

[17] Escrito de Revisión Administrativa ante el TA presentado por Juan Cortés y otros en In re Autoridad de Energía Eléctrica, KLRA 2010 246, 21 de diciembre de 2010 [Escrito de Revisión], págs. 37-38; Apéndice del Certiorari CC-2011-718, págs. 59-60; Apéndice del Certiorari CC-2011-722, págs. 87-88.

escritos que recibieron.[18] No se debe olvidar que el derecho a ser escuchado tiene un objetivo: que se tome en cuenta la idea expresada. Además, las vistas públicas sobre la DIA-P que solicitaron los ciudadanos fueron denegadas en la misma Resolución de la J.C.A. en que se aprobó la DIA-F.[19] De acuerdo con los vecinos, la DIA-F tampoco atiende sus comentarios ni los de los expertos que depusieron.[20]

---

[18] Los vecinos señalan que el Informe ni siquiera incluye los comentarios presentados por los peritos del Colegio de Ingenieros y del Fish and Wildlife Service. Escrito de Revisión, págs. 39-40; Apéndice del Certiorari CC-2011-718, págs. 61-62; Apéndice del Certiorari CC-2011-722, págs. 89-90. *Véase además* la Regla 26.6 del Reglamento Núm. 3672 sobre Procedimiento de Vistas Administrativas de la Junta de Calidad Ambiental de 1988, que la J.C.A. ordenó utilizar en la celebración de las vistas sobre el borrador de documento ambiental de Vía Verde y que obliga al Panel Examinador a incluir los comentarios recibidos en su informe. R-10-30-1 de la J.C.A., pág. 3; Apéndice del Certiorari CC-2011-722, pág. 15. R-10-37-1 de la J.C.A., pág. 6; Apéndice del Certiorari CC-2011-718, pág. 122s 5; Apéndice del Certiorari CC-2011-722, pág. 422.

[19] R-10-30-1 de la J.C.A., pág. 2; Apéndice del Certiorari CC-2011-722, pág. 14. El portavoz que suscribió la solicitud de vistas públicas fue el recurrido Miguel Báez Soto. R-10-45-1 de la J.C.A., págs. 2-3 y 7; Apéndice del Certiorari CC-2011-722, págs. 34-35 y 39.

[20] Escrito de Revisión, págs. 42-43; Apéndice del Certiorari CC-2011-718, págs. 64-65; Apéndice del Certiorari CC-2011-722, págs. 92-93. Según se observa en la tabla de resumen de comentarios en las vistas públicas y respuestas a éstos, incluida al final del Capítulo 8 de la DIA-F, muchas de las preocupaciones de los vecinos y de las organizaciones profesionales que presentaron ponencias se contestaron refiriéndolos a secciones de la DIA que están impugnando, señalando que la J.C.A. tiene *expertise* para hacer la evaluación que hizo o con la oración "No tenemos comentarios". En la tabla también se observa que no aparecen los comentarios que el Escrito de Revisión menciona que fueron ignorados y que los representantes de Eco Eléctrica informaron que no tendrían la capacidad necesaria para la operación de Vía Verde.

Tal como explica la Resolución de la J.C.A. que aprueba la DIA-F de Vía Verde, "al requerirse la preparación de una DIA, ello presupone que existe la probabilidad de que la acción propuesta puede ocasionar un impacto significativo sobre el ambiente; de lo contrario, no sería requerida la preparación [de] dicho documento ambiental".[21] Del mismo modo, en *Hernández, Álvarez v. Centro Unido*, aseveramos que "el trámite de preparar una declaración de impacto ambiental está reservado para aquellas ocasiones en que, por la gran magnitud del impacto ambiental de la acción propuesta (impacto significativo o sustancial), no sólo se requiere un análisis más riguroso de la acción, sino también que se examinen alternativas a ésta".[22] El Reglamento de Documentos Ambientales de la J.C.A. exige específicamente que se prepare una DIA, entre otras situaciones, cuando: una acción pueda degradar significativamente los usos del ambiente; las acciones realizadas en diversas etapas del proyecto puedan tener un impacto acumulado significativo; se pueda impactar significativamente un área donde existen recursos naturales o valores de importancia ecológica, recreativa, social, cultural o arqueológica; se afecten las áreas de amortiguamiento de los terrenos de la Zona Cárstica del Río Tanamá, y se realicen extracciones, remociones, dragados o

---

[21] (Énfasis suplido.) R-10-45-1 de la J.C.A., pág. 4; Apéndice del Certiorari CC-2011-722, pág. 36.

[22] *Hernández, Álvarez v. Centro Unido*, 168 D.P.R. 592, 639 (2006).

excavaciones en la corteza terrestre de la zona costanera o de las cuencas hidrográficas de ríos que se utilizan como toma de agua.[23] Un impacto ambiental significativo se define como el "efecto sustancial de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limitarse a: una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de vida, la salud pública, los recursos renovables o no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo en favor de los usos a corto plazo o viceversa".[24]

Evidentemente, al requerir la presentación de una DIA en este caso, las agencias gubernamentales reconocieron los altos riesgos ambientales y contra la salud pública y la calidad de vida que supone el proyecto de gasoducto Vía Verde. Sin embargo, cuando los vecinos señalan que sienten gran preocupación por su seguridad y por los efectos perniciosos que tendrá esta tubería de gas natural sobre sus fincas, sus cosechas, los cuerpos de agua que pasan por

---

[23] Regla 252, Reglamento Núm. 6510 de la J.C.A. sobre el Proceso de Presentación, Evaluación y Trámite de Documentos Ambientales de 2002 [Reglamento 6510 de 2002]. Este era el reglamento vigente cuando se aprobó la Resolución que se impugna e incluye, entre otras, las primeras tres situaciones mencionadas. Dicho reglamento fue sustituido por el Reglamento 7948 de la J.C.A. sobre Evaluación y Trámite de Documentos Ambientales [Reglamento 7948 de 2010], que entró en vigor el 1 de diciembre de 2010 y que enmendó el Reglamento 6510 para acoplarlo a las disposiciones de la nueva Ley de Permisos, Ley Núm. 161-2009. La Regla 112 B del Reglamento 7948 de 2010 incluye, entre otras, las cinco situaciones mencionadas.

[24] Regla 203 (Definiciones) del Reglamento 6510 de 2002. La definición de "impacto ambiental significativo" en la Regla 109 EE del Reglamento 7948 es idéntica a la del Reglamento 6510.

sus propiedades y el medio ambiente cercano a sus viviendas, la Opinión mayoritaria concluye que esos vecinos están especulando sobre los efectos adversos. Aun cuando, de entrada, existe una probabilidad de impacto significativo sobre el ambiente que rodea a estas personas, una mayoría de este Tribunal lo descarta porque cree que eso no es un daño suficientemente concreto. Los daños en el plano ambiental que exponen los vecinos son múltiples y no se basan sólo en "creencias suyas"; surgen de la información obtenida por los vecinos a través de estudios científicos y técnicos sobre la propuesta de Vía Verde. Veamos algunos en detalle.

Los señores Carlos Cabán Cañedo, Luis Rodríguez Cruz y Jorge Rivera Rodríguez residen en el Barrio Portugués, en Adjuntas. Además, son miembros y portavoces del Comité Barrio Portugués en Contra del Gasoducto, una organización comunitaria que reúne a los vecinos de este sector y que tiene como fin la protección y el disfrute de los recursos naturales, así como de las propiedades que poseen sus miembros en el Barrio Portugués. Esta asociación se dedica a realizar actividades educativas y de denuncia sobre el proyecto del Gasoducto, por lo que la aprobación de la DIA-F de Vía Verde afecta directamente los objetivos del grupo y de sus integrantes.[25] En el recurso de revisión administrativa que presentaron ante el Tribunal de

---

[25] Escrito de Revisión, págs. 5-6; Apéndice del Certiorari CC-2011-718, págs. 28-29; Apéndice del Certiorari CC-2011-722, págs. 55-56.

Apelaciones, los señores Cabán Cañedo, Rodríguez Cruz y Rivera Rodríguez, como individuos y como portavoces del Comité Barrio Portugués, señalaron que la DIA-F es insuficiente y no analiza de manera adecuada el impacto que tendrá el proyecto sobre sus propiedades y las zonas aledañas. El Comité, por conducto del señor Cabán Cañedo, depuso en las vistas públicas sobre la propuesta del gasoducto Vía Verde.[26]

Los portavoces del Comité Barrio Portugués indican que, tanto dentro de las propiedades de los miembros de la organización como en las áreas colindantes a éstas, hay varios cuerpos de agua importantes, de entre los cuales resaltan los que están localizados dentro de las 42 cuerdas protegidas por el Fideicomiso de Conservación de Puerto Rico bajo la Servidumbre Escénica y de Conservación Clark Foreman, en donde nace el Río Portugués.[27] De acuerdo con lo

---

[26] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 21, en la página 10 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 9; Apéndice del Certiorari CC-2011-722, pág. 42.

[27] La Servidumbre Escénica y de Conservación Clark Foreman, en Adjuntas, es la primera de este tipo en Puerto Rico y fue establecida en 1971 a través de un convenio entre el Fideicomiso de Conservación de Puerto Rico y los esposos Clark y Mairi Foreman. El predio está protegido a perpetuidad mediante una escritura con cláusulas restrictivas que permite a los dueños mantener la titularidad de los terrenos con la condición de que los usos que hagan de éstos no alteren las características naturales del paisaje, del bosque húmedo que domina el área y del Río Portugués. El área se utiliza para estudios científicos y educativos. Esta servidumbre forma parte del escaso 7.2% de los terrenos de Puerto Rico que están protegidos por ley para fines de conservación. Fideicomiso de Conservación de Puerto Rico, Áreas naturales protegidas

que exponen en el Escrito de Revisión presentado ante el foro apelativo, la ruta propuesta para Vía Verde que recoge la DIA-F impactaría las quebradas, manantiales y pozos acuíferos de los cuales se sirven los integrantes de la comunidad, algunos mediante sistemas de agua colectivos y otros individualmente. Esos cuerpos de agua son los que suplen principalmente al Río Portugués, en el cual se propone construir una represa, y de manera secundaria al Río Grande de Arecibo y al Lago Dos Bocas.[28]

Estos ciudadanos están reclamando no sólo la protección del ambiente en general del área en la que habitan, sino, muy específicamente, la protección del agua de la que se sirven para sus necesidades diarias y de los cuerpos de agua que se encuentran en sus propiedades. En *Paoli Méndez v. Rodríguez*, explicamos que el agua es un recurso indispensable para la actividad humana y que nuestro ordenamiento legal exige el mayor cuidado con el fin de asegurar su pureza y disponibilidad.[29] Asimismo, en

---

– Servidumbre Escénica del Río Portugués (Familia Foreman), en www.fideicomiso.org (última visita: 1 de enero de 2012).

[28] Escrito de Revisión, págs. 6-7; Apéndice del Certiorari CC-2011-718, págs. 29-30; Apéndice del Certiorari CC-2011-722, págs. 56-57. El Lago Dos Bocas, creado por la A.E.E. para la generación de energía hidroeléctrica, sirve agua para el proyecto Superacueducto de la Autoridad de Acueductos y Alcantarillados.

[29] Paoli Méndez v. Rodríguez, 138 D.P.R. 449, 456-471 (1995). *Véase, por ejemplo,* la Ley de Arena, Grava y Piedra, que otorga una protección especial a los ríos que se utilizan para toma de agua al requerir que, antes de otorgar cualquier permiso de excavación, extracción o dragado en estas cuencas hidrográficas, el Departamento de Recursos Naturales se asegure del cumplimiento con la Ley sobre Política Pública Ambiental mediante la preparación de

*Misión Industrial P.R. v. J.P. y A.A.A.*, destacamos la importancia de los sistemas para proveer agua a las residencias en Puerto Rico.[30] Todo ello es cónsono con la política pública del País de "mantener el grado de pureza de las aguas de Puerto Rico que requiera el bienestar, la seguridad y el desarrollo del país; asegurar el abasto de aguas que precisen las generaciones puertorriqueñas presentes y futuras" y satisfacer con prelación las necesidades de agua para consumo doméstico.[31]

Los esposos Juan Cortés Lugo y Sofía Colón Matos, residentes en el Barrio Arenas de Utuado hace más de 30 años, viven en una finca de 22 cuerdas por la cual discurren riachuelos y manantiales. Lo mismo sucede con los esposos Luis Guzmán Meléndez y Ana Oquendo Andújar, quienes viven en su finca de 34 cuerdas en el Barrio Río Abajo de Utuado y cuyos tres hijos también tienen sus casas en esa finca. Ambas familias se dedican a la agricultura y la calidad del agua que transcurre por sus terrenos, la cual

---

una DIA en lugar de la evaluación ambiental menos rigurosa que se requiere para otros terrenos. 28 L.P.R.A. sec. 207.

[30] *Misión Industrial P.R. v. J.P. y A.A.A.*, *supra. Véase también* M. Padilla Rodríguez, El derecho humano al agua en Puerto Rico: desde el Derecho Internacional hasta su protección local, 68 (Núm. 4) Rev. Col. Abog. P.R. 778 (2007).

[31] Art. 2, Ley para la Conservación, el Desarrollo y el Uso de los Recursos de Agua de Puerto Rico, Ley Núm. 136 de 3 de junio de 1976, 12 L.P.R.A. sec. 1115a. Esta ley permite el aprovechamiento de pozos y tomas de agua. *Íd.* secs. 1115n-1115p y 1115u.

se afectaría con la construcción de Vía Verde, es esencial para sus cultivos.[32]

El señor Gustavo Casalduc Torres es otro residente del Barrio Río Abajo de Utuado que será afectado por la ubicación cercana del Gasoducto. En su finca de 3 cuerdas hay un manantial con una tubería para suplirle agua a él, a su familia y a otros vecinos del Sector Graulau que toman su agua de allí. El paso del Gasoducto interrumpiría el sistema de agua rural de estas personas.[33] El señor Casalduc Torres depuso en las vistas públicas sobre el proyecto, en nombre propio y del Comité Utuadeños Contra el Gasoducto.[34] Igualmente, Ana Serrano Maldonado y Félix Rivera González, residentes en el Barrio Arenas en Utuado, advirtieron que el Gasoducto impactaría directamente la fuente de agua de su comunidad y afectaría sus propiedades.[35]

---

[32] Escrito de Revisión, pág. 5; Apéndice del Certiorari CC-2011-718, pág. 28; Apéndice del Certiorari CC-2011-722, pág. 55.

[33] *Íd.*

[34] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 23, en la página 10 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 9; Apéndice del Certiorari CC-2011-722, pág. 42.

[35] Escrito de Revisión, pág. 8; Apéndice del Certiorari CC-2011-718, pág. 31; Apéndice del Certiorari CC-2011-722, pág. 58. Otros residentes del Barrio Arenas que figuran como recurridos son Virginio Heredia Bonilla, Lillian Serrano Maldonado y Yamil Heredia Serrano, en representación propia y de su hijo menor de edad Jean Paul Heredia Romero. Escrito de Revisión, pág. 9; Apéndice del Certiorari CC-2011-718, pág. 32; Apéndice del Certiorari CC-2011-722, pág. 59.

La DIA-F de Vía Verde indica que el movimiento del terreno para la construcción del proyecto puede degradar la calidad del agua, al provocar turbidez, arrastrar contaminantes y matar organismos acuáticos al disminuir el oxígeno disuelto que utilizan para respirar. Asimismo, señala que el tráfico de maquinaria pesada y el movimiento de terreno puede reducir la capacidad de absorción del suelo y causar impactos adversos a la agricultura. Sobre estos impactos, sólo se indica que se prepararán planes para minimizarlos.[36]

Por su parte, Miguel Báez Soto, quien reside en el Barrio Caguanas en Utuado y transita a diario por un tramo de la ruta propuesta para el Gasoducto, es el portavoz del Comité Utuadeño en Contra del Gasoducto. Esta organización se dedica a realizar actividades educativas y de denuncia sobre el proyecto Vía Verde con el fin de proteger los recursos naturales de Utuado y garantizar el disfrute de éstos. Indicó el señor Báez Soto que los objetivos de su organización y los de sus miembros se ven adversamente afectados por la construcción y la operación eventual del Gasoducto, que inicia con la aprobación de la DIA-F de Vía Verde.[37] El señor Báez Soto, además, fue deponente en las vistas públicas sobre el gasoducto propuesto.[38]

---

[36] DIA-F de Vía Verde, págs. 6-12 – 6-17.

[37] Escrito de Revisión, pág. 11; Apéndice del Certiorari CC-2011-718, pág. 34; Apéndice del Certiorari CC-2011-722, pág. 61.

[38] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 22, en la

En el Escrito de Revisión, además de estos daños muy específicos, los vecinos reclaman que la aprobación de una DIA-F insuficiente para el proyecto Vía Verde dará paso a efectos sustanciales adversos a los recursos naturales de las zonas en las que residen. Los daños ambientales señalados incluyen: impacto negativo sobre 369 acres de humedales que sirven de hábitat para la vida silvestre y favorecen la recarga de los acuíferos;[39] actividades perjudiciales sobre áreas de importante valor ecológico en la Zona del Carso no contempladas en la DIA;[40] estudio deficiente sobre el impacto que tendrá el proyecto en al menos 32 especies vulnerables o en peligro de extinción de flora y fauna, según señalamientos del Servicio de Pesca y Vida Silvestre federal,[41] y perjuicio directo sobre yacimientos de alto valor arqueológico, incluyendo abrigos rocosos con petroglifos y restos de estructuras históricas,

---

página 10 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 9; Apéndice del Certiorari CC-2011-722, pág. 42.

[39] Escrito de Revisión, págs. 78-83; Apéndice del Certiorari CC-2011-718, págs. 100-105; Apéndice del Certiorari CC-2011-722, págs. 128-133. *Véanse* Ley de Vida Silvestre, Ley Núm. 241-1999, 12 L.P.R.A. secs. 107-107u; Ley de Humedales en Puerto Rico, Ley Núm. 314-1998, 12 L.P.R.A. secs. 5001-5005; Colón Cortés v. Pesquera, 150 D.P.R. 724, 783 (2000).

[40] Escrito de Revisión, págs. 83-86; Apéndice del Certiorari CC-2011-718, págs. 105-108; Apéndice del Certiorari CC-2011-722, págs. 133-136. *Véase* Ley para la Protección y Conservación de la Fisiografía Cárstica de Puerto Rico, Ley Núm. 292-1999, 12 L.P.R.A. secs. 1151-1158.

[41] Escrito de Revisión, págs. 86-89; Apéndice del Certiorari CC-2011-718, págs. 108-111; Apéndice del Certiorari CC-2011-722, págs. 136-139. *Véanse* Regla 253A del Reglamento 6510 de 2002; Regla 112E del Reglamento 7948 de 2010.

según identificados por los Programas de Patrimonio Histórico y de Arqueología y Etnohistoria del Instituto de Cultura Puertorriqueña y por la Oficina Estatal de Conservación Histórica.[42] Puntualizamos que, según el principio internacional de prevención que adoptó nuestra Ley sobre Política Pública Ambiental, no se requiere demostrar la posibilidad de estos daños con certeza científica.[43] Al amparo de ese principio, que, recalcamos, es parte de nuestro ordenamiento, el peso de la prueba sobre la ausencia de peligros que pueda causar una actividad "recae en el proponente de la misma, no en la ciudadanía", y existe la obligación de, antes de iniciar una actividad, "evaluar una amplia gama de alternativas, incluyendo la alternativa de no hacer nada".[44]

Los recurridos manifiestan que la DIA-F incumple con uno de los propósitos principales de este tipo de documento

---

[42] Escrito de Revisión, págs. 89-94; Apéndice del Certiorari CC-2011-718, págs. 111-116; Apéndice del Certiorari CC-2011-722, págs. 139-144. *Véase* Ley para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, Ley Núm. 112 de 20 de julio de 1988, 18 L.P.R.A. secs. 1551-1566.

[43] Art. 4(b)(5), Ley sobre Política Pública Ambiental, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001a(b)(5); Comisión de Recursos Naturales y Calidad Ambiental de la Cámara de Representantes, Informe sobre el P. de la C. 4790, 24 de junio de 2004, pág. 4; J.C.A., Informe de Evaluación del P. de la C. 4790 (Historial Legislativo de la Ley 416 de 2004), 18 de junio de 2004, págs. 4-5. El principio de prevención o Precautionary Principle se tomó de la Declaración de Rio sobre Ambiente y Desarrollo de 1992, que adoptó la Conferencia sobre Ambiente y Desarrollo de la Organización de Naciones Unidas para guiar el desarrollo sustentable.

[44] Arts. 4(b)(5)(B), (C) y (D), Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001a(b)(5).

ambiental al no considerar diversas alternativas al proyecto que son viables y reducirían el impacto negativo sobre el ambiente y sus comunidades, pues no conllevarían la transportación del combustible por grandes extensiones de terreno pobladas. Entre éstas mencionaron: la conversión de las centrales existentes a plantas para la quema de gas natural; el uso de barcazas en alta mar como tanques de gas natural, que se suministraría a las centrales mediante un sistema de boyas, y el inicio de la transición hacia sistemas de energía renovable, como los paneles solares y los molinos de viento.[45]

B. Menoscabo económico

Diversos vecinos también reclamaron daños económicos, relacionados con su derecho a disfrutar su propiedad, su

---

[45] Escrito de Revisión, págs. 59-69; Apéndice del Certiorari CC-2011-718, págs. 81-91; Apéndice del Certiorari CC-2011-722, págs. 109-119. Es de conocimiento público que, por instrucciones del gobernador Luis Fortuño, la A.E.E. está evaluando nuevamente si son viables estas alternativas, en especial la de las barcazas. Además, Vía Verde está siendo reevaluado actualmente por un comité nombrado por el gobernador. *Véanse* G.E. Alvarado León, "El gasoducto tiene los días contados", en: Puerto Rico Hoy: Asuntos energéticos, El Nuevo Día, 12 de enero de 2012, pág. 12; G.E. Alvarado León, "Fortuño debe hablar claro", en: Puerto Rico Hoy: Alternativas energéticas, El Nuevo Día, 13 de enero de 2012, pág. 29; G. Ruiz Kuilan, "Sobre la mesa el futuro del gasoducto", en: Puerto Rico Hoy, El Nuevo Día, 14 de enero de 2012, pág. 36; G. Ruiz Kuilan, "El gasoducto del norte: relato de un natimuerto", en: A Fondo, El Nuevo Día, págs. 36-37; G.E. Alvarado León, "Otra tranquilla para el gasoducto", en: Puerto Rico Hoy: Proyecto energético, El Nuevo Día, 8 de febrero de 2012, pág. 10; D. Rivera Vargas y G.E. Alvarado León, "Contundente pedido ciudadano", en: Puerto Rico Hoy: Protesta contra el gasoducto, El Nuevo Día, 20 de febrero de 2012, pág. 6; G.E. Alvarado León, "Fortuño vuelve a apoyar el gasoducto", en: Puerto Rico Hoy: Energía, El Nuevo Día, 20 de febrero de 2012, pág. 8.

potencial para generar ingresos y los efectos perniciosos sobre sus cosechas.

La finca de 22 cuerdas de los esposos Cortés Lugo y Colón Matos, en Utuado, está totalmente sembrada de café y cítricos. De la venta de estos productos agrícolas es que la Familia Cortés Colón recibe su sustento. El matrimonio Guzmán-Oquendo y sus tres hijos también tienen su finca de 34 cuerdas en Utuado sembrada de café, verduras y frutos menores. Esos cultivos representan su trabajo de muchos años y su fuente de ingresos.[46] Por su parte, los residentes del Barrio Portugués, en Adjuntas, tienen siembras de frutos menores, que incluyen plátanos, guineos, chinas, chinas mandarinas, yautías, malangas, chayotes, aguacates y café, que utilizan para el consumo de sus familias, que han requerido inversión económica y de labor. De perderse,

---

[46] Escrito de Revisión, pág. 5; Apéndice del Certiorari CC-2011-718, pág. 28; Apéndice del Certiorari CC-2011-722, pág. 55. En su Alegato ante este Tribunal, los vecinos también indican que "[l]as acciones de las partes peticionarias han menoscabado la paz y el libre disfrute de la propiedad de los comparecientes, toda vez que les han causado grandes angustias mentales al realizar los procedimientos de expropiación de forma irresponsable. Las cartas notificando a los aquí recurridos sobre la intención de expropiación de sus terrenos causan grandes angustias mentales, ya que muchos de estos tienen sus predios completamente sembrados y dependen de sus cosechas para el sustento de sus familias. Además, la agricultura es el empleo al cual se han dedicado toda su vida. Una expropiación los obligaría a buscar una nueva forma de sustento, lo que les causa una grave angustia, pues altera su estilo de vida, al cual han estado acostumbrados por años". Alegato de las Partes Recurridas ante el TS, CC-2011-718 y CC-2011-722, 26 de septiembre de 2011 [Alegato de las Partes Recurridas], pág. 18.

tendrán que adquirir esos productos en el mercado.[47] El mismo problema enfrenta Jesús García Oyola, quien tiene una finca de una cuerda y media en el Barrio Hato Viejo de Arecibo, en la que se encuentra su casa y en la que tiene siembras de mamey, carambola, guineos y plátanos, que utiliza para el consumo de su familia.[48] En nuestro ordenamiento, los daños a cosechas, árboles y otros elementos naturales dentro de una propiedad son reconocidos como daños ambientales patrimoniales.[49]

Por otro lado, Virgilio Cruz Cruz, residente del Barrio Factor 2 en Arecibo, indicó que el Gasoducto pasaría *a menos de 69 metros de su hogar* y recibió una notificación de la A.E.E. que dice que su propiedad se verá afectada por el paso de la tubería de gas natural.[50] Trinita Alfonso Viuda de Folch, vecina del Barrio Salto Abajo en Utuado, así como Alex Noel Natal Santiago y Miriam Negrón Pérez, residentes en el Barrio Salto Arriba en Utuado, señalaron

---

[47] Escrito de Revisión, pág. 7; Apéndice del Certiorari CC-2011-718, pág. 30; Apéndice del Certiorari CC-2011-722, pág. 57.

[48] Escrito de Revisión, págs. 10-11; Apéndice del Certiorari CC-2011-718, págs. 33-34; Apéndice del Certiorari CC-2011-722, págs. 60-61.

[49] Rivera v. S.L.G. Díaz, 165 D.P.R. 408, 424-427 (2005). En este caso también reconocimos los daños ambientales morales, que son los que sufre una persona cuando la acción de otra perjudica, por ejemplo, un paisaje con valor ecológico que disfrutaba el reclamante en su propiedad. Ambos tipos de daños ambientales son resarcibles.

[50] Escrito de Revisión, pág. 10; Apéndice del Certiorari CC-2011-718, pág. 33; Apéndice del Certiorari CC-2011-722, pág. 60. *Véase también* Oposición a Alegato de las Partes Recurridas de la A.E.E. en el T.S., 6 de octubre de 2011 [Oposición a Alegato], pág. 9.

que el Gasoducto pasaría por sus casas y que ya la A.E.E. les envió cartas informándoles que podrían ser expropiados.[51] El señor Natal Santiago depuso en las vistas públicas sobre la propuesta de Vía Verde.[52] Por su parte, Iván Carlos Vélez Montero, vecino de la Calle Cabrera en Utuado, tiene un terreno donde planifica construir su casa. Según se expone en la DIA-F de Vía Verde, el Gasoducto pasaría justo por ese terreno.[53] Además, Luis Rodríguez Cruz, uno de los portavoces del Comité Barrio Portugués, informó ante este Tribunal que los funcionarios de la A.E.E. y personal contratado por esta peticionaria le han requerido copia de las escrituras de su finca y acceso a la misma en diversas ocasiones con el fin de expropiarlo, y, ante su negativa, la A.E.E. presentó el recurso *A.E.E. v. Rodríguez Cruz*, al amparo de la Ley de Expropiaciones, para que se le ordene permitir acceso a su propiedad.[54]

---

[51] Escrito de Revisión, págs. 7-8; Apéndice del Certiorari CC-2011-718, págs. 30-31; Apéndice del Certiorari CC-2011-722, págs. 57-58. *Véase también* Oposición a Alegato, pág. 9.

[52] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 4, en la página 10 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 9; Apéndice del Certiorari CC-2011-722, pág. 42.

[53] Escrito de Revisión, pág. 7; Apéndice del Certiorari CC-2011-718, pág. 30; Apéndice del Certiorari CC-2011-722, pág. 57.

[54] Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, págs. 20-21. El caso ante el Tribunal de Primera Instancia es el KEF 2010 428. La Petición de entrada a propiedad fue incluida en la petición de certiorari de la J.C.A. Apéndice del Certiorari CC-2011-718, págs. 752-756.

La A.E.E. y la J.C.A argumentan que, una vez se apruebe la alineación del proyecto de gasoducto establecida en la DIA-F de Vía Verde y comience el proceso de expropiación, los recurridos no tendrán un interés propietario o de seguridad sobre sus residencias, puesto que vendrán obligados a abandonarlas.[55] Aparte del cinismo administrativo que este argumento revela, contiene implícita su propia negación, pues la inminencia de la expropiación hace más patente el daño que da derecho a cuestionar los procesos y la información utilizados para aprobar el proyecto en el cual se basa el fin público que justificaría la expropiación.[56]

C. Angustias mentales

El proceso que se está llevando a cabo a partir de la aprobación de la DIA-F también ha afectado la salud emocional y la tranquilidad mental de los vecinos. Nuestro ordenamiento reconoce como daños aquellas lesiones morales, mentales o espirituales que producen los sufrimientos y las sensaciones de dolor, tristeza, miedo, ansiedad, humillación y pérdida de paz que afecten la salud, el bienestar y la felicidad de una persona. Estas angustias,

---

[55] Certiorari de la J.C.A. ante el T.S., CC-2011-718, pág. 17; Certiorari de la A.E.E. ante el T.S., CC-2011-722, 6 de septiembre de 2011, págs. 24-25.

[56] En diciembre de 2011, el Tribunal de Primera Instancia, en el caso *A.E.E. v. Montero*, KEF 2011 431, paralizó la entrega material de las propiedades para las cuales ya comenzó el proceso de expropiación hasta tanto el proyecto Vía Verde obtenga los permisos de construcción del Cuerpo de Ingenieros del Ejército de Estados Unidos, porque los terrenos aún no se podrán dedicar al uso público propuesto.

que son incluso compensables económicamente, causan una perturbación anímica de naturaleza intangible pero latente.[57] Por eso, no pueden ser tratadas como penas insignificantes o meros temores.

María Cruz Rivera, quien vive junto a su hija en un terreno de 1.46 cuerdas en el cual hay una quebrada en el Barrio Salto Arriba de Utuado, alegó en el Escrito de Revisión que "la ruta propuesta del Gasoducto estará pasando al frente de su casa, lo que le causa temor por su seguridad, lo que la mantiene en un estado constante de ansiedad e inseguridad".[58] La señora Cruz Rivera depuso en las vistas públicas sobre Vía Verde.[59] Otros que están experimentando "mucha ansiedad y desasosiego" a causa de los procesos que se están llevando a cabo a partir de la aprobación de las declaraciones de impacto ambiental de Vía Verde son Cristóbal Orama Barreiro y Haydée Irizarry Medina. Ellos tienen una propiedad de 6 cuerdas en el Barrio Salto Abajo de Utuado y el Gasoducto pasaría por el paseo de la Carretera 10, justo frente a su casa. Un

---

[57] *Véanse, por ejemplo*, <u>Sagardía de Jesús v. Hosp. Aux. Mutuo</u>, 177 D.P.R. 484, 506 (2009); <u>Cintrón Adorno v. Gómez</u>, 147 D.P.R. 576, 589 (1999); <u>García Pagán v. Shiley Caribbean</u>, 122 D.P.R. 193, 205-206 (1988); <u>Acosta & Rodas, Inc. v. PRAICO</u>, 112 D.P.R. 583, 611-612 (1982); <u>Ramos Rivera v. E.L.A.</u>, 90 D.P.R. 828, 831 (1964).

[58] Escrito de Revisión, pág. 11; Apéndice del Certiorari CC-2011-718, pág. 34; Apéndice del Certiorari CC-2011-722, pág. 61.

[59] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 58, en la página 11 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 10; Apéndice del Certiorari CC-2011-722, pág. 43.

funcionario de la A.E.E. le informó al recurrido Orama Barreiro que el tubo de gas natural pasaría *a entre 50 y 70 pies de su hogar*. Además, le solicitó que firmara un documento para realizar estudios en su propiedad.[60]

Los residentes del Barrio Portugués de Adjuntas, representados por los señores Cabán Cañedo, Rodríguez Cruz y Rivera Rodríguez, indican en el Escrito de Revisión que la mayor parte de ellos son personas de edad avanzada, que sufren de condiciones médicas como alta presión, problemas cardiacos y Alzheimer. Algunos de ellos están encamados o no pueden caminar sin ayuda. Destacan que la implementación del proyecto Vía Verde, que se hace posible luego de la aprobación de la DIA-F requerida, se está llevando a cabo a través de un amplio despliegue de funcionarios que miden el área y discuten sobre expropiaciones, lo que "les ha alterado la paz de la que por muchos años disfrutaban, antes del anuncio" del Gasoducto.[61] Manifiestan que: "La

---

[60] Escrito de Revisión, pág. 11; Apéndice del Certiorari CC-2011-718, pág. 34; Apéndice del Certiorari CC-2011-722, pág. 61.

[61] Escrito de Revisión, pág. 6; Apéndice del Certiorari CC-2011-718, pág. 29; Apéndice del Certiorari CC-2011-722, pág. 56. Ante este Tribunal, los vecinos explican que "el proceso de entrega de cartas, contratos y visitas inesperadas a las propiedades para medir las fincas que están realizando los empleados contratados por la A.E.E. ha causado gran inquietud e inseguridad a los aquí comparecientes. Esto se debe a que la falta de información sobre los procedimientos y acciones que está tomando el gobierno crea incertidumbre sobre el destino de sus propiedades, vidas y fuentes de sustento. Además, los recurridos se han sentido oprimidos y amenazados con las constantes visitas, a las cuales se suma el sobrevuelo de helicópteros de la A.E.E. Estos helicópteros vuelan a una altura sumamente cerca del suelo de sus propiedades, lo que ha causado daño a sus cosechas y a su tranquilidad mental y

incertidumbre de lo que sucederá con sus propiedades, la cercanía del gasoducto y los peligros que éste representa les ha causado angustia, ansiedad y desasosiego. La posibilidad de verse obligados a relocalizarse les causa mucha preocupación".[62] Esta situación les ha provocado angustias emocionales y un miedo colectivo que ha hecho necesario que el Comité Barrio Portugués coordine servicios psicológicos para sus residentes.[63] Esto representa un daño espiritual actual, concreto y directamente relacionado con la aprobación de la DIA-F.

El daño es todavía más palpable, ya que los vecinos del Barrio Portugués detallan que, desde el comienzo de la implementación del proyecto Vía Verde, varios helicópteros han estado sobrevolando sus residencias, a muy bajas alturas y de modo constante. "Los fuertes vientos y ruidos que producen las aspas y motores de los helicópteros han causado temor, ansiedad y falta del descanso necesario, sobre todo a los residentes con condiciones de salud serias".[64] El sobrevuelo de los helicópteros que ocurre actualmente en esta comunidad les causa no sólo un daño emocional por la ansiedad y la intranquilidad que produce,

---

emocional debido, entre otras razones, al ruido extremo que producen los helicópteros". Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, pág. 18.

[62] Escrito de Revisión, pág. 6; Apéndice del Certiorari CC-2011-718, pág. 29; Apéndice del Certiorari CC-2011-722, pág. 56.

[63] *Íd.*

[64] *Íd.*

sino también daños físicos por la falta de descanso y las posibles lesiones a la audición debido a la exposición a un sonido muy fuerte durante un tiempo prolongado.

Hemos indicado que la Ley sobre Política Pública Ambiental provee protecciones ante efectos negativos sobre la calidad de vida de los residentes, incluyendo los producidos por el ruido y el polvo.[65] Además, el ruido continuo atenta contra el disfrute del domicilio familiar y la vida privada.[66] Esto no se debe tomar livianamente en Puerto Rico, donde la protección de la vida privada y familiar es de rango constitucional, y el derecho a la intimidad opera *ex proprio vigore*.[67] No podemos olvidar que nuestra Constitución protege el disfrute de la tranquilidad, la seguridad y la sensación de bienestar en el seno del hogar, que nuestro ordenamiento considera "un castillo y fortaleza tanto para su defensa … como para su reposo".[68]

---

[65] Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 77-78 (2000).

[66] *Véase* M.F. Moretón Sanz, La intimidad personal y familiar a la luz de la jurisprudencia del Tribunal Europeo de Derechos Humanos: el caso español y la protección contra las inmisiones derivadas de la contaminación acústica, 41 Rev. Jur. U.I.P.R. 299 (2006).

[67] Art. II, sec. 8, Const. P.R.; Vigoreaux Lorenzana v. Quizno's, 173 D.P.R. 254, 261-262 (2008); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 56-64 (1986); Puerto Rico Tel. Co. v. Martínez, 114 D.P.R. 328, 338-340 (1983); Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982).

[68] Pueblo v. Figueroa Navarro, 104 D.P.R. 721, 725 (1976). *Véase también* E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 439-441 (1975).

D. Problemas de seguridad

Todas las personas que están impugnando la DIA-F han expuesto, unos en mayor grado que otros, que su entorno, sus propiedades y sus vidas se encuentran en peligro a partir de la aprobación de dicho documento y a raíz de lo que las determinaciones contenidas en éste permiten. Esto les está provocando angustias mentales y representa una amenaza cercana de daños ambientales y patrimoniales. Por eso, discutimos de modo separado el problema de seguridad que enfrentan los vecinos y las vecinas ante el inminente paso del gasoducto Vía Verde cerca de sus residencias.

Cabe mencionar que <u>todos los vecinos incluyeron sus direcciones residenciales completas</u> en el Escrito de Revisión, incluyendo números de carretera y de kilómetro en el caso de las áreas rurales y nombre de calle y número de casa en el caso de las áreas urbanas. Asimismo, la mayor parte de los recurridos anotaron a cuántos metros de sus propiedades pasaría el Gasoducto. Los vecinos que son portavoces de las organizaciones comunitarias recurridas también incluyeron dicha información. De esa forma, se establece claramente la proximidad entre el lugar en el que se encuentran los vecinos y el lugar donde se desarrollará el proyecto, y se atiende la preocupación expresada en *Surfrider* sobre la necesidad de colocar al foro judicial en posición de poder determinar la probabilidad de que se

sufra un efecto adverso, proveyendo información sobre la localización.[69]

El Gasoducto pasaría *a menos de 19 metros* de las propiedades de Maribel Torres Carrión, Hernán Padín Jiménez y Rosa Serrano González, ubicadas en el Barrio Factor 2 de Arecibo.[70] Sabrina Padua Rullán, vecina del Barrio Factor 2 en Arecibo, indicó que el Gasoducto pasaría *a menos de 34 metros* de su residencia.[71] Margarita Forestier Torres, Ernesto Forestier Torres y Carmen Juarbe Pérez, quienes componen la Sucesión de Ada Torres y son residentes en El Roblegal en Utuado, así como Fernando Vélez Vélez, alegaron que el Gasoducto pasaría *a menos de 50 metros* de su propiedad.[72] Gilberto Padua Rullán, residente en el Barrio Factor 2 en Arecibo, señaló que el Gasoducto pasaría *a menos de 51 metros* de su vivienda.[73] Cándida Cruz Cruz y Amparo Cruz Cruz, vecinas del Barrio Factor 2 en Arecibo, indicaron que el Gasoducto pasaría *a menos de 69 metros* de sus hogares.[74] Alejandro Saldaña Rivera, Dixie Vélez Vélez,

---

[69] Surrider, *supra*, a las págs. 587-588.

[70] Escrito de Revisión, pág. 10; Apéndice del Certiorari CC-2011-718, pág. 33; Apéndice del Certiorari CC-2011-722, pág. 60.

[71] *Íd.*

[72] Escrito de Revisión, pág. 9; Apéndice del Certiorari CC-2011-718, pág. 32; Apéndice del Certiorari CC-2011-722, pág. 59.

[73] Escrito de Revisión, pág. 10; Apéndice del Certiorari CC-2011-718, pág. 33; Apéndice del Certiorari CC-2011-722, pág. 60.

[74] *Íd.* El procedimiento de expropiación sobre la propiedad de Cándida Cruz Cruz y Amparo Cruz Cruz comenzó mientras se

Dylia Santiago Collazo y Miriam Morales González, todos vecinos de El Roblegal en Utuado, aseveraron que el Gasoducto pasaría *a menos de 100 metros* de sus residencias.[75] El Gasoducto pasaría *a menos de 200 metros* de la residencia del señor García Oyola y de un caño de agua dulce cercano a ésta, en el Barrio Hato Viejo de Arecibo, por lo que alegó que siente ansiedad y preocupación por su seguridad.[76] Maritza Rivera Cruz, vecina del Barrio Factor 2 en Arecibo, señaló que el Gasoducto pasaría *a menos de 300 metros* de su residencia.[77] Arístides Rodríguez Rivera, Ada Rodríguez Rodríguez y William Morales Martínez, vecinos de la Calle Cabrera en Utuado, indicaron que sus residencias se encuentran en un área crítica, *a 720 metros* de donde pasaría el gasoducto.[78] El señor Rodríguez Rivera fue deponente en las vistas públicas sobre el proyecto.[79]

---

tramitaba este caso. Oposición a Alegato, pág. 9. Otros vecinos del Barrio Factor 2 que están impugnando la DIA-F son Pablo Montalvo Bello y Ramona Ramos Días. Escrito de Revisión, pág. 9; Apéndice del Certiorari CC-2011-718, pág. 32; Apéndice del Certiorari CC-2011-722, pág. 59.

[75] Escrito de Revisión, págs. 8-9; Apéndice del Certiorari CC-2011-718, págs. 31-32; Apéndice del Certiorari CC-2011-722, págs. 58-59.

[76] Escrito de Revisión, págs. 10-11; Apéndice del Certiorari CC-2011-718, págs. 33-34; Apéndice del Certiorari CC-2011-722, págs. 60-61.

[77] Escrito de Revisión, pág. 9; Apéndice del Certiorari CC-2011-718, pág. 32; Apéndice del Certiorari CC-2011-722, pág. 59.

[78] Escrito de Revisión, págs. 7-8; Apéndice del Certiorari CC-2011-718, págs. 30-31; Apéndice del Certiorari CC-2011-722, págs. 57-58.

[79] En la lista de deponentes a los que la J.C.A. les envía copia de la R-10-45-1, aparece en el número 8, en la página

De igual forma, los vecinos de Colinas de San Andrés, en la Carretera 10 en Utuado, expusieron que el gasoducto Vía Verde pasaría frente a sus residencias, según la propuesta discutida en la DIA-F del proyecto. En ese grupo se encuentran Iván Vélez González, Francisca Montero Colón y Sol María de los Ángeles Rodríguez Torres.[80] Francisco Ruiz Nieves y Silvia Jordán Molero, vecinos del Barrio Salto Arriba en Utuado, también indicaron que el Gasoducto pasaría frente a sus residencias.[81] Emma González Rodríguez, quien tiene su residencia y finca en el Sector La Pica en Arecibo, así como Samuel Sánchez Santiago y Raquel Ortiz González, vecinos del mismo sector, expusieron que el Gasoducto pasaría por frente y por detrás de sus propiedades.[82] También se encuentran entre las personas recurridas, tres residentes de Toa Baja que habitan dentro del área crítica de peligrosidad del Gasoducto, en zonas

---

10 de dicha Resolución; Apéndice del Certiorari CC-2011-718, pág. 122c 9; Apéndice del Certiorari CC-2011-722, pág. 42.

[80] Escrito de Revisión, pág. 7; Apéndice del Certiorari CC-2011-718, pág. 30; Apéndice del Certiorari CC-2011-722, pág. 57. En la página 9 de su Oposición a Alegato de las Partes Recurridas, presentado el 6 de octubre de 2011, la A.E.E. informó que la señora Rodríguez Torres ya es parte del grupo de ciudadanos contra quienes comenzó el proceso de expropiación.

[81] Escrito de Revisión, pág. 8; Apéndice del Certiorari CC-2011-718, pág. 31; Apéndice del Certiorari CC-2011-722, pág. 58.

[82] Escrito de Revisión, pág. 9; Apéndice del Certiorari CC-2011-718, pág. 32; Apéndice del Certiorari CC-2011-722, pág. 59. El procedimiento de expropiación sobre la propiedad de Raquel Ortiz González comenzó mientras se tramitaba este caso. Oposición a Alegato, pág. 9.

densamente pobladas de Levittown: Elizabeth Nazario Rodríguez, de la Urbanización Levittown Lakes; Lydia Muñoz Mercado, de la 3ra Sección de Levittown, y Samira Yassin Hernández, de la Urbanización Valparaíso.

Los recurridos alegaron que los cambios de alineación de la tubería que se reflejan en la DIA-F, la acercan más a las residencias en diversas áreas.[83] Ninguno de ellos, a diferencia de los que mencionamos en la sección sobre daños económicos, indicó en el Escrito de Revisión haber recibido notificación de la A.E.E. informando que podría ser expropiado o que su residencia podría verse afectada, a pesar de que todas las residencias están en áreas muy cercanas a la ruta del Gasoducto. Algunas, incluso, se encuentran dentro del área de despejo de alto riesgo de *150 pies (45.72 metros)* identificada por la Autoridad. La A.E.E. alega que todas las propiedades en esta zona de alta peligrosidad serán expropiadas.[84]

Sobre el área de despejo entre el Gasoducto y las viviendas, los recurridos expusieron en el Escrito de Revisión presentado al Tribunal de Apelaciones que esta distancia no representa la verdadera zona de alta peligrosidad. Explicaron que la agencia se basó en un estudio que utiliza como punto de referencia áreas

---

[83] Escrito de Revisión, pág. 94; Apéndice del Certiorari CC-2011-718, pág. 116; Apéndice del Certiorari CC-2011-722, pág. 144.

[84] Certiorari de la A.E.E. en el TS, CC-2011-722, pág. 22. La DIA-F menciona que en la zona de alta peligrosidad de 150 pies "no se permitirá la construcción de nuevas estructuras". DIA-F de Vía Verde, pág. 5-55.

escasamente pobladas, que no corresponden a las zonas del área metropolitana de alta densidad poblacional, como Levittown, por las que transcurrirá Vía Verde. Además, se adoptó una medida que no contempla el cálculo del área de acuerdo con las características de Vía Verde. En cuanto a esto, explicaron que el Capítulo 5.11.2(j) de la DIA-F sobre Análisis de Riesgos y Medidas de Seguridad dispone que la distancia de despejo de 150 pies se seleccionó de acuerdo con el estudio "A Model for Sizing High Consequence Areas Associated with Natural Gas Pipelines", realizado en el 2000, que proveyó una fórmula para calcular el radio de impacto potencial donde una falla en la tubería podría tener altas consecuencias en la vida y la propiedad. Sin embargo, la DIA-F más adelante indica que, aunque el cálculo para Vía Verde según el estudio es de *422 pies (128.63 metros)*, las consecuencias fatales sólo alcanzarían los primeros 150 pies.[85] Los recurridos indicaron que la DIA-F no explica por qué se utiliza la distancia de 150 pies en lugar de la de 422 pies que resulta de la fórmula que recomienda el estudio científico. Además, señalaron que, según un estudio que presentó en las vistas públicas el Dr. Neftalí García Martínez, de Servicios Científicos y Técnicos, la distancia de despejo debía ser mayor a los 422 pies. De acuerdo con las fórmulas matemáticas explicadas por García Martínez, esto se debe a que la distancia de 422

---

[85] Escrito de Revisión, págs. 48-49; Apéndice del Certiorari CC-2011-718, págs. 70-71; Apéndice del Certiorari CC-2011-722, págs. 98-99. DIA-F de Vía Verde, págs. 5-55 – 5-56.

pies se calculó tomando como factores unos números de presión de gas natural y diámetro de tubería que no corresponden a los de Vía Verde; se realizó a base de una presión dentro de la tubería de 650 libras por pulgada cuadrada, pero Vía Verde está diseñado para aguantar hasta 1,450 libras por pulgada cuadrada, y, a mayor presión del gas, mayor es la distancia de despejo que se requiere como medida de seguridad.[86]

Los recurridos también discutieron en su Escrito de Revisión un estudio realizado por los arquitectos Patrick Urbain y Ricardo Miranda que determina que la zona real de peligro es de 800 metros (2,624.67 pies) de ancho e incluye 25,877 viviendas, además de edificaciones no residenciales. La medida se basó en el alcance de la onda expansiva de calor e incendio que se registró en ciudades de Estados Unidos y otros países donde explotaron líneas de transmisión de gas natural con características similares a las propuestas para el gasoducto Vía Verde, entre el 2004 y el 2010.[87]

---

[86] Escrito de Revisión, págs. 49-51; Apéndice del Certiorari CC-2011-718, págs. 71-73; Apéndice del Certiorari CC-2011-722, págs. 99-101. *Véase también* N. García Martínez, Comentarios sobre el Gasoducto del Sur-Centro-Norte, 16 de octubre de 2010; Apéndice del Certiorari CC-2011-718, págs. 122q-122q 24; Apéndice del Certiorari CC-2011-722, págs. 339-363. En el Capítulo 5 de la DIA-F, se estima que el gas natural entrará a la tubería con una presión de 650 libras por pulgada cuadrada, pero todos los equipos tienen capacidad para operar a una presión de 1,450 libras por pulgada cuadrada. DIA-F de Vía Verde, págs. 5-3 y 5-51.

[87] Escrito de Revisión, págs. 51-52; Apéndice del Certiorari CC-2011-718, págs. 73-74; Apéndice del Certiorari CC-2011-722, págs. 101-102.

Además, los recurridos basaron sus preocupaciones respecto a su seguridad personal en información de conocimiento general histórico sobre el saldo de explosiones de tuberías de gas natural en distintas ciudades, entre las cuales mencionaron: San Bruno, California, donde murieron 8 personas y se destruyeron 38 casas en el 2010; Bergenfield, Nueva Jersey, donde 3 personas murieron y un edificio fue declarado pérdida total en el 2005; Carlsbad, Nuevo México, donde murieron 12 personas y hubo extensos daños a la propiedad en el 2000, y Bellingham, Washington, donde murieron 3 menores de edad y la planta de agua de la ciudad sufrió daños millonarios en el 1999. Estos accidentes y otros descritos en el Escrito de Revisión se detallan en los informes de accidentes de sistemas de gas natural de la National Transportation Safety Board. Asimismo, los recurridos incluyeron datos de la agencia federal para la regulación de gasoductos, la Pipeline and Hazardous Materials Safety Administration, que señalan que en Estados Unidos, donde sólo hay 100 inspectores para 2.3 millones de millas de gasoductos, se han registrado sobre 2,840 accidentes significativos desde el 1990. Según los datos de las agencias federales, entre el 1989 y el 1998, murieron 226 personas y 1,330 resultaron heridas en Estados Unidos como resultado de accidentes en gasoductos. Un informe del Congressional Research Service indica que los errores, fugas, fallas y explosiones relacionados con gasoductos cobran un promedio de 17 vidas

anualmente en Estados Unidos.[88] De esa forma, <u>los recurridos demostraron que sus temores son reales y los fundamentaron en sucesos históricos y en estudios científicos.</u>[89]

De otra parte, Miguel Báez Soto, así como Arístides Rodríguez Rivera y Ada Rodríguez Rodríguez, expusieron que transitan diariamente por la Carretera 10, que es parte de la ruta de Vía Verde descrita en la DIA-F.[90] Resulta contradictorio e incomprensible que la Opinión mayoritaria indique que el mero hecho de transitar por un tramo cercano al proyecto no confiere legitimación cuando en *Surfrider* se advirtió que una de las razones por las cuales no se podía auscultar si el peticionario sufriría un efecto adverso era que "[n]i siquiera sabemos si el señor Richter tiene que transitar por el área cercana al proyecto".[91]

En la sección sobre impactos geológicos del Escrito de Revisión, los vecinos advirtieron que la DIA-F dejó fuera estudios indispensables para proteger la seguridad pública que fueron requeridos por el grupo de Asesoramiento Científico de la J.C.A. Además, resaltaron que los mapas geológicos utilizados en el estudio eran de la década de

---

[88] Escrito de Revisión, págs. 52-57; Apéndice del Certiorari CC-2011-718, págs. 74-79; Apéndice del Certiorari CC-2011-722, págs. 102-107.

[89] Lo mismo hicieron los peticionarios en <u>Massachusetts v. E.P.A.</u>, *infra*.

[90] Escrito de Revisión, págs. 7 y 11; Apéndice del Certiorari CC-2011-718, págs. 30 y 34; Apéndice del Certiorari CC-2011-722, págs. 57 y 61.

[91] <u>Surfrider</u>, *supra*, a la pág. 588. *Véase* Opinión mayoritaria, a la pág. 27.

1970 y no fueron corroborados por estudios de campo, por lo que no calculan adecuadamente los riesgos reales sobre terremotos, maremotos, inundaciones, licuefacción y susceptibilidad a deslizamientos.[92] Estas consideraciones son importantes para las personas que residen y transitan por el área. Asimismo, los recurridos señalaron que el estudio de riesgos en la DIA se realizó de forma fragmentada, violando la obligación de discutir el impacto conjunto, y no contempló el proyecto de vender gas natural directamente a clientes comerciales e industriales mediante conexiones en el trayecto del Gasoducto.[93]

El Escrito de Revisión Administrativa que presentaron los recurridos incluye también una sección sobre seguridad en la cual se detallan los riesgos a la vida y la propiedad de las personas que viven en zonas aledañas a la ruta propuesta del Gasoducto y que no se consideraron o se consideraron inadecuadamente en la DIA-F de Vía Verde, permitiendo que las acciones subsiguientes sobre el proyecto los ignoren. Señalaron que no se incluyó un análisis de los peligros que se enfrentarían durante todas las fases del proyecto, incluyendo lo concerniente al

---

[92] Escrito de Revisión, págs. 69-75; Apéndice del Certiorari CC-2011-718, págs. 91-97; Apéndice del Certiorari CC-2011-722, págs. 119-125. *Véase también* R-10-37-1 de la J.C.A., págs. 20-22; Apéndice del Certiorari CC-2011-718, págs. 122s 19 – 112s 21; Apéndice del Certiorari CC-2011-722, págs. 436-438.

[93] Escrito de Revisión, págs. 75-78; Apéndice del Certiorari CC-2011-718, págs. 97-100; Apéndice del Certiorari CC-2011-722, págs. 125-128. *Véase* Municipio de Loíza v. Sucns. Suárez, 154 D.P.R. 333, 361 (2001).

mantenimiento de la tubería, el almacenaje y la transportación del gas natural.[94] Indicaron que, ignorando las recomendaciones del grupo de Asesoramiento Científico de la propia J.C.A., tampoco se consideraron accidentes que pudieran resultar de fenómenos naturales como huracanes y terremotos, de errores humanos ni de vandalismo en las trincheras abiertas de la tubería, y que no se incluyeron planes de contingencia para estas situaciones ni ante emergencias por escapes de gas natural.[95] Todos estos señalamientos sobre la seguridad de los vecinos ameritan, cuando menos, que se les reconozca legitimación activa para que los tribunales puedan ponderar sus alegaciones en contraposición con las de los proponentes del Gasoducto.

E. Relación de los daños con la aprobación de la DIA-F

La Opinión mayoritaria subraya que el "daño tiene que ser causado por la decisión administrativa de la cual se recurre" y la legitimación se evalúa con referencia a ésta.[96] Sin embargo, limita su análisis al contenido de una sección del Escrito de Revisión Administrativa que describe

---

[94] Escrito de Revisión, págs. 43-48 y 58-59; Apéndice del Certiorari CC-2011-718, págs. 65-70 y 80-81; Apéndice del Certiorari CC-2011-722, págs. 93-98 y 108-109.

[95] Escrito de Revisión, págs. 45 y 48; Apéndice del Certiorari CC-2011-718, págs. 67 y 70; Apéndice del Certiorari CC-2011-722, págs. 95 y 98. *Véase también* Oneida Delgado – Área de Asesoramiento Científico J.C.A., Evaluación DIA-P (Borrador) (AEE) Vía Verde de Puerto Rico, 17 de agosto de 2010, págs. 12-13; Apéndice del Certiorari CC-2011-718, págs. 122h 11 - 122h 12; Apéndice del Certiorari CC-2011-722, págs. 248-249.

[96] Opinión mayoritaria, a las págs. 23-24.

las maneras en que cada recurrido se relaciona con el proyecto Vía Verde. De esa sección, titulada "Identificación de las Partes", colige, <u>sin referirse a las demás secciones del Escrito</u>, que los vecinos no tienen legitimación activa porque supuestamente no especifican cómo sus daños derivan de la aprobación de la DIA-F que se impugna. Aunque entendemos que los daños alegados en esta sección que describe a las partes son suficientes, advertimos que el Escrito se debe examinar de forma íntegra.

La mayoría hace caso omiso del resto del Escrito de Revisión, que incluye una discusión pormenorizada sobre las deficiencias de la DIA-F y cómo éstas afectan a todos los recurridos o a algunos de éstos, dependiendo del área de la DIA-F que se analiza.[97] Esto a pesar de que, cuando se alega que un peticionario no tiene legitimación, nuestro ordenamiento exige a los tribunales analizar sus reclamos del modo más favorable para éste, así como presumir que sus alegaciones son ciertas.[98] Además, los recurridos explican en su Alegato que

_____

[97] Escrito de Revisión, págs. 41-99; Apéndice del Certiorari CC-2011-718, págs. 63-121; Apéndice del Certiorari CC-2011-722, págs. 91-149.

[98] *Véanse* <u>Crespo v. Cintrón</u>, 159 D.P.R. 290, 299 (2003); <u>Col. Peritos Electricistas v. A.E.E.</u>, 150 D.P.R. 327, 332 (2000); <u>Col. Ópticos de P.R. v. Vani Visual Center</u>, 124 D.P.R. 559, 567 (1989). Esta práctica es cónsona con la política de nuestros tribunales de permitir a los ciudadanos su "día en corte" y promover que los casos se resuelvan en sus méritos. *Véanse, por ejemplo,* <u>Pueblo v. Rivera Toro</u>, 173 D.P.R. 137, 145 (2008); <u>Soc. de Gananciales v. García Robles</u>, 142 D.P.R. 241, 260 (1997).

una DIA incompleta o deficiente, como los aquí recurridos plantean que ocurre con la elaborada para el Gasoducto, falla en permitir que la agencia proponente tome en consideración los impactos ambientales significativos del proyecto antes de tomar una decisión en torno a su viabilidad, al igual que no logra advertir a la ciudadanía de las consecuencias ambientales y sociales del desarrollo del proyecto. Es de allí que surge el daño irreparable que describe este Tribunal, daño que supera con creces el tipo de daño que debe alegar una parte para demostrar que tiene legitimación activa para presentar un recurso de revisión como el de la presente controversia. Ello también sirve para explicar por qué, y contrario a lo alegado por la peticionaria A.E.E., este Tribunal ha resuelto incontables controversias sobre el cumplimiento de documentos ambientales elaborados por agencias proponentes con la [Ley de Política Pública Ambiental], en vez de concluir que el daño alegado por los allí recurrentes era insuficiente para demostrar que tenían legitimación activa.[99]

Es ilógico analizar el daño sufrido o la posibilidad de sufrir un daño como consecuencia de la aprobación de un documento sin razonar cuáles son las implicaciones probables de ese escrito. Es decir, no podemos entender que la aprobación de la DIA-F no va a provocar un daño porque en el texto de la DIA no se encuentra la orden expresa de expropiar, de demoler, de talar, de construir o de transportar un combustible peligroso a pocas millas de un hogar. No considerar estas consecuencias de la aprobación de la DIA equivaldría a hacer un análisis en el abstracto, contrario a la finalidad de la decisión en *Surfrider*, que añadió requisitos a la doctrina de legitimación, según expuso, con el propósito de eludir lo hipotético. Lo cierto

---

[99] Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, págs. 12-13.

es que la aprobación de la DIA-F permite que se lleven a cabo las acciones que están afectando o afectarán adversamente a quienes la impugnan.

Como explica la J.C.A. en su recurso, la DIA-F no representa la autorización final para llevar a cabo el proyecto, pero le permite a las agencias decidir si procede otorgar los permisos subsiguientes, pues les asegura que se evaluaron todos los posibles impactos ambientales y que se les ha provisto toda la información que necesitan para tomar su decisión.[100] No se puede desvincular la acción cuestionada en el presente recurso, la aprobación de la DIA-F del gasoducto Vía Verde, de los permisos para la construcción y operación de dicho proyecto, con el fin de argumentar que la aprobación del documento ambiental no conlleva daños.[101] Ello es contrario a toda lógica, ya que las etapas de permisos de construcción y uso del proyecto que siguen a la DIA-F van a depender de la evaluación de las consecuencias ambientales significativas realizada en

---

[100] Certiorari de la J.C.A. ante el T.S., CC-2011-718, págs. 13-15.

[101] Opinión mayoritaria, a las págs. 22-23. Una situación similar se da cuando se pretende evaluar por separado un permiso de construcción del uso que se le va a dar a esa construcción, pues todas las etapas de desarrollo de un proyecto están indiscutiblemente vinculadas. *Véase, por ejemplo*, Voto de conformidad del juez Martínez Torres en Brito Díaz y otros v. Bioculture y otros, 2011 T.S.P.R. 185, pág. 8, en el que señala: "No podemos separar los conceptos construcción y uso. La ley no concibe que se conceda un permiso de construcción enajenado del uso que se le va a proporcionar a la edificación construida. Después de todo, nadie construye en el abstracto".

ésta.[102] Requerir que se demuestre que la aprobación misma de la DIA, como acto aislado, causa daños más directos que los particularizados aquí equivaldría a decretar irrevisables las aprobaciones de documentos ambientales.[103]

Es cierto que, como expresamos en *Misión Industrial P.R. v. J.C.A.*, existen remedios para atender daños ambientales no previstos en la DIA o daños que surjan de una declaración que no fue aprobada adecuadamente, remedios que representan alternativas viables siempre y cuando se permita ejercer las acciones correspondientes para hacerlos valer. Ello no significa que los ciudadanos no tengan legitimación en etapas anteriores del proceso, como lo es la de la aprobación de la DIA, para presentar reclamaciones ante violaciones a la política pública ambiental.[104] Cuando en aquel caso mencionamos que la DIA es un instrumento de planificación y su aprobación no es una carta blanca para dejar de tomar medidas en protección del ambiente en etapas más adelantadas del proyecto, lo hicimos con el fin de aclarar que la DIA no exime a las agencias de evitar efectos ambientales adversos no contemplados en ésta y que

---

[102] "[E]l proceso de presentación, análisis y trámite de los documentos ambientales dispuesto en este reglamento [de la J.C.A. sobre declaraciones de impacto ambiental] debe concluirse previo al inicio del proyecto o acción gubernamental propuesta" y "previo a establecer cualquier compromiso de naturaleza irrevocable de los recursos o del ambiente". Regla 251 B del Reglamento 6510 de 2002; Regla 112 C del Reglamento 7948 de 2010.

[103] *Véase* Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, pág. 23.

[104] Misión Industrial P.R. v. J.C.A., *supra*, a las págs. 926-927.

su aprobación no se debe interponer como defensa contra una persona que alega que el avance del proyecto va en detrimento del ambiente.[105] A diferencia de lo que sugiere la Opinión mayoritaria, de ninguna manera *Misión Industrial v. J.C.A.* limita la capacidad de unos vecinos con interés para impugnar una DIA.

En casos anteriores, hemos señalado que las agencias fiscalizadoras, como es la J.C.A., tienen el deber de evitar, mediante una intervención temprana, que la prisa por completar las obras públicas en el menor tiempo posible afecte adversamente el medio ambiente.[106] Por el carácter permanente de los daños ambientales, las violaciones a los procedimientos de declaración de impacto ambiental se consideran daños irreparables de por sí y quien sufre ese daño irreparable en casos ambientales de interés público es el Pueblo.[107] Por lo tanto, siguiendo lo dispuesto en nuestro ordenamiento, todas las personas que impugnaron la

---

[105] *Íd.* págs. 925-926. *Véase* Opinión mayoritaria, págs. 22-23.

[106] Misión Industrial P.R. v. J.P. y A.A.A., *supra*, a la pág. 685.

[107] Nuestra norma de legitimación activa es sumamente amplia cuando se trata de casos de interés público como el presente. AMPR v. Srio. Educación, E.L.A., 178 D.P.R. 253, 265 (2010). En éstos, "el Pueblo es considerado como la parte especialmente interesada y el demandante no necesita probar que tiene interés especial en el resultado del caso. Basta demostrar que es un ciudadano y, como tal, está interesado en la ejecución y protección del derecho público". Asociación de Maestros v. Pérez, Gobernador Int., 67 D.P.R. 848, 851 (1947). *Véanse también*: AMPR, *supra*, a las págs. 265-266; Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 237 (1988); Solís v. Municipio de Caguas, 120 D.P.R. 53, 56 (1987); P.S.P. v. E.L.A., 107 D.P.R. 590, 595 (1978).

DIA-F por ser insuficiente, en virtud de la Ley de Política Pública Ambiental y del mandato constitucional de protección del ambiente, están legitimadas para ello. Pero, aun si ignorásemos esas claras disposiciones, todos los daños discutidos anteriormente demuestran que los recurridos, o al menos uno de ellos -lo que sería suficiente-, tienen legitimación. Asimismo, los vecinos reclamaron en el momento necesario para detener los daños que estaban sufriendo y evitar otros que probablemente sufrirían, antes de que fueran irremediables. Los recurridos cumplieron con el requisito de alegar un daño real, concreto, no especulativo, específico y particular en su primera comparecencia ante el Tribunal de Apelaciones, mediante todo lo planteado en su Escrito de Revisión.[108]

## II

Los requisitos de justiciabilidad, uno de los cuales es la legitimación activa, son utilizados por los tribunales "para delimitar su propia jurisdicción … y no lanzarse a resolver cuestiones hipotéticas o planteadas

---

[108] Lo planteado en el Escrito de Revisión es suficiente para determinar que existen los daños requeridos, sin contar con el resto de la información presentada por los recurridos, que se encuentra en el expediente administrativo de la J.C.A., que no se elevó a este Tribunal. Aun así, los recurridos, en el Tribunal de Apelaciones, ofrecieron suplementar su Escrito de Revisión con declaraciones juradas sobre sus daños. Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, págs. 25-26. En Sierra Club v. Morton, 405 U.S. 727, 735 esc. 8 (1972), se permitió que los opositores al proyecto propuesto enmendaran sus alegaciones para establecer que sufrirían un daño particular. Este caso es citado extensamente en la discusión sobre "parte adversamente afectada" de Surfrider, supra, a las págs. 583-584.

dentro de un contexto inadecuado".[109] El propósito primordial de determinar si una persona tiene legitimación es asegurarse de que ésta tiene un interés genuino en la controversia planteada que es adverso al de la otra parte y que el remedio que se dicte afectará su situación jurídica.[110] Por eso, los criterios que se utilizan para determinar si una parte tiene legitimación activa funcionan como un filtro para comprobar que la persona que está ante el tribunal tiene tanto interés en el caso que gestionará su causa de acción de forma vigorosa con el fin de que el foro judicial cuente con todos los elementos de juicio necesarios para adjudicarla de la manera más justa, según el ordenamiento jurídico aplicable.[111]

Según alegan los recurridos, y se observa a través de los documentos contenidos en el expediente del presente caso, "[d]ifícilmente pueda encontrarse en Puerto Rico alguna otra parte que esté dispuesta a litigar este asunto con el interés y la adversidad que tienen las partes aquí comparecientes hacia las determinaciones tomadas por el Estado".[112] La participación activa que han tenido los

---

[109] Hernández Torres v. Hernández Colón *et al.*, 131 D.P.R. 593, 598 (1992); E.L.A. v. P.R. Tel. Co., 114 D.P.R. 394, 399 (1983).

[110] Noriega v. Hernández Colón, 135 D.P.R. 406, 420-421 (1994). *Véanse también* Moreno v. Pres. U.P.R. II, 178 D.P.R. 969, 973 (2010); E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559 (1958).

[111] Crespo, *supra*, a la pág. 299; Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 413 (1982).

[112] Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, pág. 23.

recurridos durante todo el proceso de evaluación del proyecto de gasoducto propuesto, así como los recursos que han presentado ante los tribunales diligentemente en busca de que se reconozca su derecho a oponerse y se escuchen sus preocupaciones y sugerencias ante una acción gubernamental que les afecta directamente, demuestran el interés particular que tienen en la presente controversia.[113]

Aunque un interés legítimo por sí sólo no confiere legitimación activa, ese interés, que puede ser de tipo económico, social, ambiental u otro, es un ingrediente que abona significativamente al derecho a acudir en revisión judicial de una acción administrativa.[114] El interés genuino en la controversia es la base de los requisitos de legitimación y los recurridos han demostrado tenerlo. También han confirmado que su interés es adverso al de las peticionarias, por lo que se esforzarán por presentar toda la información necesaria para la impugnación de la DIA-F y tramitarán su causa de acción hasta el final. Asimismo, han acreditado que el remedio que se dicte afectará su situación jurídica, pues la cancelación del proyecto o los cambios a éste que consigan a través de la impugnación de

---

[113] Debemos mencionar que, según se desprende de los alegatos de las partes y las resoluciones administrativas y judiciales, la participación de los recurridos ha sido mayor que la que refleja el expediente, pues, en algunas ocasiones no se incluyeron los comentarios que manifestaron o entregaron a las agencias en los informes que éstas prepararon y en otras ocasiones los tribunales decidieron no aceptar los documentos presentados por los vecinos.

[114] *Véase* San Antonio Maritime v. P.R. Cement Co., 153 D.P.R. 374, 392-393 (2001).

la DIA-F puede librarlos de ser expropiados de sus hogares y terminar con los temores que los aquejan sobre los efectos adversos a su medio ambiente, sus cosechas y su seguridad personal. Así, cumplen con el requisito general de la doctrina de justiciabilidad.

En *García Oyola v. J.C.A.*, este Tribunal rechazó el planteamiento de la J.C.A. y la A.E.E. sobre falta de legitimación activa de los ciudadanos y determinó que los residentes tenían capacidad jurídica para presentar el recurso, pues su interés en la controversia respondía a consideraciones ambientales, estéticas y de salud legítimas; existía relación entre los daños que alegaban y la determinación de la Junta; habían figurado como deponentes en las vistas públicas, y se amparaban en la Ley sobre Política Pública Ambiental.[115] Las mismas circunstancias están presentes respecto a los recurridos en este caso.

La doctrina de legitimación activa establece cuatro requisitos con los que debe cumplir la parte demandante, "en ausencia de un estatuto que expresamente confiera legitimación activa a ciertas personas".[116] Por eso, la primera pregunta que se deben hacer los tribunales al examinar la legitimación de un demandante es si alguna ley

---

[115] García Oyola, *supra*, a las págs. 538-539. En este caso, un grupo de vecinos solicitó la revisión de la determinación de la J.C.A. de aprobar una DIA para un proyecto de la A.E.E. mediante el cual se establecería una planta para generar electricidad cerca de sus residencias.

[116] (Énfasis suplido.) Hernández Torres v. Gobernador, 129 D.P.R. 824, 835 (1992).

le confiere una causa de acción. En este caso, los recurridos están legitimados estatutariamente en virtud del derecho a solicitar revisión judicial que provee la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) a cualquier parte adversamente afectada, en el marco de un proceso administrativo flexible. No obstante, aunque los recurridos en este caso tienen capacidad para demandar por concesión legislativa, igualmente han demostrado que cumplen con los requisitos de legitimación elaborados para casos en que no existe tal autorización. Esos criterios son: haber sufrido un daño claro y palpable; que ese daño sea real y preciso, no abstracto ni hipotético; que exista un nexo causal entre ese daño alegado y la causa de acción que se presenta, y que la causa de acción surja al amparo de la Constitución o de alguna ley.[117] Todos los vecinos, según se ha discutido, han sufrido o están en riesgo inminente de sufrir daños claros y palpables, que son reales, precisos y no hipotéticos. Además, los daños que los recurridos alegaron en su Escrito de Revisión están claramente relacionados con su impugnación de la DIA-F, pues sin la aprobación de ésta no se podría construir y operar el gasoducto Vía Verde. Finalmente, la causa de acción surge al amparo de la disposición constitucional de conservación ambiental y de la Ley sobre Política Pública Ambiental, y se tramita según dispuesto en la L.P.A.U. y la Ley 76 de 2000.

---

[117] Lozada Tirado *et al.* v. Testigos de Jehová, 177 D.P.R. 893 (2010).

En el caso de organizaciones que demandan a nombre de sus integrantes, éstas deben probar que los intereses que se pretenden proteger están relacionados con los objetivos de la asociación; que los miembros tendrían legitimación activa para demandar a nombre propio, y que el remedio solicitado no requiere la participación individual de los miembros en el pleito.[118] Las asociaciones que se encuentran entre los recurridos también cumplen con los requisitos que impone la doctrina de legitimación para grupos que demandan en representación de sus miembros.

Los objetivos de las organizaciones Comité Barrio Portugués en Contra del Gasoducto y Comité Utuadeño en Contra del Gasoducto no pueden estar más relacionados con los intereses que pretenden proteger, pues se trata de grupos comunitarios que se crearon precisamente para defender a los vecinos que se estaban viendo o se verían adversamente afectados por el Gasoducto y para informar sobre el desarrollo y las consecuencias del proyecto Vía Verde. Los miembros de la organización en su carácter individual también tienen legitimación, pues son los residentes de los barrios adyacentes al proyecto y presentan los daños ya discutidos. La Opinión mayoritaria identifica como una deficiencia que no se incluyó una lista todos los miembros de ambos grupos. La realidad es que en ninguno de los casos sobre legitimación activa de asociaciones que ha visto este Tribunal se ha requerido que

---

[118] <u>Asoc. Maestros P.R. v. Srio. Educación</u>, 137 D.P.R. 528, 535-536 (1994); <u>Col. Ópticos de P.R.</u>, *supra*, a la pág. 567.

se incluya una lista de todos los miembros de la organización para poner al foro en posición de revisar si alguno de los integrantes tiene legitimación.[119] Una descripción de los objetivos de la agrupación y una alegación sobre los daños de al menos uno de sus miembros siempre han sido suficientes. En este caso, las dos organizaciones incluyeron los nombres, las direcciones y los daños específicos de sus portavoces, miembros de las asociaciones que también son vecinos recurridos. Por último, la participación de cada uno de los integrantes no es necesaria para este tipo de "acción pública", que busca revisar que una acción administrativa haya cumplido con la normativa ambiental y cuyo resultado va a beneficiar a todos los integrantes de la organización por igual sin que sea necesario evaluar compensaciones en daños para cada uno ni asuntos similares.[120]

Es evidente que los recurridos cumplen con todos los requisitos de legitimación activa para que los tribunales puedan atender su solicitud de revisión judicial. No hay tal ausencia de caso o controversia que impida que un tribunal considere la petición en sus méritos. Todo lo contrario. Como indicamos en *Misión Industrial v. J.C.A.*, "nos toca verificar que la Junta de Calidad Ambiental haya examinado adecuadamente todas las consecuencias ambientales

---

[119] *Véase* Opinión mayoritaria, pág. 26.

[120] *Véanse* Asoc. Maestros P.R. v. Secretario Educación, *supra*, a las págs. 542-543; Col. Ópticos de P.R., *supra*, a la pág. 568.

significativas que sean razonablemente previsibles y que haya discutido de igual modo todas las alternativas que razonablemente existan a la acción contemplada por la agencia proponente. De esta manera, ejercemos nuestra responsabilidad de velar por que la Junta haya dado cumplimiento al esquema estatutario y reglamentario que le rige, y la de procurar que se observe la política ambiental del país que, como hemos señalado ya, es de origen constitucional".[121] Negarnos a acoger este recurso, utilizando erróneamente la doctrina de legitimación activa, implica, no sólo cerrarle las puertas de los organismos de justicia a unos ciudadanos con interés legítimo en una situación de alto interés público que les afecta directamente, sino también rehuir de nuestro deber como el más alto foro judicial del País.

III

El rechazo a la atención de los reclamos de los vecinos que supone la decisión de una mayoría de este Tribunal es aún más alarmante si se consideran las circunstancias en las que surge la controversia de este caso. La DIA-F del gasoducto Vía Verde es un paso imprescindible hacia la construcción y operación de un proyecto que se ha desarrollado y tramitado en virtud de una declaración de "emergencia energética" mediante orden ejecutiva y de las disposiciones de la Ley 76 de 2000.

---

[121] Misión Industrial P.R. v. J.C.A., *supra*, a la pág. 930. *Véase también* la Opinión de conformidad del juez Hernández Denton en Municipio de San Juan, *supra*, a las págs. 745-752.

La Ley 76 de 2000 dispensa a las agencias y corporaciones públicas relacionadas con la concesión de permisos, endosos y consultas de cumplir con diversas disposiciones que reglamentan los procedimientos en la J.C.A., la Administración de Reglamentos y Permisos (A.R.Pe.), la Junta de Planificación y los municipios, así como con ciertas normas de la L.P.A.U., en casos de proyectos que surjan como consecuencia de estados de emergencia declarados mediante orden ejecutiva. El propósito de esa ley es lograr "la más eficaz conservación de los recursos existentes y el mayor desarrollo y aprovechamiento de los mismos para proteger y garantizar la salud, la seguridad pública y el bienestar de todo el Pueblo de Puerto Rico".[122] Con ese fin, establece procedimientos especiales para otorgar permisos y acorta los términos para presentar endosos, para evaluar documentos ambientales y consultas de ubicación y para solicitar revisión judicial. Asimismo, otorga prioridad a los proyectos que se lleven a cabo para atender la emergencia y confiere al Gobernador la potestad de promulgar, enmendar y revocar reglamentos, órdenes, contratos y convenios de manera que se facilite la respuesta a la emergencia.[123]

Ante las amplias facultades que concede dicha ley respecto a un tema que requiere tanta cautela y ante la

---

[122] Exposición de Motivos, Ley Núm. 76-2000.

[123] Arts. 2-13, Ley Núm. 76-2000, 3 L.P.R.A. secs. 1932-1943.

reducción considerable de las garantías de participación ciudadana y transparencia gubernamental que permite, es importante recalcar que <u>un estado de emergencia es un estado excepcional</u>. El historial legislativo de la Ley 76 de 2000 demuestra que la Asamblea Legislativa tuvo muy en cuenta esa idea.[124] Los comentarios de las agencias en torno al proyecto que se convirtió en esta ley revelan, además, la preocupación por que ésta no se utilizara inapropiadamente para casos que no representaran emergencias ni permitiera desarrollos sin la planificación debida.[125]

La Legislatura intentó subsanar esa deficiencia utilizando un lenguaje más específico en la Exposición de Motivos de la Ley y expresiones que denotaban mayor severidad en la definición de "emergencia". Así, ésta pasó de ser "cualquier evento o problema de infraestructura que afecte o pueda afectar la salud pública, la seguridad o el bienestar general de la ciudadanía",[126] en el proyecto

---

[124] Los documentos del Historial Legislativo de la Ley 76 de 2000 están disponibles a través del sistema electrónico de la Oficina de Servicios Legislativos, bajo el P. del S. 1791 de 1999, www.oslpr.org.

[125] *Véanse:* A.E.E., Comentarios al P. del S. 1791, 14 de octubre de 1999; A.E.E., Comentarios al P. del S. 1791, 14 de junio de 1999; J.C.A., Cometarios al P. del S. 1791, 8 de junio de 1999; J.C.A., Cometarios al P. del S. 1791, 15 de octubre de 1999. Administración de Reglamentos y Permisos [A.R.Pe.], Comentarios al P. del S. 1791, 7 de octubre de 1999, pág. 2; Departamento de Recursos Naturales y Ambientales, Comentarios al P. del S. 1791, págs. 2-4; Departamento de Justicia, Comentarios al P. del S. 1791, 22 de octubre de 1999, págs. 8-9.

[126] P. del S. 1791, 13 de mayo de 1999, pág. 4.

original, a "graves problemas de deterioro en la infraestructura física de prestación de servicios esenciales al pueblo, o que ponga en riesgo la vida, la salud pública o seguridad de la población o de un ecosistema sensitivo".[127]

Asimismo, se redujo el término por el cual se podía decretar la emergencia de un año a seis meses y, en vez de permitirle a la Asamblea Legislativa prorrogar el período de emergencia por términos adicionales de un año a petición del Gobernador, se incluyó una disposición para permitirle a la Legislatura pasar juicio sobre la declaración de emergencia y delimitarla, dentro del período de seis meses.[128] Para que la Asamblea Legislativa pueda realizar ese análisis, se requiere que la orden ejecutiva que declara la emergencia establezca la intensidad y extensión de los daños, su área geográfica y las obras públicas que deben protegerse con urgencia.[129] Mediante esa disposición, la Legislatura debía asegurarse de que la orden ejecutiva se limitara a las situaciones que busca atender la Ley, que son aquellas que requieren soluciones inmediatas.[130]

---

[127] (Énfasis suplido.) Art. 1(a), Ley Núm. 76-2000, 3 L.P.R.A. sec. 1931; Informe de Conferencia sobre el P. del S. 1791, 22 de noviembre de 1999.

[128] P. del S. 1791, 13 de mayo de 1999, pág. 8; Art. 12, Ley Núm. 76-2000, 3 L.P.R.A. sec. 1942. En este caso, el término de la emergencia era originalmente del 19 de julio de 2010 al 19 de enero de 2011.

[129] Art. 2, Ley Núm. 76-2000, 3 L.P.R.A. sec. 1932.

[130] Los informes de las comisiones legislativas que atendieron el proyecto de ley resaltan que éste surgió para procurar mayor efectividad en emergencias como la ocurrida

Sin embargo, durante la vigencia original de la declaración de "emergencia energética" y basándose específicamente en la necesidad de continuar la construcción acelerada de proyectos como Vía Verde, la Legislatura enmendó la Ley 76 de 2000 para permitir que el Gobernador extienda el estado de emergencia, mediante orden ejecutiva, por el tiempo que permanezca en su cargo como primer ejecutivo.[131] También proveyó para que los trámites de las obras que comiencen durante la vigencia de la declaración de emergencia continúen hasta el final según el

---

por el paso del Huracán Georges y evitar suspensiones prácticamente totales de los servicios públicos esenciales. Comisión de Gobierno y Asuntos Federales del Senado, Informe del P. del S. 1791, junio de 1999, pág. 3; Comisión de Gobierno de la Cámara de Representantes, Informe sobre el P. del S. 1791, 5 de noviembre de 1999, págs. 1-2. *Véase también* W. Vázquez Irizarry, Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. U.P.R. 951, 1039-1040 (2007). El profesor explica que la Ley 76 de 2000 para dispensar de los trámites de permisos debe verse en conjunto con el artículo 15 de la Ley Núm. 211 de 1999, 25 L.P.R.A. sec. 172m, sobre manejo de emergencias y administración de desastres, que se utiliza para declarar estados de emergencia cuando fenómenos atmosféricos causan estragos.

[131] Exposición de Motivos y Arts. 1-2, Ley Núm. 32-2011. Esta ley fue aprobada el 14 de marzo de 2011 para regir inmediatamente. En la Exposición de Motivos, menciona que, aunque la política energética del Gobierno de Puerto Rico dirige los esfuerzos de infraestructura hacia la energía renovable, esos proyectos necesitan combinarse con la construcción de Vía Verde para reducir la dependencia del petróleo utilizando también el gas natural. Añade que "[e]sa iniciativa de nuestra Administración [Vía Verde] es parte de un plan comprensivo para atender con mayor celeridad la emergencia energética decretada por el Gobernador [OE-2010-034]" y que la enmienda a la Ley 76 busca "asegurarnos que todas las solicitudes de permisos de aquellos proyectos energéticos iniciados durante la vigencia de la Orden Ejecutiva, y los que puedan surgir durante alguna extensión, puedan aprovechar el proceso expedito establecido".

procedimiento acelerado, aunque el período dispuesto en la orden ejecutiva haya concluido.[132]

Las declaraciones de emergencia, no obstante, pueden pasar por un cedazo adicional, que es el del Poder Judicial. Para esto, la Ley 76 permite que las personas afectadas adversamente por las resoluciones emitidas por las agencias dentro del marco de la emergencia soliciten revisión judicial ante el Tribunal de Apelaciones.[133] Esto se debe a que, al redactar el proyecto, se reconoció que era necesario proveer a los ciudadanos las garantías mínimas que exige la L.P.A.U., así como asegurar la fiscalización de los proyectos y la protección del ambiente y prevenir que la Ley 76 implicara la inobservancia de los deberes ministeriales de las agencias.[134] Esta disposición cobra aun más valor ante la enmienda a la Ley 76 que deja en manos del Poder Ejecutivo la extensión de la emergencia y establece prácticamente la renuncia de la Rama Legislativa a fiscalizarlo.

Los tribunales tienen que ser sumamente cuidadosos al evaluar las solicitudes de revisión de decisiones administrativas tramitadas de forma expedita a tenor con la Ley 76. Son decisiones que se permiten excepcionalmente y que, por su urgencia, no brindan el espacio para la

---

[132] Art. 12, Ley Núm. 76-2000 según enmendada por la Ley Núm. 32-2011, 3 L.P.R.A. sec. 1942.

[133] Art. 13, Ley Núm. 76-2000, 3 L.P.R.A. sec. 1943.

[134] Comisión de Gobierno del Senado, *supra*, a las págs. 3-4 y 6.

participación ciudadana que se espera de los procedimientos administrativos. Lo acelerado del proceso en esos casos hace que sea más probable la posibilidad de que se afecte adversamente a una o más personas. Esa realidad debe mover a los tribunales a atender con prontitud a la vez que con sumo rigor las alegaciones de los ciudadanos sobre los efectos adversos de las determinaciones administrativas. Por lo mismo, se debe interpretar cualquier requisito de legitimación activa de la manera más favorable a los reclamantes.

Esto es de particular importancia cuando los ciudadanos alegan que la orden ejecutiva que permitió acortar el trámite administrativo se dictó sin existir una verdadera emergencia, pues el historial de la Ley 76 demuestra que tanto los representantes de la Rama Legislativa como los de la Rama Ejecutiva pretendieron en todo momento limitar las facultades que concede la ley para que no se diera ese uso inapropiado.

En este caso se ha cuestionado que la Orden Ejecutiva 2010-034 declare una emergencia real, pues se basa en un problema con el costo del combustible más que en una situación de riesgo y plantea una política pública sobre el desarrollo de la infraestructura de generación energética más adecuada en lugar de establecer una solución inmediata a un problema grave de deterioro de la infraestructura para proveer el servicio eléctrico. Los recurridos indican que el Gasoducto no representa una respuesta ante una emergencia, pues realmente es parte de un diseño operativo

de gran magnitud que se llevaría a cabo en varias etapas.[135] Tampoco representa una opción de energía renovable, que es lo que la orden ejecutiva define como la solución para enfrentar la "situación de emergencia" que ha creado "la dependencia excesiva de combustibles derivados del petróleo para generar electricidad" que "atenta contra la vida, la salud y la seguridad de todos los puertorriqueños".[136] Alegan que el gas natural, además de no ser una fuente de energía renovable, ha provocado numerosos accidentes en los que cientos de personas han muerto, han resultado heridas o enfermas y han perdido sus bienes, por lo que la construcción y operación del gasoducto, descritas en la

---

[135] Sobre este punto, la A.E.E. señala en su recurso ante este foro que el proyecto de gasoducto Vía Verde es "parte del plan estratégico de la A.E.E. para reducir la dependencia del petróleo para generar energía eléctrica en Puerto Rico" y es "un paso de transición hacia el futuro para permitir el desarrollo de proyectos de energía renovable". Certiorari de la A.E.E. ante el TS, CC-2011-722, pág. 3.

[136] *Véase* Orden Ejecutiva 2010-034 de 19 de julio de 2010; Apéndice del Certiorari CC-2011-718, págs. 1034-1036; Apéndice del Certiorari CC-2011-722, págs. 1-3. Durante la evaluación del proyecto Vía Verde, el Área de Asesoramiento Científico de la J.C.A. indicó que la A.E.E. no proveyó información sobre otros proyectos de energía renovable ni justificó su exclusión como alternativas. Aseveró que: "Aunque el gas natural es un combustible menos contaminante que el petróleo y sus derivados, la intención de mejorar la diversificación se convierte en la sustitución del petróleo por el gas natural, pero ambos son combustibles fósiles. ¿Cómo se podría, entonces, comenzar la transición hacia esos futuros proyectos de fuentes de energía renovable con el proyecto Vía Verde?". Oneida Delgado – Área de Asesoramiento Científico J.C.A., Evaluación DIA-P (Borrador) (AEE) Vía Verde de Puerto Rico, 17 de agosto de 2010, pág. 2; Apéndice del Certiorari CC-2011-718, pág. 122h 1; Apéndice del Certiorari CC-2011-722, pág. 238.

DIA-F de Vía Verde, tiene un efecto opuesto al que busca la Orden Ejecutiva.[137]

Por otro lado, resulta casi imprescindible la revisión judicial en casos de declaraciones de impacto ambiental tramitadas de forma acelerada en virtud de la Ley 76, porque estos documentos son instrumentos de planificación que funcionan como "la primera etapa de un largo camino de autorizaciones oficiales".[138] Sin embargo, ese camino se acorta cuando el proyecto se desarrolla amparado en una disposición legal que permite preterir los procesos de permisos y endosos. Entonces, cobra mayor vigencia el interés de un ciudadano por asegurarse de que el documento ambiental aprobado en poco tiempo contenga toda la información necesaria para que se evite que el desarrollo del proyecto le afecte adversamente.

IV

La decisión de hoy es parte de una tendencia reciente de este Tribunal que, en contravención de toda la doctrina sobre legitimación activa en casos de alto interés público que se ha estado desarrollando en las últimas décadas, crea requisitos que tienen el efecto de obstaculizar el camino de la ciudadanía hacia los tribunales.[139] En nuestra

---

[137] Escrito de Revisión, págs. 24-36; Apéndice del Certiorari CC-2011-718, págs. 46-58; Apéndice del Certiorari CC-2011-722, págs. 74-86.

[138] Misión Industrial P.R. v. J.C.A., *supra*, a la pág. 925.

[139] *Véanse* Surfrider, *supra*; J.P., Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009). La extensión de *Surfrider* a la controversia de este caso consolida esa preocupante y lamentable tendencia.

disidencia en *Surfrider* advertimos que la Opinión mayoritaria estaba desarticulando nuestro desarrollo jurisprudencial sobre legitimación para llevar acciones públicas a nombre propio o de terceros.[140] Al disentir en *Surfrider*, rechazamos por excesivo el grado de especificidad que exigió la Opinión mayoritaria para la alegación de daños. En ese caso, el ciudadano a quien el Tribunal no le reconoció legitimación cumplía no sólo con el criterio de ser vecino del lugar impactado, sino también con los de haber participado de los procesos ante las agencias y tener un interés particular en el asunto por su efecto perjudicial para él.[141] Lo mismo sucede en este caso. Sin embargo, la Opinión mayoritaria decide, nuevamente, ignorar nuestra doctrina de legitimación.

Como punto de partida, debemos recordar que los requisitos de justiciabilidad en Puerto Rico no son impuestos constitucionalmente sino adoptados jurisprudencialmente.[142] De los criterios de justiciabilidad, el requisito de legitimación activa es el que se exige con menor rigurosidad.[143] Éste se ha interpretado de forma cada vez más flexible, pues hemos

---

[140] <u>Surfrider</u>, *supra*, a la pág. 612 (Opinión disidente de la jueza Fiol Matta).

[141] *Íd.* a las págs. 598-600.

[142] <u>E.L.A. v. Aguayo</u>, *supra*.

[143] Los tribunales ejercen su discreción "dependiendo de la trascendencia del derecho afectado y la importancia de los intereses en conflicto". <u>Zachry International v. Tribunal Superior</u>, 104 D.P.R. 267, 273 (1975).

reconocido que ello es necesario "para cumplir con nuestra responsabilidad constitucional" y no cerrar las puertas de los tribunales "a personas y entidades que han sido adversamente afectadas y que presentan reclamaciones que pueden ser debidamente atendidas por el foro judicial".[144]

La legitimación se examina aún más liberalmente cuando la demanda es contra las agencias y los funcionarios gubernamentales.[145] Esta vertiente de la doctrina puertorriqueña sobre legitimación activa, relacionada con las "acciones públicas", flexibiliza la interpretación sobre la capacidad de demandar de un ciudadano o grupo de ciudadanos cuando el reclamo está revestido de un alto interés público. Para ello, se analiza de forma liberal la ley en la que se fundamenta la acción, se amplía el concepto de lo que constituye un daño o se imponen menos exigencias en cuanto al requisito de que el daño sea uno particular del reclamante. Este detalle la distingue del modelo más restrictivo de legitimación que se ha desarrollado en la jurisprudencia constitucional de Estados Unidos.[146] El profesor José Julián Álvarez señala que, a

---

[144] Col. Ópticos de P.R., *supra*, a la pág. 564.

[145] Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754, 765 (2002); García Oyola, *supra*, a la pág. 539. Esto se debe a que las cuestiones de gran interés público no pueden tratarse con las mismas normas que las contiendas privadas, pues las circunstancias dispares exigen tratamientos diferentes. E.L.A. v. P.R. Tel. Co, *supra*, a la pág. 399.

[146] L.M. Villaronga, Derecho Constitucional, 62 (Núm. 4) Rev. Jur. U.P.R. 683, 684-685 (1993). *Véase también* Hernández Torres v. Gobernador, *supra*, a las págs. 875-887 (Opinión disidente del juez Rebollo López). Sobre la doctrina de legitimación activa en Puerto Rico, *véase*

pesar de que el Tribunal Supremo de Puerto Rico ha demostrado "más apego del necesario hacia la jurisprudencia del Tribunal Supremo federal" sobre justiciabilidad, cuando entra en el campo de la legitimación activa, "varias decisiones correctamente se apartan del modelo diseñado para las cortes federales y reconocen 'acciones públicas', sin exigir al litigante que demuestre un daño particularizado, distinto al del resto de la ciudadanía".[147] Esto es posible ya que "la Constitución federal marca tan sólo el límite mínimo de los derechos que pueden reconocerse en Puerto Rico; cuánto más podemos volar es función de nuestras propias alas".[148]

Pero en *Surfrider* se cortan esas alas. En esa Opinión, en la que hoy se ampara una mayoría de este Tribunal para cerrar las puertas de la justicia a los ciudadanos nuevamente, se incorporó a nuestra normativa cierta jurisprudencia federal sobre legitimación, sin hacer distinción alguna en cuanto a "acciones públicas", sólo porque al redactarse la L.P.A.U. se tomaron como modelos la Administrative Procedure Act federal (A.P.A.) y el Model State Administrative Procedure Act (M.S.A.P.A.).[149] Al

---

*también* J.J. Álvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Temis, 2009, págs. 114-119.

[147] J.J. Álvarez González, La protección de los Derechos Humanos en Puerto Rico, 57 Rev. Jur. U.P.R. 133, 168-169 (1988).

[148] *Íd.* a la pág. 168.

[149] *Véanse* Ley de Procedimiento Administrativo Uniforme [L.P.A.U.], Ley Núm. 170 de 12 de agosto de 1988, 3

Tribunal no le importó que esas normas federales se usaron tan sólo como guías y que la L.P.A.U. no es una copia de éstas, sino una ley independiente que incorpora la doctrina jurídica de Puerto Rico, con sus requisitos de legitimación activa más liberales.[150] De esa manera, *Surfrider* limitó las posibilidades de que las personas afectadas por acciones administrativas solicitaran revisión judicial. El efecto de *Surfrider* ha sido restringir la legitimación en Puerto Rico incluso más allá de lo resuelto por los tribunales federales.

El uso de jurisprudencia federal más restrictiva para estos fines es más preocupante aun cuando el caso plantea un problema ambiental, pues la protección del medio ambiente en Puerto Rico es una obligación impuesta constitucionalmente. La Constitución declara: "Será política pública del Estado Libre Asociado la más eficaz

---

L.P.R.A. secs. 2101-2201; Pagán Ramos v. F.S.E., 129 D.P.R. 888, 898 (1992).

[150] Surfrider, *supra*, a las págs. 600-604 (Opinión disidente de la jueza Fiol Matta). *Véase* J. Berkan, La nueva Ley de Procedimiento Administrativo Uniforme de Puerto Rico: una comparación con Administrative Procedure Act, Programa de Educación Legal Continuada de la Universidad Interamericana de Puerto Rico, 1989. *Véase también* la tabla comparativa entre la A.P.A., el M.S.A.P.A. y la Ley 170 incluida en el Historial Legislativo de la L.P.A.U. Además, el Historial Legislativo de la L.P.A.U. revela que, desde 1968, se intentó aprobar una ley de procedimiento administrativo en el País. Se descartaron los proyectos que eran traducciones literales del M.S.A.P.A. en varias ocasiones y el texto de la L.P.A.U. aprobado en 1988, que consideró la A.P.A. y el M.S.A.P.A. como antecedentes, fue el producto de una discusión intensa en la que participaron casi todas las agencias de Puerto Rico. Informe Conjunto de las Comisiones de Gobierno Estatal, Asuntos Municipales y de lo Jurídico del Sustitutivo P. del S. 350 [Informe Conjunto].

conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad".[151] Esta disposición no es una mera exhortación, sino que dicta el "criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental", y prevalece sobre cualquier estatuto, reglamento u ordenanza en contrario.[152]

Asimismo, para darle cuerpo a nuestra disposición constitucional, la Ley sobre Política Pública Ambiental ordena a todos los departamentos, agencias y corporaciones del Gobierno de Puerto Rico interpretar, aplicar y administrar todas las leyes y reglamentos vigentes, así como los que se aprueben en el futuro, en "estricta conformidad" con los objetivos de la política pública ambiental del Estado.[153] Nuestra política ambiental no es,

---

[151] Art. VI, sec. 19, Const. P.R.

[152] Misión Industrial P.R. v. J.C.A., *supra*, a las págs. 919-920. *Véase también* Fed. Pescadores Playa Picúas v. J.P., 148 D.P.R. 406, 412 (1999).

[153] Art. 4, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001a(b). La Ley sobre Política Pública Ambiental procura "la más efectiva protección del ambiente y los recursos naturales; el uso más prudente y eficiente de los recursos naturales para beneficio de toda la ciudadanía; un progreso social que reconozca las necesidades de todos, y el logro y mantenimiento de altos y estables niveles de crecimiento económico". Art. 3, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001(c).

pues, un adorno, un procedimiento *pro forma* o una exigencia con la cual se cumple fácilmente con plasmar en papel lo que parezca plausible aunque no coincida con la realidad. Nuestra Constitución requiere una política de desarrollo que integre la conservación y el uso responsable de los recursos, ya que las políticas ambientales no son obstáculos al progreso sino garantías de calidad de vida para el futuro.[154]

Nuestra Ley sobre Política Pública Ambiental se distingue de la que aparenta ser su equivalente en el ámbito federal, la National Environmental Policy Act (N.E.P.A.).[155] En primer lugar, la N.E.P.A., contrario a la ley puertorriqueña, no tiene base constitucional.[156] En

---

[154] Misión Industrial P.R. v. J.P. y A.A.A., *supra*, a la pág. 689. Por eso, el escrutinio más riguroso de las determinaciones administrativas que pueden afectar nuestro ambiente es el estándar de revisión judicial más adecuado para nuestra realidad constitucional. Municipio de San Juan, *supra*, a las págs. 749-752 (Opinión de conformidad del juez Hernández Denton). *Véase también* L. Fiol Matta, De regreso al futuro: el hard look y la "nueva" revisión judicial rigurosa en casos ambientales, 72 Rev. Jur. U.P.R. 71 (2003). Por la misma razón, la doctrina de legitimación activa más flexible es la más apropiada para estos casos. *Véase* E.L. Chiesa Aponte, Comentarios a la ponencia de la jueza Fiol Matta sobre el estándar de revisión judicial en casos ambientales, 72 Rev. Jur. U.P.R. 93, 107-108 (2003).

[155] National Environmental Policy Act [N.E.P.A.], 42 U.S.C. 4321-4347.

[156] En su análisis de los casos ambientales resueltos por este Tribunal, el profesor Luis Rodríguez Rivera señala como desacertado el uso de interpretaciones de la N.E.P.A. para fundamentar la revisión judicial, ignorando nuestras realidades jurídicas, sociales y ambientales, y limitando el alcance de nuestro mandato constitucional de preservación del ambiente. L.E. Rodríguez Rivera, La educación jurídica y el Derecho Ambiental: La jurisprudencia como instrumento en la educación jurídica –

segundo lugar, distinto a nuestra Ley sobre Política Pública Ambiental, la N.E.P.A. no contiene una disposición que permita que "cualquier persona" recurra a los tribunales para exigir que se cumpla con su mandato.[157] Por eso, los ciudadanos en Estados Unidos se amparan en la revisión judicial que provee la A.P.A. para presentar casos sobre incumplimiento con la N.E.P.A.[158]

Cuando se utiliza el mecanismo de revisión de la A.P.A. para hacer valer leyes que no conceden legitimación por sí mismas, no se deben analizar los requisitos de legitimación de manera uniforme y rigurosa, sino de acuerdo a las disposiciones sustantivas del estatuto en el que se basa la petición.[159] Esto se debe a que la A.P.A. establece que podrá pedir revisión judicial de la acción de una agencia una persona adversamente afectada por ésta, dentro

---

Análisis quinquenal de la jurisprudencia ambiental, 70 Rev. Jur. U.P.R. 1097 (2001).

[157] *Véase* Art. 19, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8002m.

[158] *Véase* R. Beers, Standing and Rights of Action in Environmental Litigation, American Law Institute - American Bar Association Continuing Legal Education (2007), págs. 40-41 y 52-55.

[159] W.A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 255-265 (1988). El profesor Fletcher señala que la A.P.A. establece una "presunción de revisabilidad". *Íd.* a la pág. 265. *Véase también* la discusión sobre la "provisión generosa para revisión judicial" de la A.P.A. y su relación con las "zonas de interés" de otras leyes, especialmente las que confieren legitimación a "cualquier persona" o atienden preocupaciones legislativas amplias, como son las ambientales, en C.H. Koch, Administrative Law and Practice, 3rd ed., Ed. West, 2010, Vol. 4, págs. 335-338.

del significado de un estatuto pertinente.[160] El tratadista estadounidense en materia de Derecho Administrativo Richard Pierce afirma que "una interpretación amplia del daño, la causalidad y la zona de interés es compatible con la intención legislativa y la intención legislativa debe ser la base para resolver prácticamente todas las disputas sobre legitimación a las que aplique la A.P.A.".[161]

En este caso, aunque se entendiera que la legitimación para la revisión judicial de la L.P.A.U. se debe interpretar igual que la de la A.P.A., se tendrían que adecuar los requisitos de *standing* al contenido sustantivo de la Ley sobre Política Pública Ambiental, que es el estatuto en el que se basan los recurridos para impugnar la aprobación de la DIA-F, es decir, "el estatuto pertinente". Así, habría que considerar que dicha ley provee un marco de legitimación amplio para vindicar en los tribunales las violaciones a la misma: acciones en daños contra entes privados, solicitudes de *mandamus* para obligar a las agencias a implantar la Ley y acciones de revisión judicial

---

[160] "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof". A.P.A., 5 U.S.C. sec. 702.

[161] "[A] broad interpretation of injury, causality, and the zone of interests test is consistent with congressional intent and congressional intent should be the basis for resolving virtually all standing disputes to which the APA applies." R.J. Pierce, Administrative Law Treatise, 5th ed., Austin, Aspen Publishers, 2010, Vol. III, pág. 1537.

para cuestionar decisiones referentes a documentos ambientales.[162]

En virtud de esas disposiciones sobre legitimación, este Tribunal ha afirmado que la Ley sobre Política Pública Ambiental establece "acciones públicas" que permiten a cualquier ciudadano afectado recurrir a los tribunales para obligar a la agencia proponente a ajustar sus acciones a las políticas ambientales y exigir al Estado el cumplimiento riguroso de su deber de velar por el uso prudente de los recursos.[163] Esa ley, además, impone utilizar todos los medios prácticos para que el País pueda "cumplir con las responsabilidades de cada generación como

---

[162] Art. 19, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8002m. En específico, la Ley dispone que las impugnaciones de decisiones de la J.C.A. sobre documentos ambientales no se tramitan mediante *mandamus*, sino utilizando el procedimiento que provee la L.P.A.U. De esta forma, confiere legitimación para solicitar revisión judicial en el Tribunal de Apelaciones a "cualquier persona natural o jurídica afectada por la falta de implantación" de la Ley. *Íd.*

[163] Colón Cortés, *supra*. En este caso, varias comunidades objetaron las deficiencias de la declaración de impacto ambiental de un proyecto mediante el recurso de *mandamus* que establecía la Ley sobre Política Pública Ambiental de 1970. Dicha ley se sustituyó por la Ley sobre Política Pública Ambiental de 2004 y ahora las impugnaciones de decisiones de la J.C.A. relacionadas con documentos ambientales se tramitan mediante recursos de revisión judicial de determinaciones administrativas, como el que se presentó en este caso. No obstante, el recurso sigue siendo una "acción pública" diseñada para que cualquier ciudadano afectado pueda exigir el cumplimiento con la política pública ambiental. De esa forma, se faculta "al ciudadano común, que es quien normalmente se ve afectado por los problemas ambientales, con una forma simple de solicitar la observancia seria y escrupulosa de la política pública ambiental". *Íd.* a la pág. 785. *Véanse también* Misión Industrial P.R. v. J.C.A., *supra*, a la pág. 927; Salas Soler, *supra*, a las págs. 718-725; Cerame Vivas v. Srio. de Salud, 99 D.P.R. 45, 52 (1970).

custodio del medio ambiente para beneficio de las generaciones subsiguientes" y "lograr un balance entre la población y el uso de los recursos que permita altos niveles de vida y una amplia participación de las amenidades de la vida".[164] Con ese cimiento, las exigencias de legitimación activa tendrían que estudiarse obligatoriamente de la manera más favorable a las personas que acudan a los tribunales para pedir un uso juicioso de los recursos e impedir la degradación ambiental y los riesgos a la salud o la seguridad de los ciudadanos. Sólo así el País, a través de la Rama Judicial, cumpliría con su deber de fomentar que la ciudadanía del presente vele por la calidad del ambiente para el bienestar de las generaciones por venir.

Más aún, debido a la legitimación estatutaria que provee la política pública ambiental local y a su fundamento constitucional, así como al desarrollo de nuestro ordenamiento a favor de las "acciones públicas", a un litigante en Puerto Rico no se le puede exigir probar su legitimación con el grado de rigurosidad exigido en un tribunal federal.[165] Además, en los últimos años, la propia

---

[164] Art. 4, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001a(a)(1) y (5).

[165] Debemos recordar que la A.P.A., según fue redactada, reconoce legitimación a los ciudadanos en diversas circunstancias y no representa un impedimento, como tampoco lo representaba la doctrina de legitimación activa, para que el Congreso reconozca *standing* por vía legislativa en numerosos escenarios. *Véase* C.R. Sunstein, What's Standing After Lujan? Of Citizen Suits, "Injuries", and Article III, 91 Mich. L. Rev. 163, 181-182, 192-193 y 209-236 (1992). En cuanto a las "acciones públicas" o del ciudadano, el

jurisprudencia federal sobre legitimación en casos ambientales se ha apartado del enfoque más restrictivo de la época de *Lujan v. Defenders of Wildlife* para reconocer capacidad para demandar a ciudadanos que cuestionan determinaciones que les afectan de la misma forma que a otras personas.

Así, en *Friends of Earth v. Laidlaw*, el Tribunal Supremo de Estados Unidos decidió que unos ciudadanos representados por una organización ambientalista tenían *standing* porque las descargas de aguas usadas hacia un río en exceso de las permitidas que hacía una planta de incineración de desperdicios afectaban sus intereses recreativos, estéticos y económicos.[166] Entre los daños que señalaron los ciudadanos se encontraban: que vivían cerca del río y les interesaba ir a pescar, a contemplarlo y a bañarse en él, pero ya no se atrevían a hacerlo por la

Tribunal Supremo de Estados Unidos resolvió, en Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), que la exigencia constitucional federal de "caso o controversia" no permite que el Congreso otorgue capacidad para solicitar un remedio judicial a cualquier ciudadano, sino que éste tiene que cumplir con los requisitos de legitimación activa. Sin embargo, esta decisión se basó en la doctrina de separación de poderes federal, que no obliga a los tribunales de Puerto Rico ni controla las determinaciones de la Legislatura puertorriqueña. Entonces, "nuestro poder legislativo puede crear por sí mismo este tipo de remedio disponible para toda la ciudadanía" y con ello no estaría burlando los requisitos de justiciabilidad. W. Vázquez Irizarry, Derecho Administrativo, 79 (Núm. 2) Rev. Jur. U.P.R. 647, 658 (2010). Así lo hizo en las leyes ambientales vigentes.

[166] Friends of Earth v. Laidlaw, 528 U.S. 167, 180-189 (2000). Este caso es citado en Surfrider, *supra*, a la pág. 573. *Véase también* R.V. Percival & J.B. Goger, Escaping the Common Law's Shadow: Standing in the Light of *Laidlaw*, 12 Duke Envtl. L. & Pol'y F. 119, 141-154 (2001).

información de que estaba contaminado; que les gustaba comer, pasear y observar pájaros cerca del río, pero ya no lo hacían debido a la contaminación ambiental del área; que tenían intención de comprar una casa cerca del río, pero habían desistido por temor a los efectos de las descargas, y que el valor de sus propiedades se había reducido a causa de los problemas ambientales provocados por la planta.[167] En este caso, el Tribunal Supremo federal analizó las alegaciones a la luz de la doctrina de legitimación activa constitucional federal y la disposición sobre revisión judicial de la Clean Water Act, que le permite demandar a "personas que tienen un interés que está siendo o puede ser adversamente afectado".[168]

Más recientemente, en *Massachusetts v. E.P.A.*, el Tribunal Supremo federal le reconoció legitimación activa a unas organizaciones ambientalistas y varios gobiernos estatales que reclamaron en los tribunales que la agencia de protección ambiental federal violó su deber de velar por que se cumpliera con la Clean Air Act al determinar que no regularía las emisiones de bióxido de carbono de vehículos de motor que contribuyen al calentamiento global y al

---

[167] *Friends of Earth*, *supra*, a las págs. 181-183.

[168] (Énfasis suplido.) 33 U.S.C. sec. 1365. *Véase también* *Friends of Earth*, *supra*, a las págs. 173-175. Cuando se presentó la demanda, Laidlaw pidió que se desestimara porque los miembros de la organización ambientalista no habían demostrado un daño concreto o *injury in fact* para tener legitimación activa. A los demandantes se les permitió presentar declaraciones juradas sobre sus daños para suplementar sus alegaciones. *Íd.* a la pág. 177.

cambio climático.[169] Los daños que alegaron y que el Tribunal determinó que eran suficientemente concretos incluyeron: que la emisión de gases de invernadero contamina el aire y produce un alza en las temperaturas, que el cambio climático que propician las emisiones provoca que aumente el nivel del mar y se reduzcan los terrenos costeros, y que el cambio climático tendrá efectos adversos serios sobre los ecosistemas naturales y la salud humana, los cuales, aunque remotos, son reales y podrían reducirse mediante la acción que se solicitaba de parte de la agencia administrativa. Sus alegaciones se basaron en sucesos históricos y en estudios científicos, igual que las de los recurridos en este caso cuando expresaron su preocupación respecto a su seguridad, tomando en cuenta las explosiones de gasoductos en varias ciudades y las fórmulas para determinar las zonas de riesgo.

Como se puede apreciar, los peticionarios a los que se les reconoció legitimación en estos casos, utilizando la doctrina de *standing* federal en la cual se basa hoy la decisión de una mayoría de este Tribunal, no alegaban el tipo de daño inmediato y particularizado que se les está

---

[169] Massachusetts, *et al.* v. Environmental Protection Agency, *et al.*, 549 U.S. 497, 516-526 (2007). En este caso se revocó la Sentencia de la Corte de Apelaciones para el Distrito de Columbia en la que se denegó la petición de revisión judicial de la determinación administrativa. *Véanse también* R.J. Lazarus, Super Wicked Problems and Climate Change: Restraining the Present to Liberate the Future, 94 Cornell L. Rev. 1153 (2009); B.C. Mank, Standing and Future Generations: Does *Massachusetts v. EPA* Open Standing for Generations to Come?, 34 Colum. J. Envtl. L. 1 (2009).

exigiendo a los vecinos del área donde se construye el gasoducto Vía Verde. Y es que el nivel de especificidad que requiere *Surfrider* para la descripción de los daños y el uso mismo de la doctrina de legitimación activa han sido altamente criticados en Estados Unidos cuando se trata de casos ambientales.[170] En los casos ambientales, la inminencia del daño no siempre va a estar presente, porque las consecuencias de un daño ambiental suelen ser acumulativas y progresivas.[171] Asimismo, en casos

---

[170] *Véase, por ejemplo*, P. Weinberg, Unbarring the Bar of Justice: Standing in Environmental Suits and the Constitution, 21 Pace Envtl. L. Rev. 27 (2003). En éste se advierte que limitar el acceso de los ciudadanos a los tribunales en casos ambientales a través de la doctrina de legitimación activa permite que el gobierno y las industrias violen impunemente las políticas ambientales, cuando, si se quiere proteger el esquema de separación de poderes como se invoca al recurrir a los requisitos de justiciabilidad, la Rama Judicial tiene que ser accesible y eficaz para evitar abusos por parte del poder ejecutivo. Por otro lado, los criterios trazados en la jurisprudencia federal para determinar legitimación en casos que surgen por violaciones a la N.E.P.A. y otras leyes ambientales han creado gran confusión y han sido desaprobados por expertos que señalan que se desarrollaron obviando distinciones importantes entre los casos ambientales y otros en los que normalmente se analizan los daños sufridos. *Véanse:* B. Mank, Standing and Statistical Persons: A Risk-Based Approach to Standing, 36 Ecology L.Q. 665 (2009); R.J. Lazarus, Human Nature, the Laws of Nature, and the Nature of Environmental Law, 24 Va. Envtl. L.J. 231 (2005); G.R. Nichol, Standing for Privilege: The Failure of Injury Analysis, 82 B.U. L. Rev. 301 (2002).

[171] D.N. Cassuto, The Law of Words: Standing, Environment, and Other Contested Terms, 28 Harv. Envtl. L. Rev. 79, 86-87 y 127-128 (2004). El profesor Cassuto explica que las doctrinas de legitimación activa tradicionales no tienen cabida en la jurisprudencia ambiental, pues la noción de un daño particular relacionado con los bienes de una persona es incompatible con el ambiente, que es de todos y de nadie a la vez. Cassuto sugiere que los tribunales se fijen, entonces, en si el daño es del tipo que la legislación ambiental busca prevenir. Asimismo, critica el que se requiera que el ciudadano haya sufrido un daño concreto si

ambientales, el daño no puede ser particular, pues las actividades perjudiciales al medio ambiente afectan a todos los ciudadanos por igual.[172]

Por otra parte, el rango constitucional de nuestra política pública ambiental requiere que, cuando se trata de la revisión judicial de casos ambientales, se use una metodología distinta a la que se utiliza en acciones administrativas en general. En cuanto a esto, el profesor Luis Rodríguez Rivera explica que "[n]o podemos continuar evaluando problemas ambientales bajo un esquema de derecho administrativo. Contrario a los Estados Unidos, nuestro ordenamiento ambiental es de génesis constitucional y no estatutario. Como tal, nuestro medioambiente amerita una protección más celosa por parte de la Rama Judicial".[173] Bajo esta óptica, la revisión judicial debe ser menos deferencial y el reconocimiento de legitimación activa de quienes buscan hacer valer una política ambiental debe ser

---

el estatuto habla de que el ciudadano vea adversamente afectado un interés suyo o entienda que se ha violado una política pública. *Íd.* a la pág. 86. *Véase* el artículo 4 de la Ley sobre Política Pública Ambiental, en el que se reconoce "el carácter mundial y de largo alcance de los problemas ambientales". 12 L.P.R.A. sec. 8001a(b)(6).

[172] Además, las leyes ambientales hablan de zonas de interés y algunas otorgan capacidad para demandar, por lo que naturalmente van a chocar con el análisis de caso o controversia constitucional. S. Kalen, Standing on its Last Legs: *Bennett v. Spear* and the Past and Future of Standing in Environmental Cases, 13 J. Land Use & Envtl. L. 1 (1997).

[173] L.E. Rodríguez Rivera, No todo lo que brilla es oro: apuntes sobre el desarrollo de la norma de revisión judicial en la jurisprudencia ambiental a la luz de la constitucionalización de la política pública ambiental puertorriqueña, 72 Rev. Jur. U.P.R. 113, 133 (2003).

más liberal y no atada a conceptos derivados de la L.P.A.U. No obstante, si se ignorase ese mandato constitucional y se decidiera atender los casos ambientales como cualquier otra acción administrativa, la interpretación sobre legitimación activa adoptada en *Surfrider* no es cónsona con nuestro ordenamiento.

Al examinar el significado de un estatuto, no es correcto tomar una frase aislada, identificar su presencia en las leyes de otras jurisdicciones y basarnos en ese dato para incorporar a nuestro ordenamiento la jurisprudencia interpretativa de esas leyes. Debemos tomar en cuenta que "[e]l medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas es considerar la razón y espíritu de ella o la causa o motivos que indujeron al poder legislativo a dictarla".[174] El significado de la frase "adversamente afectada" que menciona la L.P.A.U. en su sección 4.2 no debe explorarse en abstracción de las demás disposiciones de la Ley y su historial legislativo. Es necesario considerar las otras normas sobre revisión judicial que contiene la L.P.A.U.

La sección 4.3 de la L.P.A.U. releva a los peticionarios del requisito de agotar todos los remedios administrativos antes de solicitar revisión judicial en diversas circunstancias, con el fin de proteger sus

---

[174] Art. 19, Código Civil de P.R., 31 L.P.R.A. sec. 19.

derechos y evitar que muera su causa de acción.[175] La sección 4.4 instruye al Tribunal Supremo a regular los procedimientos de revisión judicial de modo que se promueva el acceso efectivo a los tribunales para los ciudadanos.[176] La sección 4.5 indica que el tribunal podrá conceder el remedio apropiado si determina que el recurrente tiene derecho a éste.[177] Originalmente, dicha cláusula decía que los concedería si determinaba que el peticionario "ha sido o será sustancialmente perjudicado", un estándar más estricto que el de "adversamente afectado", y esa frase se sustituyó por "tiene derecho a un remedio".[178] La sección 4.6 establece que el tribunal puede conceder cualquier remedio que considere apropiado, aunque el peticionario no lo haya solicitado.[179] Asimismo, la sección 1.2, en la cual se declara la política pública sobre los procedimientos administrativos, indica que la L.P.A.U. se interpretará liberalmente.[180] El Informe de la Legislatura en el que se recomienda la aprobación del proyecto de ley que se

---

[175] Sec. 4.3, L.P.A.U., 3 L.P.R.A. sec. 2173.

[176] Sec. 4.4, L.P.A.U., 3 L.P.R.A. sec. 2174. También instruye a evitar desestimaciones por defectos de forma y a fomentar la comparecencia de ciudadanos por derecho propio y en *forma pauperis*.

[177] Sec. 4.5, L.P.A.U., 3 L.P.R.A. sec. 2175.

[178] *Véanse* Sustitutivo al P. del S. 350 de 9 de abril de 1987, pág. 24; Informe del Sustitutivo al P. del S. 350 de 3 de junio de 1988, pág. 22.

[179] Sec. 4.6, L.P.A.U., 3 L.P.R.A. sec. 2176.

[180] Sec. 1.2, L.P.A.U., 3 L.P.R.A. sec. 2101. La A.P.A. no contiene una disposición similar.

convirtió en la L.P.A.U. recalca que el texto intenta al máximo "mantener fidelidad al principio rector de flexibilidad que debe permear el Derecho Administrativo".[181] Todas esas cláusulas apuntan hacia la apertura de los tribunales para las personas que interesen revisar determinaciones administrativas.

Según explicamos en nuestra disidencia en *Surfrider*, no hay razón para obviar la legitimación estatutaria que establece la L.P.A.U. y recurrir a la doctrina federal sobre *standing*. La L.P.A.U. dispone que "una parte adversamente afectada por una orden o resolución final de una agencia … podrá presentar una solicitud de revisión ante el Tribunal de Apelaciones".[182] Cuando a una parte se le confiere capacidad para demandar por vía legislativa, no es necesario analizar la legitimación según los requisitos de justiciabilidad.[183] Pero, aunque se entendiera que la

_____

[181] Informe Conjunto, *supra*, pág. 11.

[182] Sec. 4.2, L.P.A.U., según enmendada por la Ley Núm. 277-2006, 3 L.P.R.A. sec. 2172.

[183] Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 723-724 (1980); Fletcher, *supra*, a las págs. 253-254. El profesor Richard Pierce afirma que: "Once Congress issues a command to agencies and calls on courts to enforce that command, a judicial refusal to enforce the command can no longer be characterized as judicial restraint. It is more accurately characterized as abdication of judicial responsibility to enforce the policy decision of a politically accountable Branch". Pierce, *op. cit.*, a la pág. 1439. *Véase también* la discusión de este autor sobre la relación del requisito de ser "adversamente afectado" con el *standing* estatutario y la evolución inconsistente de la jurisprudencia del Tribunal Supremo de Estados Unidos sobre el requisito de legitimación en casos de revisión judicial de decisiones administrativas. *Íd.* págs. 1401-1544.

L.P.A.U. no le concede tal legitimación estatutaria, la determinación de los criterios para decidir quién puede solicitar revisión de acciones administrativas en los tribunales no debe ignorar la naturaleza flexible e inclusiva de nuestro ordenamiento administrativo.

La revisión judicial representa la continuación de un proceso administrativo, caracterizado por una mayor flexibilidad en pro de la participación ciudadana.[184] El trámite administrativo de evaluación de una DIA ni siquiera es un procedimiento adjudicativo.[185] Siendo así, no tiene por qué compartir los requisitos de legitimación para demandar que se imponen comúnmente en los casos que se presentan ante los tribunales.[186] No obstante, aunque

---

[184] Por ejemplo, en este caso, los recurridos no tuvieron que presentar una solicitud de intervención ante la J.C.A. para participar del proceso administrativo.

[185] Tanto la peticionaria J.C.A. como los recurridos resaltaron que el procedimiento en este caso no es adjudicativo. Certiorari de la J.C.A. ante el T.S. CC-2011-718, 6 de septiembre de 2011, págs. 17-18; Alegato de las Partes Recurridas, CC-2011-718 y CC-2011-722, págs. 13-15. Sin embargo, a pesar de que la elaboración de una DIA no es un procedimiento reglamentario ni adjudicativo y el proceso de revisión de la L.P.A.U. está diseñado para procedimientos adjudicativos, la Ley sobre Política Pública Ambiental dispone que se utilicen los procedimientos dispuestos en la L.P.A.U. para cuestionar el cumplimiento con la política ambiental por parte de la J.C.A. en consideraciones de documentos ambientales. Art. 19, Ley Núm. 416-2004, 12 L.P.R.A. 8002m; Sec. 4.1, L.P.A.U., 3 L.P.R.A. sec. 2171; Colón y otros, supra, a las págs. 447-449.

[186] Si se examina el historial legislativo de la L.P.A.U. (P. del S. 350, 1985-1988), se puede apreciar que diversas agencias expresaron en sus ponencias ante la Comisión de Gobierno del Senado que entendían que era innecesario que esta ley incluyera disposiciones sobre revisión judicial, porque ya los tribunales se encargarían de ese proceso según las normas que utilizaban para los demás casos. Sin

entendamos que, en la etapa de revisión judicial, es necesario cumplir con los criterios de legitimación desarrollados para los tribunales, la interpretación del término "adversamente afectada" que adopta *Surfrider* carece de apoyo en la jurisprudencia sobre legitimación, tanto en la puertorriqueña y como en la federal.[187]

El presente caso reafirma el análisis incorrecto de *Surfrider*. A pesar de que nuestra L.P.A.U. provee legitimación estatutariamente, se recurrió a la doctrina de legitimación activa constitucional para analizar la capacidad de acudir en revisión judicial. No sólo eso, sino que, en lugar de utilizar los criterios de legitimación activa de Puerto Rico, se usaron los criterios más rigurosos desarrollados para las cortes federales. Al hacerlo, además, no se consideraron los precedentes más

embargo, estas disposiciones del proyecto de ley se mantuvieron, lo que tiende a indicar que la Legislatura quiso que las revisiones judiciales de decisiones administrativas se trataran de forma diferente, según los principios de flexibilidad de la L.P.A.U.

[187] *Véase* W. Vázquez Irizarry, Derecho Administrativo, 80 (Núm. 3) Rev. Jur. U.P.R. 637, 652 (2011). Según el profesor Vázquez Irizarry, la consecuencia de la especificidad extrema de los efectos adversos de la acción administrativa requerida en *Surfrider* para que se reconozca legitimación en revisión judicial es que, ante la agencia, el ciudadano tendrá que afirmar, posiblemente de modo especulativo, la forma en que un resultado eventual le afectará adversamente para que conste en el expediente administrativo, que es lo único que tendrán en sus manos los tribunales apelativos al revisar. Por consiguiente, la norma dispuesta, en vez de asegurar que los tribunales atiendan solamente revisiones en que los peticionarios están sufriendo o sufrirán daños concretos, logra lo contrario, pues obliga a suponer desde el inicio cuáles serían todos los efectos específicos de un acto que está aún en desarrollo como única opción para que el caso no muera en los tribunales.

recientes del Tribunal Supremo de Estados Unidos que flexibilizan el reconocimiento de legitimación activa en "acciones públicas" por asuntos ambientales. Finalmente, se aplicaron esas normas sin tener en cuenta que este caso surge bajo el palio de la Ley sobre Política Pública Ambiental, que tiene base constitucional. Por todo eso, entendemos que el análisis de legitimación activa que hace la Opinión mayoritaria en este caso se asienta en premisas erróneas.

V

En el fondo de esta controversia legal yace un problema de acceso a la justicia.[188] El acceso a la justicia "es el principal derecho –el más importante de los derechos humanos– en un sistema legal moderno e igualitario que tenga por objeto garantizar, y no simplemente proclamar, los derechos de todos" y requiere un sistema judicial que garantice su ejercicio pleno.[189] En términos más concretos y en palabras del profesor Efrén Rivera Ramos, "[p]or acceso a la justicia nombramos el conjunto de condiciones que facilitan o dificultan el que determinados grupos, sectores o personas puedan hacer uso equitativo de los mecanismos y

---

[188] El acceso a la justicia es un pilar de la política que guía la Rama Judicial. Exposición de Motivos, Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 201-2003; Rama Judicial de Puerto Rico, *Imperativo Estratégico III: Acceso a la justicia para todos y todas*, Plan Estratégico de la Rama Judicial de Puerto Rico 2012-2015, págs. 33-34.

[189] H. Birgin & B. Kohen, *El acceso a la justicia como derecho*, Acceso a la justicia como garantía de igualdad. Instituciones, actores y experiencia comparadas, Buenos Aires, Editorial Biblos, 2006, págs. 16-17.

procesos establecidos para la prevención de la violación de los derechos, para la solución de controversias y para la obtención de remedios legales".[190] Los obstáculos al acceso a la justicia no responden sólo al diseño de las estructuras judiciales y administrativas y a los recursos disponibles, sino también a la forma en que se organiza la sociedad en general, y particularmente a una falta de sensibilidad respecto a los problemas de los demás.[191]

Los estudios sobre acceso a la justicia destacan el derecho a la revisión judicial de decisiones administrativas como un componente esencial, pues "la ausencia de mecanismos judiciales adecuados para efectuar una revisión amplia de las decisiones administrativas también tiene efectos directos sobre la vigencia de los derechos sociales".[192] Otra razón para abogar por una concepción amplia sobre la legitimación en revisiones de decisiones administrativas es que, de esa manera, se permite que la ciudadanía se asegure del funcionamiento adecuado de las agencias gubernamentales y se cumplen metas

---

[190] E. Rivera Ramos, *Las múltiples caras del acceso a la justicia*, Primer Congreso Acceso a la Justicia – XXII Conferencia Judicial, Hato Rey, Publicaciones Puertorriqueñas, 2005, pág. 8.

[191] *Íd.* a la pág. 14.

[192] Organización de Estados Americanos – Comisión Interamericana de Derechos Humanos, El acceso a la justicia como garantía de los derechos económicos, sociales y culturales, OEA, 2007, pág. 45.

importantes relacionadas con la política pública del país.[193]

Los obstáculos para que los ciudadanos y las ciudadanas puedan presentar sus reclamos se han observado durante todo el proceso de evaluación del proyecto de gasoducto Vía Verde. Desde la declaración de "emergencia energética", que trastoca todos los procedimientos diseñados para garantizar la participación ciudadana, hasta la decisión de hoy sobre una supuesta carencia de legitimación activa, el camino sólo se ha ido empinando.[194]

La Opinión mayoritaria, en su recuento de los hechos, indica que la A.E.E. fue quien pidió a la J.C.A. que extendiera el término para hacer comentarios sobre la DIA-P de cinco días a treinta días y que celebrara vistas públicas.[195] La J.C.A. accedió a esto debido a "la complejidad de la acción propuesta [y] lo voluminoso del borrador de documento ambiental presentado".[196] Asimismo, la

---

[193] Pierce, *op. cit.*, pág. 1537. *Véase también* É. Fontánez Torres, El derecho a participar: normas, estudio de caso y notas para una concreción, 68 (Núm. 4) Rev. Col. Abog. P.R. 631, 637-638 (2007).

[194] Incluso, en el trámite de este caso ante el Tribunal Supremo, una mayoría de los miembros de esta Curia se ha amparado en reglas procesales no jurisdiccionales para declarar sin lugar las solicitudes de prórroga y de permiso para contestar los alegatos de la parte contraria presentadas por el grupo de vecinos. Resolución del Tribunal y Voto particular disidente de la juez Rodríguez Rodríguez en Lozada Sánchez y otros v. A.E.E. y otros, 2011 T.S.P.R. 168 y 2011 T.S.P.R. 169.

[195] Opinión mayoritaria, pág. 4.

[196] R-10-30-1 de la J.C.A., pág. 3; Apéndice del Certiorari CC-2011-722, pág. 15.

Opinión menciona la celebración de vistas públicas –en las cuales se discutió el borrador de documento ambiental y no la DIA-P- y los informes sobre la DIA-P que se presentaron, indicando las fechas de los sucesos. Sin embargo, excluye los siguientes datos: que la DIA-F se presentó el 29 de noviembre de 2010 y el Sub-Comité evaluó el documento en tan sólo un día; que las recomendaciones que presentó el Sub-Comité el 30 de noviembre simplemente se enviaron a la A.E.E.; que la J.C.A. realizó "un análisis ponderado de la totalidad del contenido e integridad del expediente administrativo de la agencia" así como un estudio de la DIA-F que le permitió concluir que ésta cumplió con todos los requisitos de la Ley sobre Política Pública Ambiental y consideró adecuadamente los impactos ambientales que conlleva Vía Verde, a tan sólo un día de haberse presentado el documento, el 30 de noviembre de 2010. La Opinión tampoco informa que los ciudadanos solicitaron vistas públicas sobre la DIA-P el 24 de noviembre y las mismas fueron denegadas dentro de la misma resolución que aprobó la DIA-F.[197]

Si los vecinos perjudicados no intervienen ahora porque es prematuro para que tengan legitimación, cuando intenten intervenir en etapas más adelantadas del proyecto, ¿les señalarán que no mostraron interés anteriormente, cuando podían haber expresado sus reparos a la DIA-F? El

---

[197] R-10-45-1 de la J.C.A., págs. 3 y 7; Apéndice del Certiorari CC-2011-718, págs. 122c 2 y 122c 6; Apéndice del Certiorari CC-2011-722, págs. 35 y 39.

contenido de ese documento que hoy no se les está permitiendo impugnar ¿será utilizado como evidencia de que el proyecto cumple con los requisitos de protección ambiental cuando se opongan al gasoducto Vía Verde en una etapa más avanzada de su construcción o cuando esté listo para comenzar a operar? Entonces, ¿les dirán a los vecinos que no se opusieron lo suficiente anteriormente; que los fondos públicos que ya se han invertido en el proyecto tienen más peso que sus preocupaciones; que "ya es académico el debate en el foro judicial en cuanto a la sabiduría o error en la decisión tomada"?[198]¿En qué momento podrán intervenir estos vecinos para expresar su posición sobre un proyecto que les afecta directamente?

La limitación que una mayoría de este Tribunal le impone a las personas que solicitan revisión judicial en este caso destruye toda una trayectoria de liberalización de los criterios adoptados por este mismo Tribunal para decidir qué casos deben examinarse en los foros judiciales. Esto representa un grave retroceso para nuestra vida democrática. Después de todo, la llamada liberalización de los requisitos de legitimación activa sólo busca garantizar una oportunidad real de participación a personas con interés legítimo en una controversia.[199] No es un asunto de compasión hacia la parte más débil o de simpatía con los

---

[198] *Véase* Fund. Arqueológica v. Depto. de la Vivienda, 109 D.P.R. 387, 391 (1980).

[199] Surfrider, *supra*, a la pág. 612 (Opinión disidente de la jueza Fiol Matta).

planteamientos de un grupo.[200] Se trata de que un tribunal de justicia no puede escudarse en interpretaciones maleables del Derecho ni en el mito de la imparcialidad para aplacar los reclamos ciudadanos.

Hacer constar que se está ignorando nuestra doctrina sobre legitimación activa y que, en la alternativa, los recurridos lograron cumplir con los criterios restrictivos adoptados en *Surfrider* no es más que el ejercicio de nuestro deber constitucional como miembros de este Tribunal. Recurrir a etiquetas de activismo judicial para desacreditar esa labor y considerar el análisis propio una demostración de "la mayor objetividad" es engañarse uno mismo.[201] Un sector de este Tribunal entiende que no le corresponde revisar cierto tipo de casos. A eso, y no a frías aplicaciones de conceptos técnicos, es que responden sus decisiones. Para alcanzar ese fin, utiliza una deferencia extrema a la función administrativa y la interpretación más restrictiva posible del derecho a cuestionar las decisiones administrativas en los

---

[200] Opinión mayoritaria, págs. 29-31.

[201] El concepto "activismo judicial" es un epíteto vacío, porque se utiliza dependiendo del resultado del caso, que es la falla que el mismo concepto pretende identificar. K. Roosevelt, The Myth of Judicial Activism, New Haven, Yale Univesity Press, 2006, págs. 37-44. *Véase* H.J. Spaeth y S.H. Teger, "Activism and Restraint: A Cloak for the Justices' Policy References", en S.C. Halpern y Charles M. Lamb, Supreme Court Activism and Restraint, Massachusetts, LexingtonBooks, 1982, págs. 277-301. Asimismo, no cabe hablar de una única decisión imparcial, pues distintas posturas sobre un mismo asunto pueden argumentarse con fundamentos razonables y no parcializados. A. Sen, The Idea of Justice, Cambridge, Harvard University Press, 2009, págs. 194-207.

tribunales. Y, claro, sobre nuestras respectivas filosofías de adjudicación podemos discrepar. Pero caracterizar de forma negativa a quien piensa diferente no tiene el resultado pretendido de debilitar sus argumentos. En este caso, tampoco encubre la consecuencia de la determinación mayoritaria.[202]

El cierre al público de las instituciones públicas tiene el único efecto de acrecentar la pérdida de confianza en los organismos gubernamentales por parte de la ciudadanía.[203] La confianza de los ciudadanos es esencial para el funcionamiento y la efectividad de los tribunales, porque el respeto que la gente le tenga a las instituciones judiciales es lo que le brinda a éstas fuerza y autoridad.[204] Reiteramos que "[l]os derechos constitucionales realmente existen cuando hay el acceso a la justicia; no por el mero hecho de que se hayan plasmado

---

[202] El constitucionalista estadounidense Laurence Tribe llama a ser cautelosos con las decisiones que encuentran respuestas simples a problemas complejos, porque pasan desapercibidas a pesar de que tienen un gran impacto en las vidas de los ciudadanos. L.H. Tribe, God Save This Honorable Court: How the Choice of Supreme Court Justices Shapes Our History, New York, Ed. Random House, 1985, pág. 49.

[203] Véase J.O. Freedman, Crisis and Legitimacy: The Administrative Process and the American Government, Cambridge, Cambridge University Press, 1978.

[204] "When people feel they can't count on the law to do what it is supposed to do, they begin to disregard it. … It is because most reasonable people want to live in a society of reasonable laws -enforced in a reasonable and even-handed manner- that the justice system has the authority to be effective at all". American Bar Association, "…And Justice for All": Ensuring Public Trust and Confidence in the Justice System, ABA, 2001, pág. 7.

en la constitución de un país, sino porque a través de los tribunales se asegura al ciudadano el poder vindicarlos".[205]

Al declarar que las personas adversamente afectadas que están impugnando la DIA-F del proyecto de gasoducto Vía Verde no tienen legitimación para acceder a nuestros tribunales, se le resta legitimidad a nuestro sistema de justicia como guardián de los derechos de nuestros ciudadanos y ciudadanas. Si los organismos de justicia diseñados para presentar reclamos y resolver desacuerdos no están disponibles, ¿a dónde podrán recurrir estas personas?

Liana Fiol Matta
Jueza Asociada

---

[205] <u>Surfrider</u>, *supra*, a la pág. 611 (Opinión disidente de la jueza Fiol Matta).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br><br>     Recurridos<br><br>     v.<br><br>In Re:<br>Autoridad de Energía Eléctrica<br><br>Agencia Proponente-Recurrida<br><br>Junta de Calidad Ambiental<br><br>     Peticionaria<br><br>_____<br><br>In Re:<br>Autoridad de Energía Eléctrica<br><br>     Peticionaria<br><br>     v.<br><br>Junta de Calidad Ambiental<br><br>     Recurrida<br><br>Justo Lozada Sánchez, Juan Camacho Moreno, Wanda I. González Vélez, Carmen I. Alvarado Rivas, Enrique J. Seguí Casalduc, Elba T. Escribano de Jesús<br><br>     Recurridos | CC-2011-0718<br>CC-2011-0722 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez.


San Juan, Puerto Rico, a 21 de marzo de 2012

Esta controversia está revestida del más alto interés público. Ante nuestra consideración está si un grupo nutrido de ciudadanos tiene legitimación activa para impugnar una Declaración de Impacto Ambiental Final (DIA-F) de un enorme gasoducto promocionado publicitariamente como Vía Verde. Esta extensa línea de gas natural atravesará trece municipios y, según establecieron los vecinos a quienes este Foro les niega acceso hoy, amenaza la seguridad personal e intereses y derechos propietarios, agrícolas, ambientales, estéticos, entre otros, de los residentes de las zonas aledañas a éste.[206]

Por entender que el recurso presentado por la Autoridad de Energía Eléctrica debió desestimarse por falta de jurisdicción disiento de la Opinión mayoritaria. En cuanto al recurso presentado por la Junta de Calidad Ambiental, estoy de acuerdo con la Jueza Asociada Fiol Matta en que los recurridos tienen legitimación activa para impugnar la Declaración de Impacto Ambiental Final del gasoducto Vía Verde, por ello me uno a su Opinión disidente.

I.

El 6 de septiembre de 2011 y de forma separada, la Junta de Calidad Ambiental (JCA) y la Autoridad de Energía Eléctrica (AEE) presentaron sendos recursos de *certiorari*. En dichos recursos se nos pide que revisemos una Resolución emitida el 18 de agosto de 2011 por el Tribunal de

---

[206] *Véase* la Opinión disidente de la jueza asociada señora Liana Fiol Matta para una explicación detallada de los daños a los que se exponen los aquí recurridos.

Apelaciones. Ésta es el resultado de la presentación de tres recursos de revisión administrativa, mediante los cuales se solicitó que el foro intermedio revisara la aprobación de la Declaración de Impacto Ambiental Final (DIA-F) que emitiera la JCA en el proyecto de gasoducto "Vía Verde". Esencialmente, los peticionarios-recurridos solicitaron al Tribunal de Apelaciones que dejara sin efecto la Resolución R-10-45-1 de la Junta de Calidad Ambiental mediante la cual se aprobó el Informe del Sub-Comité y se determinó que la DIA-F presentada por la AEE para el proyecto de gasoducto cumplió con todos los requisitos de la Ley Núm. 416 de 22 de septiembre de 2004, 12 L.P.R.A. sec. 801 *et seq.*, conocida como la Ley sobre la Política Ambiental.

Así las cosas, el Tribunal de Apelaciones, el 31 de marzo de 2011, emitió sentencia desestimando, por falta de legitimación activa, los tres recursos de revisión administrativa presentados e identificados con los alfanuméricos KLRA201001238 (Justo Lozada Sánchez y otros), KLRA201001246 (Juan Cortés Lugo y otros) y el KLRA201001249 (Unión de Trabajadores de la Industria Eléctrica y Riego-UTIER). Sin embargo, luego de que oportunamente se solicitara reconsideración, el foro apelativo acogió la solicitud y dictó la Resolución ante nuestra consideración. Entendió que Juan Cortés Lugo y otros (KLRA201001246) sí cumplían con los requisitos impuestos por la doctrina de legitimación activa y por tanto podían solicitar revisión de la DIA-F del proyecto de gasoducto.

Inconformes, la AEE y la JCA recurrieron ante este Tribunal la Resolución reseñada. El 6 de septiembre de 2011 presentaron, de manera separada, mociones urgentes en auxilio de jurisdicción, entre otros escritos. Adujeron que ese mismo día habían presentado sus recursos de *certiorari* solicitando que revisáramos la Resolución que hoy nos ocupa. La Procuradora General, en representación de la JCA, certificó haber notificado la moción en auxilio de jurisdicción mediante entrega personal y/o [sic] por correo certificado con acuse de recibo a las partes. Por otra lado, los Lcdos. Eliezer Aldarondo Ortiz, Eliezer Aldarondo López y la Lcda. Rosa Campos Silva, en representación de la AEE, certificaron haber notificado la moción en auxilio de jurisdicción a los Lcdos. Pedro Saade Llórens y Luis José Torres Asencio a sus respectivas **direcciones de correo electrónico**, al Sr. Pedro J. Nieves Miranda y a la Lcda. Karla Pacheco Álvarez a sus direcciones postales.

Oportunamente, la parte recurrida presentó un escrito titulado "Alegato de las partes recurridas" donde rebatió los argumentos de las peticionarias. En respuesta, el 6 de octubre  la JCA presentó un escrito titulado "Réplica al alegato de las partes Recurridas". Según certifica la Oficina del Procurador General, el mismo día se envió copia por correo certificado a, entre otras personas, los Lcdos. Pedro Saade Llórens y Luis José Torres Asencio, representantes legales de la parte recurrida. De igual manera, la AEE presentó el 6 de octubre un escrito titulado

"Oposición a Alegato de las Partes Recurridas"; certificó haber notificado a las partes a través de **sus direcciones de correo electrónico.**

Así las cosas, el 17 de noviembre de 2011, los recurridos presentaron una "Moción de desestimación de Petición de *Certiorari* de la Autoridad de Energía Eléctrica". En la misma se solicitó que se desestimase el recurso presentado por la AEE por falta de jurisdicción, toda vez que éste no fue notificado conforme a lo dispuesto en el Reglamento de este Tribunal. La AEE, en cambio, alegó que la notificación electrónica equivalía a una notificación entregada personalmente y que, además, la Regla 39 de nuestro Reglamento, *infra*, debía interpretarse conjuntamente con la Regla 67.2 de las de Procedimiento Civil de 2009, *infra*, y las Reglas 13 y 33 del Tribunal de Apelaciones*, infra*.

II.

A.

Las cuestiones relacionadas a la autoridad de este Tribunal para entender en una controversia son altamente privilegiadas. Es por ello que tienen que ser consideradas antes que cualquier otro asunto en el recurso y pueden presentarse en cualquier etapa del proceso. *Véase* Javier A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño* (2010), en la pág. 18; José A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, Publicaciones JTS, San Juan, t. 1 (2011), en la pág. 90-91. Lo anterior está directamente relacionado con la independencia judicial y la autonomía de

los jueces y las juezas "en la recta implantación del derecho que regula la vida en sociedad bajo el sistema republicano de gobierno". Rafael Hernández Colón, *Derecho Procesal Civil*, Lexis Nexis, San Juan 5ta Ed. (2010), en la pág. 41.

En numerosas ocasiones hemos expresado que los tribunales debemos ser celosos guardianes de nuestra jurisdicción. *Dávila Pollock v. R.G. Mortgage and Investment Corp.*, 2011 T.S.P.R. 81, 182 D.P.R. ___ (2011)(Citas omitidas). En ese sentido también hemos señalado que un tribunal que carece de jurisdicción sólo tiene jurisdicción para expresar que no la tiene. *Caratini v. Collazo Syst. Analysis, Inc.*, 158 D.P.R. 345 (2003). Además, no hay duda de que la falta de jurisdicción es un defecto insubsanable por lo cual el tribunal "lo único que puede hacer es así declararlo y desestimar el caso". *Íd.* en la pág. 355 (Citas omitidas). Es por ello que las partes no pueden suplir de jurisdicción a un tribunal que carece de ésta. Nuevamente, la falta de jurisdicción es una dolencia que no puede ser subsanada por los tribunales o las partes, sea esto último por acuerdo de las mismas o por los actos de una de ellas. *Véase*, Cuevas Segarra, *ante*, en la pág. 91.

B.

El artículo V, sección 4 de la Constitución del Estado Libre Asociado de Puerto Rico dispone que "**[e]l Tribunal Supremo funcionará bajo reglas de su propia adopción…**". 1 L.P.R.A. sec. 4 (2008) (énfasis suplido). Por otro lado, el

Reglamento del Tribunal Supremo de 1996 disponía en su parte preliminar sobre Reglas de Transición que "[l]a Ley de la Judicatura de 1994, según enmendada, y este reglamento serán de aplicación a todo asunto presentado o incoada el 1ro de mayo de 1996 o con posterioridad a esta fecha, ante cualquier tribunal o agencia administrativa". 4 L.P.R.A. sec. 4, R 2, Ap. XXI-A (2002).  Asimismo el preámbulo del mismo expresa:

> En lo que respecta a las enmiendas que se aprobaron a las Reglas de Procedimiento Civil y Criminal, algunas de éstas establecieron procedimientos para el trámite de los asuntos en el Tribunal Supremo. **Estas disposiciones son de carácter directivo.** La Sección 4 del Artículo V de la Constitución dispone específicamente que **el Tribunal Supremo de Puerto Rico funcionará con reglas de su propia adopción**… Este esquema constitucional exige que cuando surja algún conflicto entre la reglamentación para el funcionamiento interno aprobada por este Tribunal o el ejercicio de su facultad como Tribunal de última instancia y alguna ley, prevalezca lo primero.

*Reglamento del Tribunal Supremo de Puerto Rico*, 4 L.P.R.A. sec. 4, R 1, Ap. XXI-A (2002).

Por otro lado, la Regla 39 del recién enmendado Reglamento de este Tribunal, en el segundo párrafo del inciso (a) dispone lo siguiente:

> La notificación se efectuará por correo certificado con acuse de recibo o mediante un servicio similar de entrega personal con acuse de recibo. La notificación a las partes se hará dentro del término jurisdiccional o de cumplimiento estricto, según sea el caso, para presentar el recurso.

Regla 39*, Reglamento del Tribunal Supremo de Puerto Rico*, ER-2011-05.

En este sentido, el Reglamento de este Tribunal dispone formas específicas de notificación en aquellos recursos que se presenten ante sí, desplazando así lo dispuesto en las Reglas de Procedimiento Civil. Más aún, el *Informe de las Reglas de Procedimiento Civil* sostuvo que "[s]e eliminaron las Reglas 53.1 a la 53.11 porque el Comité considera que lo expuesto en éstas debe ser incluido únicamente en los Reglamentos del Tribunal de Apelaciones y Tribunal Supremo de Puerto Rico de modo que no haya duplicidad". *Informe de las Reglas de Procedimiento Civil*, en la pág. 912. Sobre lo anterior, el profesor Hernández Colón[207] señala que:

> a raíz de la revisión de las Reglas del 1979, se eliminaron de las Reglas de Procedimiento Civil aquellas disposiciones procesales que tenían reglas equivalentes en los Reglamentos del TA y del TS. Ello contribuyó a subsanar las disconformidades habidas entre algunas de las Reglas del 1979 y los Reglamentos, lo que pretende enderezar la estructura procedimental del TA y del TS, **dejando únicamente en sus reglamentos lo relacionado al trámite, perfeccionamiento, contenido, notificación, etc. de los recursos apelativos.**

Hernández Colón, *ante*, en la pág. 502. Asimismo, señala que la Regla 53.3 b de las de Procedimiento Civil de 1979 disponía, respecto a las notificaciones de los recursos presentados ante el Tribunal Supremo, que "[e]l peticionario notificará la presentación del escrito de *certiorari* a todas las partes o a sus abogados de récord

---

[207] El profesor Hernández Colón es miembro del Comité Asesor Permanente de las Reglas de Procedimiento Civil y como tal participó del Informe de las Reglas de Procedimiento Civil que se sometió al Juez Presidente y el Pleno de este Tribunal el 26 de diciembre de 2007.

dentro del término para presentar el recurso y en la forma prescrita en la Regla 67". 32 L.P.R.A. Ap. III R. 53.3 (2010). Como bien señala el profesor Hernández Colón, esa regla se eliminó en las nuevas reglas de 2009 para evitar incongruencias con el reglamento de este Tribunal. Actualmente, la Regla 67.2 de las de Procedimiento Civil de 2009 dispone para que la notificación pueda hacerse mediante correo electrónico. 32 L.P.R.A. Ap. V R. 67.2 (2010).

Anteriormente hemos expresado que la omisión de notificación adecuada nos priva de jurisdicción para atender un asunto ante nuestra consideración. *Ocean View at La Parguera, Inc. et al v. Pascual García-Proyecto Reina del Mar et al*, 161 D.P.R. 545 (2004); *Montañez v. Policía de P.R.*, 150 D.P.R. 917 (2000); *Constructora Meléndez v. Autoridad de Carreteras*, 146 D.P.R. 743 (1998). Dicha notificación debe realizarse dentro del término dispuesto para la presentación del recurso ante este Tribunal. *Campos del Toro v. American Transito Corp.*, 113 D.P.R. 337 (1982). Además, el método de notificación tiene que ser uno de los establecidos en la Regla 39 del Reglamento de este Tribunal, *ante*. La Regla 39, *ante*, es clara: la notificación se efectuará por correo certificado con acuse de recibo o medio de entrega personal similar con acuse de recibo. *Eastern Sands, Inc. v. Roig Comm. Bank*, 146 D.P.R. 51, 54 (1998). Esta regla no sufrió cambios en las recientes enmiendas al Reglamento del Tribunal Supremo.

III

Los recurridos presentaron una moción de desestimación por falta de jurisdicción dado que no se les había notificado del recurso por uno de los métodos establecidos en la Regla 39, *ante*, de este Tribunal. Adujeron que la notificación electrónica no constituye notificación por correo certificado con acuse de recibo ni tampoco entrega personal con acuse de entrega. Por su parte, los peticionarios afirmaron que la notificación electrónica equivale a la entrega personal. De igual manera, expresaron que el comentario a la Regla 39 del Reglamento del Tribunal Supremo de 1996, *ante*, dispone que se incorporan como métodos de notificación los contenidos en la Regla 67 de las de Procedimiento Civil de 1979, *ante*. Asimismo, señalan que las leyes y reglamentos que regulan un mismo asunto deben interpretarse conjuntamente. Finalmente, sostienen que los recurridos no pueden ir en contra de sus propios actos y que éstos al comparecer ante este Tribunal reconocieron que el recurso se había perfeccionado y que no corresponde presentar una moción de desestimación en una etapa tan avanzada del proceso.

Como señaláramos anteriormente, las cuestiones jurisdiccionales, al ser altamente privilegiadas, pueden presentarse en cualquier etapa del proceso. Es por ello que el argumento de los aquí peticionarios sobre el estado avanzado de los procedimientos es inmeritorio. De igual manera, hemos visto que cuando un tribunal carece de jurisdicción, sólo tiene autoridad para expresar este hecho

y que dicha falta no puede ser subsanada ni por el Tribunal ni por las partes. Procede, entonces, decir que el hecho de que los recurridos hayan comparecido ante este Tribunal no subsana nuestra falta de jurisdicción para atender el recurso de los peticionarios.

Aclarado lo anterior, se debe atender la relación existente entre la Regla 67.2 de las de Procedimiento Civil de 2009, *ante*, y la Regla 39 de este Tribunal*, ante*. La Opinión mayoritaria, señala que el comentario que acompaña a la Regla 39, *ante*, indica, respecto a la controversia que nos ocupa, lo siguiente: "[a]cogemos un método de notificación a las partes similar al establecido en la Regla 67 de Procedimiento Civil…". Acto seguido pasa a citar la Regla 67.2 de las de Procedimiento Civil de 2009, *ante*, sin siquiera mencionar que el comentario que acompaña a la Regla 39 del Reglamento de este Tribunal de 1996, *ante*, se refiere a la Regla 67 de las derogadas Reglas de Procedimiento Civil*, ante*, que, a todas luces, **no disponían para la notificación electrónica.**

De igual manera, equivocadamente, señala que tanto la Regla 1 como la Regla 52.1 de las de Procedimiento Civil de 2009. 32 L.P.R.A, Ap. V, R 1 y R 52.1., 2010, hacen extensivas las disposiciones de las Reglas de Procedimiento Civil a los asuntos ante este Tribunal. Nuevamente, la interpretación de la mayoría de este Tribunal contraviene preceptos constitucionales básicos. Como expresáramos anteriormente, la sección 4 del artículo V de la Constitución del Estado Libre Asociado de Puerto Rico,

*ante*, dispone que este Cuerpo funcionará bajo sus propias reglas. En cumplimiento del mandato constitucional, el Comité que tuvo a cargo la revisión entendió que era propio que los asuntos ante este Tribunal los reglamentara este Tribunal y no las Reglas de Procedimiento Civil. No tenemos dudas que tanto el Pleno de este Cuerpo como la Asamblea Legislativa entendieron que eso era lo apropiado y, finalmente, la Regla 53.3 que disponía que se notificara conforme a la Regla 67 de las de Procedimiento Civil de 1979 fue eliminada en las Reglas de Procedimiento Civil de 2009.

Es por ello que la notificación mediante correo electrónico no puede equipararse a las dos formas de notificación dispuestas en nuestro Reglamento. De igual manera, no puede entenderse que las Reglas de Procedimiento Civil reglamentan los asuntos ante nuestra consideración toda vez que esa interpretación irrumpe nuestro poder constitucional de reglamentación.

No hay duda de que esta Curia carece de jurisdicción para atender el recurso presentado por la AEE, dado que la notificación que se hiciese a las partes no puede considerarse una adecuada. Evidencia de lo anterior es el acto de calado jurídico en el que se tiene que embarcar la mayoría para poder sostener sus argumentos. Una vez más, hacen caso omiso a los planteamientos de los aquí recurridos y, so pretexto de interpretación judicial, privan a un grupo de ciudadanos preocupados por su seguridad de acceder a los tribunales.

En este contexto entiendo que se vuelve imprescindible recordar a Charles Dickens en su bicentenario: "[i]n the little world in which children have their existence whosoever brings them up, there is nothing so finely perceived and so finely felt, as injustice". Charles Dickens, *Great Expectations*, capítulo 8. También es importante agregar lo que Amartya Sen sostiene sobre la afirmación de Dickens: "But the strong perception of manifest injustice applies to adult human beings as well. What moves us, reasonably enough, is not the realization that the world falls short of being completely just –which few of us expect– but that there are clearly remediable injustices around us which we want to eliminate". Amartya Sen, *The Idea of Justice*, Harvard University Press, 2009, en la pág. vii.

IV

Por los fundamentos antes expresados disiento enérgicamente de la Opinión de este Tribunal en cuanto a que contaba con jurisdicción para atender la petición de *certiorari* de la AEE. En su lugar, hubiese desestimado el recurso presentado por la AEE por carecer de jurisdicción para atenderlo.

Anabelle Rodríguez Rodríguez
Juez Asociada